# Nos. 22-110(L),

**22-113, 22-115, 22-116, 22-117, 22-119, 22-121**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

In Re: PURDUE PHARMA L.P., PURDUE PHARMA INC, PURDUE TRANSDERMAL TECHNOLOGIES L.P., PURDUE PHARMA MANUFACTURING L.P., PURDUE PHARMACEUTICALS L.P., IMBRIUM THERAPEUTICS L.P., ADLON THERAPEUTICS L.P., GREENFIELD BIOVENTURES L.P., SEVEN SEAS HILL CORP., OPHIR GREEN CORP., PURDUE PHARMA OF PUERTO RICO, AVRIO HEALTH L.P., PURDUE PHARMACEUTICAL PRODUCTS L.P., PURDUE NEUROSCIENCE COMPANY, NAYATT COVE LIFESCIENCE INC., BUTTON LAND L.P., RHODES ASSOCIATES L.P., PAUL LAND INC., QUIDNICK LAND L.P., RHODES PHARMACEUTICALS L.P., RHODES TECHNOLOGIES, UDF LP, SVC PHARMA LP, SVC PHARMA INC.,
Debtors.
*(Caption continued on inside cover)*

---

On Appeal from the United States District Court
for the Southern District of New York

---

**PAGE PROOF BRIEF FOR APPELLEE U.S. TRUSTEE WILLIAM K. HARRINGTON**

---

RAMONA D. ELLIOTT
*Deputy Director/General
Counsel*
P. MATTHEW SUTKO
*Associate General Counsel*
BETH A. LEVENE
SUMI K. SAKATA
*Trial Attorneys
Executive Office for United
States Trustees
U.S. Department of Justice
441 G Street NW
Suite 6150
Washington, DC 20530
(202) 307-1399*

DAMIAN WILLIAMS
*United States Attorney
Southern District of New York*

LAWRENCE H. FOGELMAN
PETER ARONOFF
DANIELLE J. LEVINE
*Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2800*

SARAH E. HARRINGTON
*Deputy Assistant Attorney
General*

MICHAEL S. RAAB
MICHAEL SHIH
SEAN R. JANDA
*Attorneys, Appellate Staff
Civil Division, Room 7260
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3388*

PURDUE PHARMA, L. P., PURDUE PHARMA INC, PURDUE TRANSDERMAL TECHNOLOGIES L.P., PURDUE PHARMA MANUFACTURING L.P., PURDUE PHARMACEUTICALS L.P., IMBRIUM THERAPEUTICS L.P., ADLON THERAPEUTICS L.P., GREENFIELD BIOVENTURES L.P., SEVEN SEAS HILL CORP., OPHIR GREEN CORP., PURDUE PHARMA OF PUERTO RICO, AVRIO HEALTH L.P., PURDUE PHARMACEUTICAL PRODUCTS L.P., PURDUE NEUROSCIENCE COMPANY, NAYATT COVE LIFESCIENCE INC., BUTTON LAND L.P., RHODES ASSOCIATES L.P., PAUL LAND INC., QUIDNICK LAND L.P., RHODES PHARMACEUTICALS L.P., RHODES TECHNOLOGIES, UDF LP, SVC PHARMA LP, SVC PHARMA INC.,

Debtors-Appellants-Cross-Appellees,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PURDUE PHARMA L.P., et al., AD HOC COMMITTEE OF GOVERNMENTAL AND OTHER CONTINGENT LITIGATION CLAIMANTS, THE RAYMOND SACKLER FAMILY, AD HOC GROUP OF INDIVIDUAL VICTIMS OF PURDUE PHARMA, L.P., MULTI-STATE GOVERNMENTAL ENTITIES GROUP, MORTIMER-SIDE INITIAL COVERED SACKLER PERSONS,

Appellants-Cross-Appellees,

v.

THE CITY OF GRAND PRAIRIE, as Representative Plaintiff for a Class Consisting of All Canadian Municipalities, THE CITIES OF BRANTFORD, GRAND PRAIRIE, LETHBRIDGE, AND WETASKIWIN., THE PETER BALLANTYNE CREE NATION, on behalf of All Canadian First Nations and Metis People, The PETER BALLANTYNE CREE NATION, on behalf itself, and The LAC LA RONGE INDIAN BAND,

Appellees-Cross-Appellants,

THE STATE OF WASHINGTON, STATE OF MARYLAND, DISTRICT OF COLUMBIA, U.S. TRUSTEE WILLIAM K. HARRINGTON, STATE OF CONNECTICUT, RONALD BASS, STATE OF CALIFORNIA, by and through ATTORNEY GENERAL ROB BONTA, STATE OF OREGON, STATE OF DELAWARE, by and through ATTORNEY GENERAL JENNINGS, STATE OF RHODE ISLAND, STATE OF VERMONT, ELLEN ISAACS, on behalf of Patrick Ryan Wroblewski, MARIA ECKE, ANDREW ECKE, RICHARD ECKE,

Appellees-Cross-Appellants.

———————————

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ...........................................................................................1

STATEMENT OF JURISDICTION ................................................................5

STATEMENT OF THE ISSUES.....................................................................5

STATEMENT OF THE CASE ........................................................................6

    A.    Statutory Background.................................................................6

    B.    Factual Background ...................................................................9

    C.    Bankruptcy Proceedings .........................................................15

    D.    District Court Proceedings.......................................................25

    E.    Subsequent Proceedings .........................................................28

SUMMARY OF ARGUMENT......................................................................30

STANDARD OF REVIEW ...........................................................................35

ARGUMENT .................................................................................................36

I.    The Bankruptcy Court Lacks Statutory Authority To Approve The
Sackler Release. ....................................................................................36

    A.    The Bankruptcy Code Does Not Authorize The Sackler Release. ..........36

    B.    The Bankruptcy Court's Residual Equitable Authority Does Not
Authorize The Sackler Release. ..............................................44

    C.    Interpreting The Code To Authorize The Sackler Release Would
Raise Grave Due-Process Concerns. .......................................49

II.    Appellants' Contrary Arguments Lack Merit. .......................................51

A. The Supreme Court Has Repeatedly Rejected Appellants' Attempts To Conflate Statutory Silence With Statutory Authorization. ..................................................................51

B. Appellants Could Not Prevail Even Accepting Their Mistaken Interpretation Of Controlling Precedent. ......................................55

C. Appellants' Statutory Arguments Would Lack Merit Even Setting Aside Controlling Precedent. ...........................................59

D. The District Court's Holding Is Consistent With This Court's Precedent. ................................................................66

III. Alternatively, The District Court's Decision Should Be Affirmed Because The Sackler Release Violates Due Process. ..............................77

A. The Sackler Release Impermissibly Extinguishes Property Interests Without Consent. .....................................................77

B. The Sackler Release Was Adopted Without Adequate Notice To Affected Claimants. .........................................................85

IV. The Court Should Affirm That The Sackler Release May Be Approved Only By An Article III Court Even If The Court Holds That The Release Is Lawful. ...............................................................87

CONCLUSION .........................................................................90

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ad Hoc Comm. of Kenton Cty. Bondholders v. Delta Air Lines, Inc.*,
  309 F. App'x 455 (2d Cir. 2009) ...................................................76

*Adams v. Zarnel (In re Zarnel)*,
  619 F.3d 156 (2d Cir. 2010) ..................................................... 8, 9

*Aegean Marine Petroleum Network, Inc., In re*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ........................................ 66

*A.H. Robins Co., In re*,
  880 F.2d 694 (4th Cir. 1989) ................................................ 42, 75

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................ 79

*American Hardwoods, Inc., In re*,
  885 F.2d 621 (9th Cir. 1989) ................................................... 56

*Andrus v. Glover Constr. Co.*,
  446 U.S. 608 (1980) ............................................................... 45

*Archer v. Warner*,
  538 U.S. 314 (2003) ............................................................... 40

*Barrett v. United States*,
  689 F.2d 324 (2d Cir. 1982) .................................................... 81

*Bernard L. Madoff Inv. Sec. LLC, In re*,
  740 F.3d 81 (2d Cir. 2014) ................................................. 71, 72

*Blonder-Tongue Labs., Inc. v. University of Ill. Found.*,
  402 U.S. 313 (1971) ............................................................... 78

*Brown v. Felsen*,
  442 U.S. 127 (1979) ............................................................... 56

*Celotex Corp. v. Edwards,*
   514 U.S. 300 (1995) ................................................................ 54, 55

*Central Va. Cmty. Coll. v. Katz,*
   546 U.S. 356 (2006) ...................................................................... 61

*Chassix Holdings, Inc., In re,*
   533 B.R. 64 (Bankr. S.D.N.Y. 2015) ............................................ 66

*Circuit City Stores, Inc. v. Adams,*
   532 U.S. 105 (2001) ...................................................................... 49

*City of New York v. New York, N.H. & H.R. Co.,*
   344 U.S. 293 (1953) ................................................ 49, 50, 77, 78

*Clain v. International Steel Grp.,*
   156 F. App'x 398 (2d Cir. 2005) ................................................. 76

*Crowell v. Benson,*
   285 U.S. 22 (1932) ........................................................................87

*Czyzewski v. Jevic Holding Corp.,*
   137 S. Ct. 973 (2017) ........ 3, 26, 32, 34, 40, 45, 47, 48, 50, 51, 52, 55, 58, 59, 63, 68

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.*
   *(In re Metromedia Fiber Network, Inc.),*
   416 F.3d 136 (2d Cir. 2005) .. 2-3, 27, 30-31, 34, 35, 41, 46, 56, 66, 67, 68, 69, 70, 76

*Ditech Holding Corp., In re,*
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) .......................................... 66

*Drexel Burnham Lambert Grp, In re.,*
   960 F.2d 285 (2d Cir. 1992) .............................................. 42-43, 75

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,*
   438 U.S. 59 (1978) ........................................................................ 82

*Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.),*
   619 B.R. 38 (S.D.N.Y. 2020) ........................................................ 16

*Elliott v. General Motors LLC (In re Motors Liquidation Co.)*,
    829 F.3d 135 (2d Cir. 2016) ....................................................................... 77

*Executive Benefits Ins. Agency v. Arkison*,
    573 U.S. 25 (2014) ..................................................................................... 86

*Federal Bureau of Investigation v. Fazaga*,
    No. 20-828, slip op. (U.S. Mar. 4, 2022) .................................................. 45

*Green v. Welsh*,
    956 F.2d 30 (2d Cir. 1992) ........................................................ 2, 7, 37-38

*Grogan v. Garner*,
    498 U.S. 279 (1991) ................................................................................... 37

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ............................................................................. 60, 62

*Hansberry v. Lee*,
    311 U.S. 32 (1940) ..................................................................................... 78

*Hemingway Transp., Inc., In re*,
    993 F.2d 915 (1st Cir. 1993) ...................................................................... 63

*Irving Tanning Co., In re*,
    496 B.R. 644 (B.A.P. 1st Cir. 2013) .......................................................... 49

*Johns-Manville Corp., In re*:
    517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom.*
    *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) ........................... 34, 71, 73
    600 F.3d 135 (2d Cir. 2010) ...................................................................... 82

*Joseph Gen. Contracting, Inc. v. Couto*,
    119 A.3d 570 (Conn. 2015) ....................................................................... 73

*Kirwan Offices S.a.R.L., In re*,
    792 F. App'x 99 (2d Cir. 2019) ............................................................ 76-77

*Law v. Siegel*,
    571 U.S. 415 (2014) ....................................... 26, 32, 39, 45, 46, 47, 48, 52, 53, 63, 68

*Lindsay v. Government Emps. Ins. Co.,*
    448 F.3d 416 (D.C. Cir. 2006) ................................................................... 78-79

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,*
    478 U.S. 501 (1986) ...................................................................... 78, 81

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) .............................................................. 3, 32, 49, 77, 81

*Lowenschuss, In re,*
    67 F.3d 1394 (9th Cir. 1995) ....................................................................... 77

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
    837 F.2d 89 (2d Cir. 1988) ..................................................................... 42, 71

*Martin v. Wilks,*
    490 U.S. 755 (1989) ................................................................ 3, 32, 50, 78

*Massachusetts v. Purdue Pharma, L.P.:*
    No. 1884CV01808, 2019 WL 5495716 (Mass. Super. Ct. Oct. 8, 2019) .................74
    No. 1884CV01808, 2019 WL 5617817 (Mass. Super. Ct. Oct. 8, 2019) ................ 74

*Millennium Lab Holdings II, LLC, In re,*
    945 F.3d 126 (3d Cir. 2019) ................................................................. 88-89

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc., (In re Dairy Mart
    Convenience Stores, Inc.),*
    351 F.3d 86 (2d Cir. 2003) ............................... 31-32, 33, 44-45, 46, 47, 60, 62, 67, 76

*Norwest Bank Worthington v. Ahler,*
    485 U.S. 197 (1988) ........................................................................ 31, 44, 60

*Opioid Litig., In re,*
    No. 400000/2017, 2019 WL2996570 (N.Y. Sup. Ct. June 21, 2019) .......................74

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) ........................................................................ 79, 84

*Patterson v. Mahah Bergen Retail Grp., Inc.,*
    --- B.R. ---, No. 21-cv-167, 2022 WL 135398 (E.D. Va. Jan. 13, 2022) ....................66

*Phillips Petroleum Co v. Shutts,*
  472 U.S. 797 (1985) ........................................................................ 78

*Prescription Home Health Care, In re,*
  316 F.3d 542 (5th Cir. 2002) ......................................................... 54

*Quigley Co., In re,*
  676 F.3d 45 (2d Cir. 2012) ...................................................... 74, 75

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) .......................... 26, 32-33, 36, 53, 55, 56, 58, 59, 63, 65

*Railway Labor Execs.' Ass'n v. Gibbons,*
  455 U.S. 457 (1982) ........................................................ 30, 36, 41

*Raleigh v. Illinois Dep't of Revenue,*
  530 U.S. 15 (2000) ......................................................................... 60

*Rhode Island v. Purdue Pharma L.P.,*
  No. PC-2018-4555, 2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019) .................. 74

*Richards v. Jefferson County,*
  517 U.S. 793 (1996) ......................................................................... 82

*SPV OSUS Ltd. v. UBS AG,*
  882 F.3d 333 (2d Cir. 2018) ........................................................... 25

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,*
  884 F.2d 688 (2d Cir. 1989) ........................................................... 72

*Stellwagen v. Clum,*
  245 U.S. 605 (1918) ......................................................................... 36

*Stern v. Marshall,*
  564 U.S. 462 (2011) ..................................................... 4, 27, 35, 87, 88, 89

*Tennessee Student Assistance Corp. v. Hood,*
  541 U.S. 440 (2004) ..................................................................... 7, 37

*Travelers Indem. Co. v. Bailey,*
  557 U.S. 137 (2009) .............................................. 34, 50, 71, 79, 88

*Tronox Inc., In re,*
    855 F.3d 84 (2d Cir. 2017) ........................................................ 72, 73

*Trulis v. Barton,*
    107 F.3d 685 (9th Cir. 1995) ........................................................ 79

*United States v. Energy Res. Co.,*
    495 U.S. 545 (1990) ........................................ 31, 41, 44, 47-48, 54, 60, 63

*United States v. Hardage,*
    982 F.2d 1436 (10th Cir. 1992) ........................................................ 64

*United States v. Noland,*
    517 U.S. 535 (1996) ........................................................ 82-83, 84

*United States v. Security Indus. Bank,*
    459 U.S. 70 (1982) ........................................................ 51

*United States v. Sutton,*
    786 F.2d 1305, 1308 (5th Cir. 1986) ........................................................ 45

*United Student Aid Funds Inc. v. Espinosa,*
    559 U.S. 260 (2010) ........................................................ 56

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
    140 S. Ct. 1837 (2020) ........................................................ 4, 32, 49, 50

*Western Real Estate Fund, Inc., In re,*
    922 F.2d 592 (10th Cir. 1990), *modified sub nom.*
    *Abel v. West,* 932 F.2d 898 (10th Cir. 1991) ........................................................ 38, 77

*Williams v. U.S. Fid. & Guar. Co.,*
    236 U.S. 549 (1915) ........................................................ 36

*Wright v. Union Cent. Life Ins. Co.,*
    304 U.S. 502 (1938) ........................................................ 2, 6-7, 36

*Zale Corp., In re,*
    62 F.3d 746 (5th Cir. 1995) ........................................................ 77

*Zapico v. Bucyrus-Erie Co.,*
    579 F.2d 714 (2d Cir. 1978) ............................................................ 81

**Statutes:**

Bankruptcy Act of 1800, ch. 19, 2 Stat. 19 ..............................................7

Bankruptcy Reform Act of 1994,
    Pub. L. No. 103-394 § 111(b), 108 Stat. 4106, 4117 ............................... 43, 59

11 U.S.C. § 101(5) ....................................................................... 20

11 U.S.C. § 105(a) ...................... 26, 31, 33, 44, 45, 46, 47, 60, 62, 63, 65, 67, 75, 76, 77

11 U.S.C. § 307 ........................................................................... 8

11 U.S.C. § 323(b) ................................................................... 33, 62

11 U.S.C. § 349(b) ...................................................................... 52

11 U.S.C. § 363(b) ................................................................... 33, 62

11 U.S.C. § 521 ...........................................................................7

11 U.S.C. § 521(a) ......................................................................37

11 U.S.C. § 522 .................................................................. 7, 37, 40

11 U.S.C. § 523(a) ......................................................................33

11 U.S.C. § 523(a)(2) ......................................................... 40, 55, 56, 57

11 U.S.C. § 523(a)(2)(A) .............................................................. 7, 37

11 U.S.C. § 523(a)(4) ............................................................... 40, 55

11 U.S.C. § 523(a)(6) ............................................................... 40, 55

11 U.S.C. § 523(a)(8) ...................................................................56

11 U.S.C. § 523(c) ................................................................. 40, 56

11 U.S.C. § 524(a)(2) ............................................................... 56

11 U.S.C. § 524(e) ................................................... 7, 8, 25, 33, 39, 57, 58

11 U.S.C. § 524(g) .............................. 3, 8, 25, 30, 33, 37, 39, 42, 43, 57, 58, 59, 82, 83

11 U.S.C. § 524(g)(2)(B)(i)(I) ......................................................... 39

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) .................................................. 8

11 U.S.C. § 524(g)(3)(A) ............................................................... 8

11 U.S.C. § 524(g)(4)(A)(ii) ............................................. 8, 33, 39, 57, 83

11 U.S.C. § 524(g)(4)(B)(i) ....................................................... 8, 83

11 U.S.C. § 524(h) ..................................................................... 42

11 U.S.C. § 727(a) ..................................................................... 37

11 U.S.C. § 727(b) ..................................................................... 57

11 U.S.C. § 1123(a)(5) .................................... 31, 33, 47, 48, 49, 62, 67

11 U.S.C. § 1123(a)(5)(A)-(J) ........................................................ 48

11 U.S.C. § 1123(b)(3)(A) .................................................... 33, 61, 62

11 U.S.C. § 1123(b)(6) ........................ 26, 31, 33, 44, 47, 63, 64, 65, 67

11 U.S.C. § 1129(a)(1) ................................................................. 48

11 U.S.C. § 1141(d)(2) ................................................................. 57

28 U.S.C. § 157(a)-(b) ................................................................... 5

28 U.S.C. § 158(d) ..................................................................... 24

28 U.S.C. § 158(d)(2)(A) ................................................................. 5

28 U.S.C. §§ 581-589a ................................................................... 8

x

28 U.S.C. § 586(a)(3)(B) ............................................................... 9

28 U.S.C. § 1292(b) ................................................................ 5, 28

28 U.S.C. § 1331 ............................................................................ 5

28 U.S.C. § 1334(a) ...................................................................... 5

31 U.S.C. § 3729 *et seq.* ........................................................... 14

**Rules:**

Fed. R. Bankr. P. 8006 ................................................................. 24

Fed. R. Civ. P. 23(a) ..................................................................... 84

Fed. R. Civ. P. 23(b)(1)(B) ................................................ 75, 83, 84

**Legislative Materials:**

140 Cong. Rec. H10,764 (daily ed. Oct. 4, 1994) ........................... 43

H.R. Rep. No. 95-595 (1977) .......................................... 8, 20-21, 41

H.R. Rep. No. 103-835 (1994) ............................................... 42, 82

S. Rep. No. 95-989 (1978) ............................................................ 41

**Other Authorities:**

Douglas G. Baird, *Elements of Bankruptcy* (6th ed. 2014) ............... 46

E1 *Collier on Bankruptcy* (16th ed.) ............................................. 43

2 *Collier on Bankruptcy* (16th ed.) ............................................... 46

Restatement (Second) of Torts (Oct. 2021 update) ......................... 81

*Inconsistent*, Merriam-Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/inconsistent (last visited Mar. 11, 2022) ....... 64

**INTRODUCTION**

Purdue Pharma L.P. and its related entities (Purdue) manufactured, sold, and distributed opioid pain medications such as OxyContin. Until recently, Purdue was controlled by members of the Raymond and Mortimer Sackler families. Under the Sacklers' leadership, Purdue aggressively marketed OxyContin to doctors and pain patients while downplaying the risks of addiction. But many patients who had been prescribed OxyContin became addicted to the drug. Many other people began using OxyContin recreationally. Nearly 247,000 people in the United States died from prescription-opioid overdoses between 1999 and 2019.

The opioid crisis spawned a tide of litigation against both Purdue and the Sacklers. To protect themselves from potential money judgments, members of the Sackler family withdrew billions of dollars from Purdue and transferred a significant portion of their wealth overseas. Purdue then filed for bankruptcy relief under the Bankruptcy Code. The Sacklers did not. Instead, the Sacklers negotiated a separate settlement with Purdue and a subset of plaintiffs, which Purdue implemented in its proposed Chapter 11 plan of reorganization. Under the plan, the Sacklers would pay the bankruptcy estate $4.3 billion over nearly a decade. In exchange, the plan would "conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever[,] and permanently release[]" the Sacklers—and hundreds if not thousands of other non-debtors, from the Sacklers' current and former spouses to the Sacklers' children and descendants not yet born—from every conceivable type of opioid-related civil

claim, including claims based on fraud and other forms of willful misconduct. SPA.920-21. And the release would cover all opioid claimants except the United States—even those claimants who did not consent to its terms. The bankruptcy court confirmed Purdue's plan (including the Sackler release) over the objections of, among others, the United States Trustee. On appeal, however, the district court vacated the confirmation order because the bankruptcy court lacked statutory authority to approve a release of this sort.

This Court should affirm the district court's well-reasoned decision. Bankruptcy is the "subject of the relations between" a "debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To benefit from bankruptcy, a debtor must shoulder a host of duties and devote substantially all of its assets to the bankruptcy estate. In exchange, the debtor is discharged from all of its debts except those that Congress has excepted from discharge by statute (such as an individual's debt for money obtained by fraud). This *quid pro quo* is the cornerstone of the Bankruptcy Code. *See Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992). And it reflects Congress's desire "to free the debtor of [its] personal obligations while ensuring that no one else reaps a similar benefit." *Id.*

The Sackler release violates this keystone principle by granting the Sacklers and a slew of other non-debtors the functional equivalent of a "bankruptcy discharge arranged without a filing and without the safeguards of the Code." *See Deutsche Bank*

2

*AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 142 (2d Cir. 2005). None of the Code's provisions authorizes this extraordinary assertion of power, and several are inconsistent with it. For example, the Sackler release applies even to claims for fraud that could not have been discharged had the Sacklers filed for bankruptcy themselves. Had Congress intended to allow bankruptcy courts to adjust the relationship between non-debtors and other non-debtors in this manner, it would have said so expressly—as it did when it authorized narrow non-debtor releases in the context of bankruptcies involving asbestos. 11 U.S.C. § 524(g). To our knowledge, however, Congress has not adopted another such provision in the 222 years since the Nation's first bankruptcy law was enacted. The Supreme Court requires "more than simple statutory silence" before a court may authorize a "major departure" from foundational bankruptcy principles. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 984 (2017). And this Court has never held otherwise.

This conclusion is underscored by the grave due-process concerns that would arise were the Sackler release to be confirmed. A cause of action is a "species of property" that the Due Process Clause protects. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Yet the release terminates virtually every opioid-related claim—past, present, and future—against the Sacklers without claimants' consent, in defiance of the "deep-rooted historic tradition that everyone should have his own day in court." *Martin v. Wilks*, 490 U.S. 755, 762 (1989) (quotation omitted). Moreover, neither the release nor debtors' notices explaining the release adequately informed

3

recipients of the release's scope. The text of the release is so impenetrable that Richard Sackler (a former director and president of Purdue) testified that he gave up trying to understand it. And the debtors' notices merely stated that the plan contemplated a broad release of the "Sackler [f]amily members[] and certain other individuals and related entities," J.A.___[Bk.Ct.ECF.No.2988.at.296-99]—a triumph of understatement that elides more than it describes. Although the district court did not reach these issues, its holding may be affirmed on these alternative grounds. But this Court need not decide them because, as the Supreme Court has admonished, Congress must "enact exceedingly clear language if it wishes to significantly alter . . . the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020). Here, Congress's "silen[ce]" is "deafening[]." SPA.100.

Finally, even if this Court holds that the Sackler release is statutorily authorized and constitutionally sound, the Court should affirm the district court's separate holding that the Sackler release may only be approved by an Article III court. Bankruptcy courts may not enter final judgment on a "matter[] of private right" without a claimant's consent because a final judgment is "the most prototypical exercise of judicial power." *Stern v. Marshall*, 564 U.S. 462, 489, 494 (2011) (quotation omitted). When the bankruptcy court confirmed Purdue's plan, it permanently extinguished many claims that implicate private rights. Only Article III courts have constitutional authority to terminate such claims for all time.

4

## STATEMENT OF JURISDICTION

The bankruptcy court had jurisdiction over debtors' bankruptcy cases under 28 U.S.C. §§ 157(a)-(b), 1331, and 1334(a). The court confirmed the plan on September 17, 2021. SPA.143-301. The district court vacated the confirmation order on December 16, 2021. SPA.1-142. The district court certified its decision for interlocutory appeal under 28 U.S.C. § 1292(b) on January 7, 2022. D. Ct. ECF No. 301. Debtors and other plan proponents timely petitioned this Court for leave to appeal. *See* Pets. for Permission to Appeal, Nos. 22-85, 22-88, 22-90, 22-94, 22-96, 22-97 (2d Cir.). This Court granted the petitions on January 27, 2022. Order, ECF No. 103, No. 22-110 (2d Cir.). The Court has jurisdiction under 28 U.S.C. §§ 158(d)(2)(A) and 1292(b).

## STATEMENT OF THE ISSUES

The bankruptcy court confirmed a Chapter 11 plan of reorganization containing a release that permanently extinguishes virtually all opioid-related civil claims against the Sacklers and hundreds if not thousands of other non-debtors without claimants' consent. The questions presented are:

**1.** Whether the district court correctly held that the bankruptcy court lacks statutory authority to approve the Sackler release;

**2.** Whether, in the alternative, the district court's decision should be affirmed because the release violates the Due Process Clause; and

5

**3.**     Whether the district court correctly held that the Sackler release may

only be approved by an Article III court.

**STATEMENT OF THE CASE**

These appeals arise from several Chapter 11 cases filed by Purdue Pharma L.P.

and its corporate affiliates ("Purdue" or "debtors").  Debtors are pharmaceutical

companies that manufactured, sold, and distributed OxyContin and other medications

that contributed to the opioid epidemic.  They sought bankruptcy relief after being

sued by thousands of claimants for trillions of dollars in damages.  Until 2018, debtors

were controlled by members of the Raymond Sackler and Mortimer Sackler families.

None of the Sacklers is a debtor in these cases.

Debtors proposed a plan of reorganization containing a release that

permanently extinguishes virtually all opioid-related claims against the Sacklers and

hundreds if not thousands of other non-debtors without the consent of all affected

claimants.  The bankruptcy court (Drain, J.) confirmed the plan over the objections

of, among others, the United States Trustee.  SPA.143-301.  The district court

(McMahon, J.) vacated the confirmation order on appeal because, as objectors had

explained, courts in bankruptcy lack authority to extinguish claims held by non-

debtors against non-debtors.  SPA.1-142.  These appeals ensued.

**A.     Statutory Background**

Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his

creditors, extending to his and their relief."  *Wright v. Union Cent. Life Ins. Co.*, 304 U.S.

6

502, 513-14 (1938) (quotation omitted).  The Bankruptcy Code is a comprehensive scheme that establishes a highly reticulated mechanism for the equitable adjustment of the debtor-creditor relationship.  Individual debtors in bankruptcy must comply with a host of requirements, *see, e.g.*, 11 U.S.C. § 521, and must apply substantially all of their assets to satisfy their creditors' claims, *see generally id.* §§ 522, 541.  In exchange, debtors are "release[d]" from "personal liability with respect to any discharged debt." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004).  Certain debts, however, are ineligible for discharge.  For example, a discharge order "does not discharge an individual debtor from any debt . . . for money, property, [or] services, . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).

None of the Code's hundreds of provisions specifically allows bankruptcy courts to discharge claims belonging to non-debtors against other non-debtors as a general matter.  That textual silence reflects the fundamental principle that bankruptcy is a mechanism "to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit."  *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992).  Indeed, § 524(e) of the Code specifies that a discharge "does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).

To our knowledge, in the 222 years since Congress enacted the Nation's first bankruptcy law, *see* Bankruptcy Act of 1800, ch. 19, 2 Stat. 19, Congress has departed

from this fundamental principle just once. In § 524(g) of the Bankruptcy Code, which applies exclusively to bankruptcies involving asbestos, Congress authorized courts to extinguish certain claims without claimants' consent. This authorization applies only to asbestos-related claims against non-debtors who are "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor," and only to the extent that "such alleged liability . . . arises" from four specified types of legal relationships with the debtor. 11 U.S.C. § 524(g)(4)(A)(ii). Moreover, such claims may be released only if the release satisfies several stringent requirements. For example, the release must be supported by at least a 75% supermajority. *Id.* § 524(g)(2)(B)(ii)(IV)(bb). The release cannot be approved unless the court first appoints a legal representative to protect the rights of future claimants whose claims would be extinguished. *Id.* § 524(g)(4)(B)(i). And the release must be "issued or affirmed by the district court that has jurisdiction over the [bankruptcy] case." *Id.* § 524(g)(3)(A). Section 524(g) expressly states that such releases are permitted "[n]otwithstanding the provisions of section 524(e)."

Congress has authorized the Attorney General to appoint U.S. Trustees, who are Department of Justice officials, to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581-589a. U.S. Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977). They "may raise and may appear and be heard on any issue in any case or proceeding" brought under the Bankruptcy Code." 11 U.S.C. § 307; *cf.*

8

*Adams v. Zarnel* (*In re Zarnel*), 619 F.3d 156, 161 (2d Cir. 2010) (holding that U.S. Trustees have standing to pursue bankruptcy appeals because of their "responsibility to represent and protect the public interest"). Congress specifically empowered U.S. Trustees to comment on proposed disclosure statements and Chapter 11 plans of reorganization. 28 U.S.C. § 586(a)(3)(B).

### B.    Factual Background

Purdue Pharma L.P. and its related entities are pharmaceutical companies that manufacture, sell, or distribute opioid pain medications such as OxyContin. Until recently, Purdue was controlled by members of the Raymond and Mortimer Sackler families. J.A.__[Bk.Ct.ECF.No.17.at.16]. From the early 1990s through 2018, at least six Sacklers sat on Purdue's board of directors, and independent directors never equaled or outnumbered them. J.A.__[JX-2096.at.0026-0027].

Purdue aggressively marketed OxyContin as a treatment for a "much broader range of patients with pain than are appropriate for the drug." SPA.15 (quotation omitted). Many of Purdue's advertisements relied on "unsubstantiated efficacy claims promoting the use of OxyContin for pain relief." *Id.* (quotation omitted). Purdue also claimed that, unlike other prescription painkillers, OxyContin posed an infinitesimal threat of addiction. *Id.* For example, Purdue created a website titled "In the Face of Pain" that urged patients to "'overcome' their 'concerns about addiction.'" *Id.* Purdue also distributed pamphlets to doctors stating that addiction "is not caused by drugs," and that, contrary to the belief that "opioid medications are addictive,"

9

such "medications give relief—not a 'high.'" SPA.16 (quotation omitted). Purdue's marketing campaign succeeded. "By 2001, OxyContin was the most prescribed brand-name narcotic medication" in the United States. *Id.* (quotation omitted).

Purdue's marketing claims notwithstanding, many patients who had been prescribed OxyContin became addicted to the drug. SPA.16. Many other people began using OxyContin recreationally after they discovered that "crushing an OxyContin tablet and then snorting or injecting it resulted in a quick 'morphine-like high.'" *Id.* Unscrupulous physicians began prescribing OxyContin to "stooge purchasers" recruited by drug dealers. SPA.17. The dealers would then sell the pills on the street for "astronomical profits." *Id.* The opioid crisis did not abate even after enhanced regulatory oversight over doctors and pharmacies reduced the amount of OxyContin prescribed. *Id.* Individuals addicted to OxyContin instead turned to alternative drugs such as heroin and fentanyl—heroin's "stronger and more lethal cousin." *Id.* According to the Centers for Disease Control and Prevention, nearly 247,000 people died in the United States from prescription-opioid overdoses between 1999 and 2019. SPA.18. The U.S. Department of Health and Human Services estimates that the "economic burden" of such misuse to be between $53-72 billion per year. *Id.* (quotation omitted).

The opioid crisis triggered a wave of litigation across the country. Between 2001 and 2007, many plaintiffs filed individual and class actions against Purdue in both state and federal court. SPA.19 (citing cases). Most attempts to certify a class

10

were unsuccessful due to the stringent requirements for class certification. *See* SPA.20. After much discovery, Purdue and the individual plaintiffs pursued coordinated settlements. *Id.*

In 2007, Purdue pleaded guilty to a felony count of fraudulently misbranding OxyContin in violation of federal criminal law. J.A.__[Bk.Ct.ECF.No.17.at.32-33]. Purdue admitted that it had falsely marketed OxyContin as a non-addictive drug, and had submitted false claims to the federal government for reimbursement of medically unnecessary opioid prescriptions. *Id.* Purdue agreed to pay over $600 million in fines and other penalties, and submitted to a five-year corporate-integrity agreement monitored by the U.S. Department of Health and Human Services. J.A.__[Bk.Ct.ECF.No.17.at.33]. Several members of Purdue's senior leadership pleaded guilty to related misdemeanor charges. J.A.__[Bk.Ct.ECF.No.17.at.32]. But the opioid crisis only worsened. As Mortimer Sackler testified at the confirmation hearing, "overdose deaths . . . continued to rise . . . . The overdose deaths kept going up and up." SPA.26 (alterations in original) (quotation omitted). Yet some Sacklers had an "evident desire to continue to drive profits from [opioid] products' sale" notwithstanding the mounting death toll. SPA.240.

In addition, and as the bankruptcy court found, "at least some of the Sacklers were very aware of the risk of opioid-related litigation claims against Purdue and sought to shield themselves from the economic effect of such claims by causing Purdue to make billions of dollars of transfers to them and to shield their own assets,

11

as well, from collection." SPA.237. In 2007, for example, Jonathan Sackler warned his cousin and fellow board member Kathe Sackler that, "if there's a future perception that Purdue has screwed up . . . , we could get murdered." J.A.__[JX-2976.at.2]. A few days later, Jonathan told his cousin Mortimer and brother Richard—both of whom were also Purdue board members—that "[t]here are a number of risks . . . we're not really braced for," including "[t]he emergence of numerous new lawsuits." J.A.__[JX-2235.at.1]. In another email exchange, David Sackler (Richard's son) advised Jonathan to "lever up where we can, and try to generate some additional income. . . . Even if we have to keep it in cash, it's better to have the leverage now while we can get it than thinking it will be there for us when we get sued." J.A.__[JX-2237.at.1]. When Jonathan responded that there would be no basis for a lawsuit against the family, David said: "We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us." *Id.*

The Sacklers responded to the threat of liability by changing Purdue's distribution patterns. Purdue's financial data demonstrate that, before 2007, the Sacklers had typically left Purdue's profits in the company. Between 1995 and 2007, Purdue distributed around $1.3 billion to the Sacklers. J.A.__[D.Ct.ECF.No.177.at.2]. Of this amount, only 9.8% were actual dividends; the remaining 90.2% were earmarked for taxes. *Id.* Between 2008 and 2017, however, Purdue distributed nearly $11 billion to the Sacklers. Of that amount, just 42.5% was earmarked for taxes; the

remaining 57.5% was paid to the Sacklers as actual dividends.

J.A.__[D.Ct.ECF.No.177.at.Ex.A]. This change in distribution patterns drained

Purdue's total assets by 75% and reduced Purdue's "solvency cushion" by 82%.

J.A.__[JX-0431.at.0081 fig.10]. As Richard Sackler acknowledged in a 2014 email,

Purdue's post-2007 distribution patterns "departed from the practice of [its] industry

peers." J.A.__[JX-1703.at.3]. And Jonathan Sackler characterized the distributions as

a "milking" program. J.A.__[JX-2974.at.3]. The Sacklers also placed money in trusts

outside the United States to protect themselves from potential court judgments. They

did so after being advised that "perceptions of deep pockets hugely affect litigants'

strategy . . . . For the family, it may be that overseas assets with limited transparency

and jurisdictional shielding from U.S. judgments will be less attractive to litigants than

domestic assets." J.A.__[JX-2241.at.4].

In the meantime, many litigants attempted to hold both Purdue and the

Sacklers responsible for the opioid crisis. Between 2014 and 2019, Purdue was named

in over 2,600 civil actions. J.A.__[Bk.Ct.ECF.No.17.at.4]. Plaintiffs included

hundreds of personal-injury victims, nearly every State and U.S. territory, hundreds of

counties and municipalities, and several foreign governments and Native American

tribes. J.A.__[Bk.Ct.ECF.No.17.at.40]. Many plaintiffs also named the Sacklers and

Purdue's outside directors and senior executives as defendants once discovery

uncovered evidence of their potential culpability. By the time Purdue filed for

bankruptcy, the Sacklers and their related parties were facing at least four hundred

13

lawsuits seeking billions of dollars in damages for their personal roles in the opioid crisis. These state-law claims "include[d], but [were] not limited to, product liability, wrongful death, negligence, . . . negligent misrepresentation, negligence *per se*[,] . . . gross negligence, fraud, fraudulent concealment, deceit and other willful misconduct, unjust enrichment, public nuisance, and claims under state consumer production and controlled substances laws." J.A.__[Bk.Ct.ECF.No.2983.at.173]. In sum, "the threat of liability for at least some members of the [Sackler] family was real." J.A.__[Bk.Ct.ECF.No.3447.at.5]. "[W]ithout the protections of bankruptcy, individual family members were at risk of substantial judgments against them." *Id.*

Purdue and the Sacklers were also subjected to multiple investigations by the U.S. Department of Justice. In 2020, Purdue pleaded guilty to a criminal information and concluded a civil settlement. Purdue admitted to deliberate wrongful conduct that included engaging in crimes to boost opioid sales notwithstanding the 2007 agreement and the opioid crisis. *See* J.A.__[JX-2094.0006], __[JX-2094.0015-18].

Several members of the Sackler family likewise concluded a civil settlement with the Department to resolve claims under, among other statutes, the False Claims Act, 31 U.S.C. § 3729 *et seq.* That settlement resolved the Department's allegations that, at the named Sacklers' behest, "Purdue developed an aggressive marketing program" that included "thousands of prescribers that the Named Sacklers knew or should have known were prescribing opioids that were not always for a medically accepted indication; were sometimes unsafe, ineffective, and medically unnecessary;

14

and that were sometimes diverted for uses that lacked a legitimate medical purpose." J.A.__[JX-2096.at.¶4]; *see* J.A.__[JX-2096.at.¶5] (alleging that the named Sacklers "knowingly caused the submission of false and fraudulent claims to federal health care benefit programs for Purdue's opioid drugs"). The agreement also resolved the Department's allegations that, at the named Sacklers' request, between 2008 and 2018, Purdue had transferred funds and assets into Sackler-family companies and trusts "with the intent to hinder future creditors and/or were otherwise avoidable as fraudulent transfers." J.A.__[JX-2096.at.¶6]; *see* J.A.__[JX-2096.at.¶¶158-70].

## C. Bankruptcy Proceedings

In September 2019, Purdue and its corporate affiliates filed for bankruptcy relief. The Sacklers did not. The Sacklers instead negotiated a so-called "settlement framework" with Purdue and certain subgroups of litigants and creditors. SPA.42. Under this framework, the Sacklers would pay at least $3 billion to Purdue's bankruptcy estate and agree to leave the pharmaceutical business. SPA.42-43; *see* Notice of Filing of Term Sheet with Ad Hoc Comm., Bk. Ct. ECF No. 257. In exchange, the Sacklers would receive a global release absolving them of all personal civil liability related to Purdue or to opioids. *Id.* The framework converted Purdue's bankruptcy into a mechanism for the Sacklers "to secure for [themselves] a release from any liability for past and even future opioid-related litigation without having to pursue personal bankruptcy." SPA.43.

15

Purdue's bankruptcy filings did not automatically stay litigation against the Sacklers and their related parties (none of whom was a debtor). Purdue thus filed an adversary complaint against anyone who had sued the Sacklers or the Sacklers' related parties. Complaint for Injunctive Relief, ECF No. 1, *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Sept. 18, 2019). The complaint sought a nationwide order enjoining the commencement or continuation of any lawsuit against the Sacklers and their related parties. *Id.* In October 2019, the bankruptcy court issued the requested order, Order Pursuant to 11 U.S.C. § 105(a) Granting, In Part, Motion for a Preliminary Injunction, ECF No. 82, *Purdue Pharma*, Adv. Pro. No. 19-08289 (Oct. 11, 2019), which was affirmed on appeal to district court, *Dunaway v. Purdue Pharm. L.P.* (*In re Purdue Pharm. L.P.*), 619 B.R. 38 (S.D.N.Y. 2020). As a result of the order—which remains in force, *see* Twenty-Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, ECF No. 338, *Purdue Pharma*, Adv. Pro. No. 19-08289 (Mar. 2, 2022)—all litigation against the Sacklers has been stayed for two and a half years. There is no way to know how many additional lawsuits would have been filed against the Sacklers in the injunction's absence.

The bankruptcy court set a July 30, 2020 deadline for anyone with a claim against Purdue to submit a proof of claim. SPA.47. Over 614,000 claimants responded. *Id.* Around eight months later, in March 2021, Purdue filed a proposed disclosure statement for its Chapter 11 plan of reorganization. The U.S. Trustee

16

objected to the statement because, among other things, it did not adequately inform

recipients of the release contemplated by the settlement framework.  *See* Bk. Ct. ECF

No. 2686.  The bankruptcy court overruled the objection.

J.A.__[Bk.Ct.ECF.No.2988].  In June 2021, Purdue sought leave to amend the

disclosure statement, which the court granted that same day, but the amendment did

not fix the problems raised by the U.S. Trustee.  J.A.__[Bk.Ct.ECF.No.2988.at.8-9],

__[Bk.Ct.ECF.No.1221.at.1-4]; SPA.635 n.6, 694 n.5.  Purdue sent the revised

statement and proposed plan—which at that point had been amended five times—to

anyone who had requested service, anyone entitled to vote on the plan, and certain

other interested parties.  J.A.__[Bk.Ct.ECF.No.2988.at.21].  Purdue also published

notice of the anticipated confirmation hearing in various ways.

J.A.__[Bk.Ct.ECF.No.2988.at.8].  These notices informed recipients of the upcoming

confirmation hearing and of the deadlines for Purdue's creditors to vote on and object

to the plan.  They also stated, in general terms, that the proposed plan would release

the liabilities of "members of the Sackler families and certain other individuals and

related entities."  J.A.__[Bk.Ct.ECF.No.2988.at.247], __[Bk.Ct.ECF.No.2988.at.289],

__[Bk.Ct.ECF.No.2988.at.297].

On July 14, 2021, debtors proposed a sixth amended plan of reorganization and

sought its confirmation.  The confirmed plan retains many of the sixth amended

plan's provisions.  Under the sixth amended plan, debtors would transfer some of

their assets to a new corporate entity tasked with using profits from future sales of

17

Purdue's products to abate the opioid crisis. J.A.__[Bk.Ct.ECF.No.3185.at.69-71]. The estate's remaining assets would be used to pay administrative expenses before being distributed to nine creditor trusts that would fund opioid-abatement efforts, compensate personal-injury claimants, and make distributions to qualified governmental entities. J.A.__[Bk.Ct.ECF.No.3185.at.79-85]. Finally, debtors would create a public repository of certain Purdue-related documents for the benefit of scholars and the public. J.A.__[Bk.Ct.ECF.No.3185.at.90-100].

The estate does not hold sufficient assets to fund the plan, in part because Purdue distributed over $11 billion to the Sacklers between 2008 and 2017. So as the settlement framework contemplated, *see* J.A.__[Bk.Ct.ECF.No.3185.at.121-25], the Sacklers agreed to pay $4.325 billion spread over nearly a decade, *see* SPA.51-52, to fund the plan. In exchange, the plan would release the Sacklers from Purdue's claims against them. *See* J.A.__[Bk.Ct.ECF.No.3185.at.121-25]. The plan would also give the Sacklers, and many other non-debtor third parties, a release of every conceivable civil claim arising from the opioid crisis. *See* J.A.__[Bk.Ct.ECF.No.3185.at.126-28] (setting forth the terms of the Sackler release).

As initially drafted, the Sackler release would accomplish this latter objective by "conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever[,] and permanently releas[ing]" all "Shareholder Released Parties" from "any and all . . . Causes of Action" belonging to "Releasing Parties." J.A.__[Bk.Ct.ECF.No.3185.at.126-28].

18

Specifically, the plan defined "Shareholder Released Parties" as:

(i) the Shareholder Payment Parties; (ii) the Persons identified on Appendix H to the Disclosure Statement; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, officers, directors and employees of any such trustees that are corporate or limited liability company trustees and members and managers of trustees that are limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) in which any of the Persons identified in any of the foregoing clauses (i) through (v) own, directly or indirectly, an Interest and/or any other Person that has otherwise received or will receive grants, gifts, property or funds from any of the Persons identified in any of the foregoing clauses (i) through (v), solely in their respective capacities as such; and (vii) with respect to each Person in the foregoing clauses (i) through (vi), such Person's (A) predecessors, successors, permitted assigns, subsidiaries, controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any director, in his or her capacity as such), consultants, experts and other professionals, solely in their respective capacities as such, and (C) property possessed or owned at any time or the proceeds therefrom; provided that the Debtors and the Excluded Parties shall not be Shareholder Released Parties.

J.A.__[Bk.Ct.ECF.No.3185.at.35-36]. Appendix H to the Disclosure Statement in turn included over a thousand line items describing various persons, entities, and categories of unidentified persons and entities related to the Sackler family.

J.A.__[Bk.Ct.ECF.No.2983.Appx.H].

The plan then defined "Releasing Parties" as holders of opioid-related claims as well as "all other Persons."  J.A.__[Bk.Ct.ECF.No.3185.at.33]; *see* J.A.__[Bk.Ct.ECF.No.3185.at.26] (defining "person" as "an individual . . . , corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit, Tribe[,] or other Entity."). The only "person" excluded from the release was the United States government. J.A.__[Bk.Ct.ECF.No.3185.at.138-41].  Finally, the plan defined "Cause of Action" to mean "any Claim" within the meaning of the Bankruptcy Code, *see* 11 U.S.C. § 101(5), as well as any claim "of any kind, character[,] or nature whatsoever." J.A.__[Bk.Ct.ECF.No.3185.at.4].

Taken together, the release terms set forth in the sixth amended plan would bar every person and entity in the world (except the United States) from bringing any form of action asserting any type of civil claim against the Sacklers and hundreds if not thousands of other non-debtors.  And the release would apply whether or not any releasing party had agreed to the release or even knew about it to begin with.

Fewer than 20% of 618,194 claimants entitled to vote—and fewer than 50% of the subset of claimants with personal-injury claims—actually voted on the plan. J.A.__[Bk.Ct.ECF.No.3372.at.5], __[Bk.Ct.ECF.No.3372.at.Ex.A].  Of those who voted, over 2,600 personal-injury claimants and several States voted against confirmation.  The U.S. Trustee objected to the Sackler release in his capacity as

20

"bankruptcy watch-dog[]." *See* H.R. Rep. No. 95-595, at 88. The U.S. Trustee argued, among other things, that the release was inconsistent with the Bankruptcy Code and violated the Due Process Clause of the Fifth Amendment. Eight States, the District of Columbia, and the City of Seattle also objected to the release, *see* Bk. Ct. ECF Nos. 3264, 3270, 3274, 3276, 3278, 3279, 3280, as did many individual opioid victims, *see* Bk. Ct. ECF Nos. 442, 443, 3099, 3235, 3575, 3648, 3677, 3742, 3793.[1]

The bankruptcy court considered the objections at a lengthy confirmation hearing, during and after which the debtors revised the plan several times. The hearing culminated in an oral ruling provisionally approving the plan, conditioned on additional language stating that the release applied only to claims where Purdue's conduct was a "legal cause or a legally relevant factor" to the relevant cause of action. *See* SPA.1 n.1, 271-73; __[Bk.Ct.ECF.No.3731.at.Tr.134-35]. Debtors filed a twelfth amended plan with that language the next day, which the bankruptcy court would ultimately confirm. SPA.789-946.

The twelfth amended plan retains the same basic features as the sixth amended plan. In particular, the release continues to extinguish virtually all civil opioid-related

---

[1] In bankruptcy court, the United States Attorney for the Southern District of New York filed a statement on behalf of the United States in its capacity as a creditor of Purdue explaining that the Sackler release is unlawful. Bk. Ct. ECF No. 3268. On appeal to the district court, the United States Attorney filed a statement of interest in support of the U.S. Trustee. D. Ct. ECF No. 94. Because the federal government is not subject to the Sackler release, the United States does not intend to file a separate amicus brief in its capacity as a creditor.

21

liability against the Sacklers and a host of other non-debtors. By its terms, the plan does not compensate claimants for the value of the extinguished claims. The plan instead states that distributions will be determined "only with consideration to . . . Claim[s] held against the Debtors, and not to . . . Claim[s] against a non-Debtor party." SPA.634; *see* SPA.693. Under this distribution scheme, an opioid victim—even one who had suffered catastrophic injuries—is likely to receive no less than $3,500 and no more than $48,000 over up to ten years. *See* J.A.__, __, __[Bk.Ct.ECF.No.2983.at.6,8,111].

The final permutation of the Sackler release is similar to the version proposed by the sixth amended plan. The release still provides that the "Shareholder Released Parties . . . be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever[,] and permanently released . . . by the Releasing Parties from any and all Causes of Action." SPA.920. The release still defines "Shareholder Released Parties" to include every member of the Sackler family, their descendants (including those yet unborn), their current and former spouses, and any related entity—on top of hundreds if not thousands of other individuals, entities, and assets both named and unnamed. SPA.831; *see* J.A.__[Bk.Ct.ECF.No.2983.at.1-69]. And the release still defines "Cause of Action" as any claim within the meaning of the Bankruptcy Code and any other claim "of any kind, character[,] or nature whatsoever"—including claims for fraud and other forms of intentional misconduct. SPA.798.

22

The final Sackler release differs from prior versions in three pertinent respects. Most significantly, the final release no longer applies to every person in the world. Instead, the release adopts a convoluted definition of "Releasing Parties" that includes, among others: (1) "all Holders of Claims . . . against" Purdue, even if the claims are not "treated under" the plan, and (2) "all Holders of Future PI Channeled Claims." SPA.828. The former group includes anyone who holds a bankruptcy claim against Purdue that arose before the bankruptcy petitions were filed, whether or not that claim relates to opioids. *See* SPA.798 (defining "Claim"). The latter group includes, with certain narrow exceptions, anyone who holds "any alleged opioid-related personal injury or similar opioid-related Cause of Action against any . . . Shareholder Released Party" that is "based on or relating to or in any manner arising from, in whole or in part, the Debtors." SPA.805. The release thus continues to extinguish all opioid-related civil claims against the Sacklers and other non-debtors brought by any claimant except the United States—including claims for fraud and other forms of intentional misconduct that cannot be discharged in individual bankruptcies.

Debtors made two additional changes to the release. The release no longer benefits every financial advisor, attorney, accountant, investment banker, expert, or other professional retained by the Sacklers and other shareholder released parties. SPA.920-21. The release also now covers only opioid-related claims where debtors' conduct is a "legal cause or is otherwise a legally relevant factor." *Id.*

23

The bankruptcy court confirmed the twelfth amended plan and overruled the remaining objections, concluding that it had statutory and constitutional authority to approve the Sackler release. SPA.143-301. The U.S. Trustee appealed the confirmation order to district court. Bk. Ct. ECF Nos. 3776, 3777 (initial notice of appeal); Bk. Ct. ECF No. 3799 (amended notice of appeal). Other entities—including eight States, the District of Columbia, certain Canadian municipalities and First Nations groups, and several individual opioid victims—appealed the confirmation order as well.

To protect themselves against the possibility that debtors or others might seek to dismiss the appeals under the doctrine of equitable mootness, the U.S. Trustee and several other appellants sought stays of the confirmation order in the bankruptcy court, *see, e.g.*, Bk. Ct. ECF No. 3778, *amended by* Bk. Ct. ECF No. 3801, and the district court, D. Ct. Dkt. No. 21-cv-7966, ECF No. 19. The stays were denied on the condition that debtors and their allies agree to a stipulation designed to mitigate the risk of equitable mootness. D. Ct. Dkt. No. 21-cv-7966, ECF Nos. 33, 49, 57; *see* D. Ct. ECF No. 71 (entering into stipulation). The U.S. Trustee and several others also sought to certify the case for direct appeal to this Court over the objections of debtors and their allies. *See, e.g.*, Bk. Ct. Dkt. Nos. 3868, 3871, 3874, 3913, 3932, 3933, 3934, 3935, 3936; *see* 28 U.S.C. § 158(d); Fed. R. Bankr. P. 8006. The bankruptcy court denied the motions.

24

### D.     District Court Proceedings

On appeal, the district court vacated the confirmation order because the bankruptcy court lacked statutory authority to approve the Sackler release.  SPA.92-137.  The court explained that, as a textual matter, only one Code provision specifically authorizes bankruptcy courts to release claims against a non-debtor.  SPA.96-100.  That provision, 11 U.S.C. § 524(g), permits non-debtor releases only in the narrow context of bankruptcies arising from certain asbestos-related circumstances.  *See* SPA.96-100.  Congress framed that provision as an exception to the general principle that a discharge affects only claims against the debtor.  *Id.*; *see* 11 U.S.C. § 524(e).  The provision's history makes clear that Congress intended merely to "remove any doubt" about the legality of some non-debtor releases previously entered in the asbestos context, and that Congress reserved for itself the decision whether to extend such authorization to other industries.  SPA.98.  Yet since § 524(g)'s enactment, "Congress has been deafeningly silent on this subject."  SPA.100.  The court thus concluded that, applying the traditional tools of statutory interpretation, the Sackler release is unlawful.[2]

---

[2] The district court also held that the bankruptcy court had subject-matter jurisdiction to authorize the nonconsensual release of third-party direct claims against non-debtors because, in this Circuit, bankruptcy courts have jurisdiction over any claim that "might have any conceivable effect" on the bankruptcy estate.  *SPV OSUS Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2018) (quotation omitted); *see* SPA.81-91].  The U.S. Trustee respectfully disagrees with that holding.

The district court rejected debtors' reliance on general Code provisions recognizing bankruptcy courts' residual equitable authority over bankruptcy proceedings, *see* 11 U.S.C. § 105(a), and the contents of a plan, *see id.* § 1123(b)(6). The court noted that, in *Law v. Siegel*, 571 U.S. 415 (2014), the Supreme Court held that bankruptcy courts may not use their residual equitable authority to "tak[e] an action inconsistent with [the Code's] other provisions." SPA.101-03; *accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012) (same); *see* 571 U.S. at 425. And in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the Court held that "simple statutory silence" is not enough to support an inference that Congress "intend[ed] a major departure" from fundamental bankruptcy principles. *Id.* at 984; *see* SPA.101-03. Because the Sackler release conflicts with both the text of the Code and also the Code's structure and purposes—for example, by authorizing the discharge of non-debtors' liabilities outside the asbestos context and by granting the Sacklers a discharge far broader than what they would have been able to obtain had they filed for bankruptcy themselves—the bankruptcy court's residual equitable authority does not authorize the release. SPA.132-36.

Finally, the court rejected debtors' argument that, in prior cases, this Court has held that releases such as the Sackler release are statutorily authorized. SPA.104-17. The court explained that the releases at issue in those cases—which applied exclusively to derivative claims that can fairly be said to be part of the estate—are different in kind from the Sackler release, which applies not only to derivative claims

26

but to direct claims against the Sacklers and the other released non-debtors.  *Id.*  The court further explained that *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), did not hold that releases such as the Sackler release were statutorily authorized.  SPA.109-13.

The court independently concluded that, even if the Sackler release were statutorily authorized, the bankruptcy court lacked constitutional authority to approve it.  SPA.74-81.  The court noted that, generally speaking, Article III of the U.S. Constitution bars bankruptcy courts from entering final judgment on claims that implicate private rights without the consent of the claimant.  SPA.76-79 (discussing *Stern v. Marshall*, 564 U.S. 462 (2011)).  The Sackler release indisputably terminates a vast number of claims implicating private rights for all time without consent.  *See* SPA.80.  Accordingly, the release may be approved only by an Article III court. SPA.80-81.

Because the court concluded that the bankruptcy court lacked statutory and constitutional authority to approve the Sackler release, the court vacated the plan without addressing any other argument supporting vacatur, including whether the Sackler release is consistent with the Due Process Clause of the Fifth Amendment and whether the Sackler release "can or should be approved on the peculiar facts of this case."  SPA.141-42.  The court certified its decision for interlocutory appeal. J.A.__[D.Ct.ECF.No.301.at.1-3].

### E. Subsequent Proceedings

Debtors appealed the district court's decision to this Court, as did six other groups of litigants: the Raymond Sackler family, the Mortimer Sackler family, the Committee of Unsecured Creditors (UCC), the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (AHCGCC), the Multi-State Governmental Entities Group (MSGE), and a group of individual victims. To eliminate any doubt as to appellate jurisdiction, debtors and five groups of litigants also petitioned this Court for leave to appeal under 28 U.S.C. § 1292(b). *See* Pets. for Permission to Appeal, Nos. 22-85, 22-88, 22-90, 22-94, 22-96, 22-97 (2d Cir.). The Court granted the petitions and directed the parties to brief "any and all issues bearing on the legal authority of the bankruptcy court—constitutional, statutory, or otherwise—to authorize the nonconsensual releases of third-party direct claims against non-debtors." ECF. No. 219, No. 22-110 (2d Cir.).

While the appeal was pending, the bankruptcy court ordered the objecting States and the District of Columbia to participate in mediation with the Sacklers. Bk. Ct. ECF No. 4261. The mediation resulted in a proposed term sheet between debtors, the Sacklers, and the objecting States and the District of Columbia. *See* J.A.__[Bk.Ct.ECF.No.4410.Mot.at.2]. The proposal does not alter any of the terms of the Sackler release. Thus, as debtors have acknowledged, the proposal will have no effect unless the district court's decision is reversed. *See* J.A.__[Bk.Ct.ECF.No.4410.Mot.at.14-15].

The term sheet states that the Sacklers have agreed to pay an additional "$1.175 billion in guaranteed payments" and "up to $500 million in contingent payments," with the additional payments to be made incrementally through 2039. *See* J.A.__, __[Bk.Ct.ECF.No.4410.Mot.at.2.Exh.B&AttachmentA]. The Sacklers have also agreed to permit "any institution or organization in the United States to remove the Sackler name" from buildings and grant programs "subject to certain [procedural] conditions." J.A.__[Bk.Ct.ECF.No.4410.Mot.at.4]. Finally, the Sacklers have agreed to permit a spokesperson to state that they "sincerely regret that OxyContin, a prescription medicine that continues to help people suffering from chronic pain, unexpectedly became part of an opioid crisis that has brought grief and loss to far too many families and communities." *Id.* (quotation omitted). Debtors have agreed to "supplement" the public-document repository contemplated by the plan "with additional privileged materials . . . related to lobbying, public relations, compliance[,] and prior advice from certain parties related to marketing." *Id.* And the States and the District of Columbia have agreed "not [to] oppose" debtors and the other plan proponents in these appeals. J.A.__[Bk.Ct.ECF.No.4410.Mot.at.3].

On March 3, 2022, debtors asked the bankruptcy court to approve the term sheet. Twenty-one States objected to the motion, as did a variety of other individuals, entities, and the U.S. Trustee. The objectors argued (among other things) that the bankruptcy court lacks jurisdiction to modify the plan due to these pending appeals, and that the allocation of funds to a subset of States violates the Bankruptcy Code.

*See, e.g.*, Bk. Ct. ECF No. 4413. On March 10, the bankruptcy court granted the motion, but stated that its order would become "effective only upon the entry of one or more orders by [this Court] or the [district court] permitting the consummation of the Plan[.]" J.A.__[Bk.Ct.ECF.No.4503.at.2-3].

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that the bankruptcy court lacked statutory authority to approve the Sackler release. The Bankruptcy Code is a highly reticulated scheme to "adjust[] . . . a failing debtor's obligations." *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation omitted). It is designed to allow an honest debtor to achieve a fresh start while ensuring an equitable distribution of the debtor's assets to its creditors. The Code implements this basic *quid pro quo* by, for example, imposing a host of duties on debtors, requiring debtors to comply with extensive disclosure obligations, requiring debtors to devote all but certain statutorily exempt assets to the estate, and specifying how the estate's assets must be distributed to creditors. But with a single exception not applicable here, *see* 11 U.S.C. § 524(g), no provision of the Code contemplates permitting a *non*-debtor—who has not shouldered the duties of a debtor and who has not agreed to devote substantially all of its assets to the estate—to obtain a discharge of its debts.

The bankruptcy court nevertheless confirmed a plan that grants the Sacklers and a slew of other non-debtors the functional equivalent of a "bankruptcy discharge arranged without a filing and without the safeguards of the Code." *See In re Metromedia*

30

*Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). The release permanently extinguishes virtually all opioid-related claims—even claims for fraud that are not dischargeable in bankruptcy—against every member of the Sackler family and hundreds if not thousands of other non-debtors, including people who have not yet been born. It covers not merely claims that are derivative of claims against debtors, but also direct claims held by non-debtors against the Sacklers and other non-debtors. And it extinguishes these claims without claimants' consent. The text of the Bankruptcy Code does not authorize courts in bankruptcy to grant a release of this breadth. And the Code's structure, history, and purpose confirm that Congress did not intend to confer such extraordinary power on any court.

Appellants do not contest that the Bankruptcy Code does not specifically authorize the Sackler release. Instead, they attempt to locate the requisite statutory authority in three related Code provisions—11 U.S.C. §§ 105(a), 1123(a)(5), and 1123(b)(6)—that embody the "traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990). But these general grants of equitable authority may "only be exercised within the confines of the" Code. *Norwest Bank Worthington v. Ahler*, 485 U.S. 197, 206 (1988). They do not allow bankruptcy courts "to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d

31

Cir. 2003) (quotation omitted). "[W]ere [Congress] to intend a major departure" from the fundamental principle that bankruptcy exists to adjust the debtor-creditor relationship, "more than simple statutory silence" is required. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 984 (2017).

The flaws in appellants' interpretation of the Code are underscored by the grave due-process concerns that approval of the Sackler release would trigger. A cause of action is "a species of property" protected by the Due Process Clause, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Yet the release extinguishes virtually all opioid-related causes of action against a host of non-debtors without claimants' consent, in violation of the "deep-rooted historic tradition that everyone should have his own day in court." *Martin v. Wilks*, 490 U.S. 755, 762 (1989) (quotation omitted). The district court's holding may be affirmed on this alternative ground. But for purposes of the statutory question, the absence of any "exceedingly clear language" in the Bankruptcy Code authorizing the Sackler release confirms that the Code may not be interpreted to permit it. *See U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020).

**II.**    Appellants' contrary arguments lack merit. Their principal argument is that the Code authorizes the Sackler release because no Code provision specifically forbids the bankruptcy court from adopting it. But the Supreme Court has repeatedly rejected the premise that statutory silence equates to statutory authorization in bankruptcy. *See Jevic*, 137 S. Ct. 973; *Law v. Siegel*, 571 U.S. 415 (2014); *RadLAX*

32

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012). Those cases hold that bankruptcy courts cannot rely on general grants of authority to take actions inconsistent with the Code's text, structure, or purposes. Moreover, the Sackler release expressly conflicts with multiple Code provisions. For example, the release covers claims for fraud and other forms of misconduct, even though the Bankruptcy Code bars individuals from discharging such debts when creditors have objected. 11 U.S.C. § 523(a). The release is inconsistent with 11 U.S.C. § 524(e), which Congress has treated as a statutory bar to discharging the debts of non-debtors, *see id.* § 524(g)(4)(A)(ii). And the release is contrary to 11 U.S.C. § 524(g)—the sole Code provision that contemplates non-debtor releases, which authorizes them only under circumstances not applicable here and which prescribes procedures that the bankruptcy court did not follow.

None of the statutory provisions cited by appellants authorizes the Sackler release. Section 105(a) extends only to "carrying out the provisions of the Bankruptcy Code" and confers no independent powers to alter substantive rights. *Dairy Mart*, 351 F.3d at 92. Section 1123(b)(6) merely specifies that plans may only contain provisions that are "not inconsistent with" the Code. Section 1123(a)(5) confers no independent authority on bankruptcy courts, much less authority to contravene the Code by extinguishing non-debtors' claims. And §§ 1123(b)(3)(A), 323(b), and 363(b) apply solely to claims belonging to the debtor or the estate.

33

Finally, the district court's holding is consistent with this Court's precedent. Appellants rely principally on *Metromedia*. But *Metromedia* did not consider the grave due-process concerns that would accompany any approval of third-party releases like those at issue here. Its analysis of the Code is inconsistent with many of appellants' arguments. It did not hold that non-debtor releases are lawful in rare cases when certain findings are made. To the extent that *Metromedia* did in fact articulate such a holding, its reasoning has been overtaken by the Supreme Court's subsequent decision in *Jevic*. And appellants cannot prevail even under their mistaken interpretation of *Metromedia* because the Sackler release fails the test that appellants believe *Metromedia* adopted. Appellants' other authorities do not support the Sackler release either. Those cases generally involved releases of claims "against non-debtors in which the liability alleged was derivative of the debtor." *In re Johns-Manville Corp.* (*Manville III*), 517 F.3d 52, 68 (2d Cir. 2008), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). They do not hold that the bankruptcy court may release non-debtors' direct claims against other non-debtors without claimants' consent.

**III.** The district court's decision should be affirmed for the alternative reason that the Sackler release violates the Due Process Clause. The release is unconstitutional in two principal respects. First, it permanently terminates claimants' property interest in their causes of action without claimants' consent and without compensation. Second, it was approved without adequate notice to affected claimants. The text of the release is so complicated that Richard Sackler (a former

34

president and director of Purdue) testified that he gave up trying to understand it. And debtors' notices of the release—which stated merely that the plan would release "members of the Sackler families and certain other individuals and related entities," J.A.__[Bk.Ct.ECF.No.2988.at.247], __[Bk.Ct.ECF.No.2988.at.289], __[Bk.Ct.ECF.No.2988.at.297]—failed to capture the release's extraordinary breadth.

**IV.** Even if this Court holds that the Sackler release comports with the Code and with the Due Process Clause, the Court should affirm the district court's independent holding that the Sackler release may only be approved by an Article III court. Article III forbids bankruptcy courts from entering final judgment on a "matter[] of private right" because such a judgment is "the most prototypical exercise of judicial power." *Stern v. Marshall*, 564 U.S. 462, 489, 494 (2011) (quotation omitted). The Sackler release extinguishes many claims arising from private rights. And the extinguished claims are both "independent of the federal bankruptcy law" and will not necessarily be "resolved in the claims allowance process." *Id.* at 487, 499. To the extent that such claims may lawfully be terminated for all time, that power must be exercised by an Article III court.

## STANDARD OF REVIEW

The Court "exercises plenary review over the decisions of the district court and bankruptcy court." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 139 (2d Cir. 2005). Conclusions of law are reviewed de novo and findings of fact are reviewed for clear error. *Id.*

# ARGUMENT

## I.   The Bankruptcy Court Lacks Statutory Authority To Approve The Sackler Release.

The bankruptcy court confirmed a plan of reorganization that "conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever[,] and permanently release[s]" the Sacklers and hundreds (if not thousands) of other non-debtors from virtually all opioid-related liability.  SPA.920.  The district court correctly held that courts in bankruptcy may not approve a release of this sort.

### A.   The Bankruptcy Code Does Not Authorize The Sackler Release.

Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief."  *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted).  To standardize an "expansive (and sometimes unruly) area of law," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012), Congress enacted the Bankruptcy Code under the Bankruptcy Clause of the U.S. Constitution, which vests Congress with power to "adjust[] . . . a failing debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation omitted).  The Code's intricate provisions are intended to give the honest but unfortunate debtor a fresh start while ensuring the maximum possible equitable distribution to creditors.  *See Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915).

36

To achieve this goal, the Bankruptcy Code establishes a basic *quid pro quo*. To benefit from bankruptcy, a debtor must shoulder a host of obligations and duties. For example, an individual debtor must generally disclose all of its creditors, its assets and liabilities, its current income and expenditures, and the nature of its financial affairs. 11 U.S.C. § 521(a). The debtor must then apply all of those assets—with certain narrow exemptions, *see generally id.* § 522—to the satisfaction of its creditors' claims. In exchange, the debtor receives a discharge of its debts, with the exception of certain debts (such as an individual debtor's debts "for money . . . to the extent obtained by . . . fraud," *id.* § 523(a)(2)(A)) that Congress determined should not be discharged as a matter of public policy. *See Grogan v. Garner*, 498 U.S. 279, 287 (1991). A bankruptcy discharge "releases a debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004); *see, e.g.*, 11 U.S.C. § 727(a) ("The court shall grant the *debtor* a discharge" unless certain conditions are met) (emphasis added). A discharge also "operat[es] as an injunction to prohibit creditors from attempting to collect or to recover the debt." *Hood*, 541 U.S. at 447.

Because the purpose of bankruptcy is to adjust the debtor-creditor relationship, the Code is replete with provisions related to that objective. But with a single exception not applicable here, *see* 11 U.S.C. § 524(g), no Code provision specifically authorizes courts in bankruptcy to discharge a non-debtor's obligations. That textual silence makes sense. The Code is designed "to free the debtor of [its] personal

37

obligations while ensuring that no one else reaps a similar benefit." *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992). A non-debtor has not assumed the many duties and obligations specified by the Code, so it should not be permitted to reap the Code's rewards. *See In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990) (per curiam) ("Obviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders."), *modified sub nom. Abel v. West*, 932 F.2d 898 (10th Cir. 1991).

The bankruptcy court nevertheless approved a release that terminates virtually all opioid-related civil claims against hundreds and potentially thousands of non-debtors—including every member of the Sackler Family and their "predecessors, successors, permitted assigns, subsidiaries (other than the Debtors), controlled affiliates, spouses, heirs, executors, [and] estates and nominees." SPA.831; *see also* SPA.920-21. None of these individuals has sought bankruptcy relief themselves. The release covers any civil claim "of any kind, character, or nature whatsoever," including claims for fraud. SPA.798; *see also* SPA.920-21. With the exception of the United States, the release governs everyone who holds an opioid-related claim against any of the released non-debtors so long as Purdue's conduct is the "legal cause" of the claim "or is otherwise a legally relevant factor." SPA.920-21. And the release applies whether or not a claimant has consented to it. *See id.* As the district court held, no

38

provision of the Code "confer[s] on any court the power to approve" a release of this magnitude and breadth. SPA.93.

The structure of the Bankruptcy Code underscores the point. As noted, the Code contains hundreds of provisions addressing the relationship between a debtor and its creditors. Indeed, the Code states that a discharge in bankruptcy generally "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). By contrast, just one Code provision—11 U.S.C. § 524(g)—authorizes the discharge of claims against non-debtors. That narrow provision applies solely to bankruptcies arising from the manufacture and sale of asbestos. *Id.* § 524(g)(2)(B)(i)(I). And it states that a bankruptcy court may "bar any action directed against" certain "third party" non-debtors "[n]otwithstanding the provisions of section 524(e)." *Id.* § 524(g)(4)(A)(ii). It therefore makes clear that Congress intended § 524(g) as an exception to the fundamental principle that bankruptcy is a mechanism for adjusting the debtor-creditor relationship.

The overwhelming number of Code provisions relating to the discharge of a debtor's liabilities, combined with the absence of any applicable Code provision relating to the discharge of a non-debtor's liabilities outside the asbestos context, confirms that Congress intended to authorize non-debtor releases in asbestos bankruptcies alone. *See Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create

39

additional exceptions."). "[W]ere [Congress] to intend a major departure" from the fundamental principle that bankruptcy exists to adjust the debtor-creditor relationship, "more than simple statutory silence" is required. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 984 (2017).

The specific terms of the Sackler release further illustrate its unlawfulness. The release applies to all "Cause[s] of Action," which the plan defines as any form of action asserting any civil claim "of any kind, character[,] or nature whatsoever." SPA.798. This definition encompasses claims for fraud, breach of fiduciary duty, and willful and malicious injury. The Bankruptcy Code forbids the discharge of debts of this sort in individual bankruptcies when creditors have timely objected. 11 U.S.C. § 523(a)(2), (4), (6), (c); *see Archer v. Warner*, 538 U.S. 314, 321 (2003) ("[The Code] ensure[s] that all debts arising out of fraud are excepted from discharge no matter what their form." (quotation omitted)). Thus, even if the Sacklers had filed for bankruptcy relief on their own behalf, they could not have obtained a discharge as broad as what the bankruptcy court gave them.

Moreover, the Code does not authorize individual debtors to devote only a subset of their wealth to the satisfaction of their creditors. To the contrary, the Code requires debtors to devote virtually all of their pre-petition assets to the bankruptcy estate. *See* 11 U.S.C. § 541 (defining estate property broadly); *id.* § 522 (exempting certain limited assets from the estate). Accordingly, had the Sacklers declared bankruptcy, they would likely have been forced to dedicate most of their wealth—

estimated at around $11 billion, J.A.__[Bk.Ct.ECF.No.2983.at.163]—to the estate as a prerequisite to obtaining a discharge. Yet the bankruptcy court granted the Sacklers (and every other released non-debtor) the functional equivalent of a bankruptcy discharge—indeed, more relief than they could obtain from a discharge—"without a filing and without the safeguards of the Code." *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

The history and purpose of the Code point in the same direction as its text and structure. As Congress has explained, the purposes of bankruptcy "are twofold: either to rehabilitate financially a distressed debtor" or "to assemble and liquidate his assets for distribution to creditors." H.R. Rep. No. 95-595, at 10 (1977). Even a bankruptcy reorganization "in its fundamental aspects[] involves" determining "how the value[] of the estate should be apportioned among creditors and stockholders." S. Rep. No. 95-989, at 10 (1978). Thus, Congress conceived of bankruptcy as "mainly a procedural [de]vice, prescribing the method of accomplishing rehabilitation or liquidation, but generally leaving undisturbed legal relationships that existed before bankruptcy." H. Rep. 95-595, at 10. This history confirms that the foundation of bankruptcy is the "adjustment of a failing debtor's obligations," *Gibbons*, 455 U.S. at 466 (quotation omitted), consistent with bankruptcy courts' "broad authority to modify creditor-debtor relationships," *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

Congress has departed from this foundational principle only once: to authorize bankruptcy courts to approve limited third-party non-debtor releases as part of a

41

global settlement of asbestos liability. 11 U.S.C. § 524(g). Congress did so in response to this Court's decision in *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*) (*Manville I*), 837 F.2d 89 (2d Cir. 1988) (*Manville I*). The *Manville* release was limited to certain actions against debtor's insurers, all of whom had agreed to dedicate the full proceeds of their policies to a settlement fund created to pay asbestos victims' claims. The Court held that the release was justified because the policies at issue were "property of the debtor's estate," *id.* at 90, but did not cite any Code provision authorizing the bankruptcy court to approve the release. Congress enacted § 524(g) in light of doubts that the *Manville I* injunction (and a similar injunction in another large asbestos bankruptcy) was statutorily authorized. *See* H.R. Rep. No. 103-835, at 41 (1994). Congress also granted retroactive statutory approval to *Manville I*-type releases adopted in the asbestos context before § 524(g)'s effective date, even if those releases had been adopted in a manner inconsistent with § 524(g)'s rigorous procedural requirements. *See* 11 U.S.C. § 524(h).

Significantly, Congress limited this retroactive-approval provision to asbestos bankruptcies even though a few courts had approved nonconsensual releases in the context of other industries and other procedural schemes. *E.g.*, *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989) (bankruptcy plan for manufacturer of medical devices where there was a certified class-action settlement); *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285 (2d Cir. 1992) (mandatory Rule 23 class-action settlement for bank). And although Congress instructed that the enactment of § 524(g) and (h) "shall" not

42

"be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization," Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 § 111(b), 108 Stat. 4106, 4117 (codified as a note to 11 U.S.C. § 524), Congress neither stated nor implied that bankruptcy courts had statutory authority to adopt *Manville I*-type releases before § 524(g) became law. To the contrary, Congress took pains to "express[] no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable" release "of this kind." E1 *Collier on Bankruptcy* (16th ed.), app. 9(b) (quoting 140 Cong. Rec. H10,764 (daily ed. Oct. 4, 1994) (statement of Rep. Brooks)). Congress also reserved for itself the authority to decide "whether the concept should be extended" beyond the asbestos context "into other areas." *Id.* (quoting 140 Cong. Rec. at H10,764 (statement of Rep. Brooks)). Yet after § 524(g) was enacted, "Congress has been deafeningly silent on this subject." SPA.100.

In sum, the traditional tools of statutory interpretation confirm that the Sackler release is contrary to the Code. By approving the release, the bankruptcy court converted bankruptcy from an equitable mechanism to adjust the debtor-creditor relationship into a coercive mechanism to extinguish virtually all opioid-related civil claims against the Sacklers (and hundreds if not thousands of other non-debtors) without claimants' consent and without the protections that Congress adopted as the

condition of discharging a debtor's liabilities in bankruptcy. The Code does not authorize this extraordinary exercise of judicial power.

**B.      The Bankruptcy Court's Residual Equitable Authority Does Not Authorize The Sackler Release.**

Appellants attempt to locate authority for the Sackler release in Code provisions embodying the "traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify *creditor-debtor relationships*." *Energy Res.*, 495 U.S. at 549 (emphasis added); *see* 11 U.S.C. §§ 105(a), 1123(b)(6). But as the district court held, these provisions say nothing about bankruptcy courts' authority to discharge non-debtors' claims against other non-debtors. They certainly do not authorize bankruptcy courts to convert bankruptcy into a mechanism for resolving non-debtors' mass-tort liabilities without claimants' consent.

1.      Appellants principally rely (Debtors' Br. 48-50; UCC Br. 44-49, 56-60) on 11 U.S.C. § 105(a), which reaffirms bankruptcy courts' authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." But as the provision's text confirms, this "equitable power[] . . . can only be exercised within the confines of the . . . Code." *Norwest Bank Worthington v. Ahler*, 485 U.S. 197, 206 (1988). "It does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" *In re Dairy Mart*

44

*Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quoting *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986)).

For these reasons, § 105(a)'s grant of general authority does not allow bankruptcy courts to enter orders that would contravene the Code. *Law v. Siegel*, 571 U.S. 415, 421 (2014). This conclusion "is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." *Id.* That axiom has special force when a statute contains "carefully calibrated exceptions and limitations," as the Bankruptcy Code does. *Id.* at 424. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980). And "more than simple statutory silence" is required before a grant of general authority may be read to allow a "major departure" from the scheme. *Jevic*, 137 S. Ct. at 984; *cf. Federal Bureau of Investigation v. Fazaga*, No. 20-828, slip op. at 9 (U.S. Mar. 4, 2022) ("The absence of any statutory reference [in FISA] to the state secrets privilege is strong evidence that the availability of the privilege was not altered in any way. . . . [T]he privilege should not be held to have been abrogated or limited unless Congress has at least used clear statutory language.").

As explained, *supra* pp. 36-43, the Sackler release is incompatible with the Code in multiple respects. The release grants the functional equivalent of a discharge to the Sacklers and an unspecified number of other non-debtors. The release does so

45

despite the fact that none of those released has filed for bankruptcy, and despite the fact that the Supreme Court and this Court have held that bankruptcy exists to adjust the debtor-creditor relationship. The release also extends to claims for fraud and other forms of abusive conduct, which Congress excepted from individuals' discharge for reasons of public policy. And the release accomplishes all of this despite the fact that not a single provision of the Code—in which Congress "meticulous[ly]" set forth "exemptions and exceptions to those exemptions" governing all aspects of a discharge in bankruptcy, *Law*, 571 U.S. at 424—specifically authorizes courts in non-asbestos cases to depart from the foundational principle that a discharge benefits only the debtor.

Section 105(a) does not support the Sackler release for a second, independent reason. The text of the provision limits the authority it confers to "order[s] . . . necessary or appropriate to carry out the provisions of this title [the Bankruptcy Code]." 11 U.S.C. § 105(a). Any "power that a judge enjoys under § 105 must" therefore "derive ultimately from some other provision of the Bankruptcy Code." Douglas G. Baird, Elements of Bankruptcy 6 (6th ed. 2014); *accord* 2 *Collier on Bankruptcy* (16th ed.) ¶ 105.01[1] ("[The text of § 105(a)] suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective."). If "no provision of the Bankruptcy Code may be successfully invoked . . . , section 105(a) affords . . . no independent relief." *Dairy Mart*, 351 F.3d at 92; *see Metromedia*, 416 F.3d at 142 (same).

46

The bankruptcy court's justification for adopting the Sackler release boils down to its belief that, without the release, the plan could not be confirmed. *See, e.g.,* SPA.277-78 ("Without the settlement payments, I find that the plan would unravel . . . . [T]he shareholder released parties are not going to agree to provide the [payments] under the settlement without receiving the shareholder release in return."). But as the district court explained, "[g]etting to a confirmable plan is [a] general bankruptcy objective, nothing more." SPA.125. Under *Dairy Mart*, this sort of "circular reasoning" is insufficient to justify the invocation of § 105(a). *Id.* (citing *Dairy Mart*, 351 F.3d at 92)).

**2.** Appellants also rely (Debtors' Br. 45-47; UCC Br. 45-46; AHCGCC Br. 25; M. Sackler Br. 25-26) on 11 U.S.C. § 1123(b)(6), which states that a bankruptcy plan may include "any other appropriate provision not inconsistent with the applicable provisions" of the Code. But like § 105(a) and § 1123(a)(5), this general provision cannot supply authority to adopt a plan provision incompatible with the Code, *see Law*, 571 U.S. at 421, or to alter the fundamental fabric of bankruptcy absent express congressional authorization, *see Jevic*, 137 S. Ct. at 984. Indeed, § 1123(b)(6) is by its own terms restricted to "appropriate provision[s] not inconsistent with" the Code. 11 U.S.C. § 1123(b)(6). The Supreme Court's decision in *Energy Resources* confirms this interpretation. There, the Court recognized that a bankruptcy court's assertion of § 1123(b)(6) authority is unlawful if it conflicts with the Code or "with another law that should have been taken into consideration in the exercise of the

47

court's discretion." 495 U.S. at 550. The Sackler release is not specifically authorized by the Code; indeed, the release contravenes it. *See supra* pp. 36-43.

**3.** Finally, one appellant argues (UCC Br. 45) that the Sackler release is authorized by 11 U.S.C. § 1123(a)(5), which states that a plan "shall[] provide adequate means for the plan's implementation." As the text of § 1123(a)(5) makes clear, this provision is not a grant of authority at all; it simply states what a confirmable plan must contain. Moreover, § 1123(a)(5) would not authorize the plan even if construed as an authority-granting provision. Any such authority may not be exercised in a manner inconsistent with the Bankruptcy Code. 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if . . . the plan complies with the applicable provisions of the [Code]."); *see Law*, 571 U.S. at 421. And again, courts may not interpret a general grant of authority to authorize a "major departure" from the Bankruptcy Code that Congress has not endorsed. *Jevic*, 137 S. Ct. at 984. The contrary interpretation would allow bankruptcy courts to deviate from the Code simply by incorporating such deviations into a plan provision and then finding that the provision was necessary to "provide adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5).

Moreover, § 1123(a)(5) must be understood in light of Congress's extensive list of example provisions that might satisfy its terms. This list is replete with references to the "debtor" and to the disposition of the "property of the estate." *Id.* § 1123(a)(5)(A)-(J). Conspicuously absent is any reference to the disposition of "property belonging to someone other than the debtor or a creditor of the debtor."

48

SPA.124-25; *cf. Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (explaining that "general words" in a "residual clause should be read to give effect to" any specific terms that surround the general term and should "be controlled and defined by reference to th[ose] enumerated categories"). Interpreting § 1123(a)(5) to nevertheless authorize the involuntary termination of claims against a non-debtor would extend the provision far "beyond what Congress can plausibly have intended." *See In re Irving Tanning Co.*, 496 B.R. 644, 663 (B.A.P. 1st Cir. 2013); *cf. id.* at 664 (rejecting the "bold and remarkable" proposition that § 1123(a)(5) authorizes a bankruptcy court to "appropriate the property of third parties" because "one cannot imagine Congress having [authorized] it without a clear and specific indication of such intent").

### C. Interpreting The Code To Authorize The Sackler Release Would Raise Grave Due-Process Concerns.

This Court should not read the Code's residual-authority provisions to authorize the Sackler release even if those provisions were susceptible to such a reading (which they are not). As the Supreme Court has admonished, Congress must "enact exceedingly clear language if it wishes to significantly alter . . . the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020). The bankruptcy court's approval of the Sackler release unquestionably effectuates such an alteration. "[A] cause of action is a species of property." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). And it is a "basic principle of justice . . . that a reasonable opportunity to be heard must precede

judicial denial of a party's claimed rights." *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953). The Sackler release contravenes these principles by permanently extinguishing virtually all opioid-related claims against the Sacklers and other non-debtors without the consent of every affected claimant. This nonconsensual extinguishment has res judicata effect. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151-54 (2009). The release is therefore inconsistent with the "deep-rooted historic tradition that everyone should have his own day in court." *Martin v. Wilks*, 490 U.S. 755, 762 (1989) (quotation omitted).

As explained, *supra* pp. 36-43, the Bankruptcy Code contains no "exceedingly clear language" authorizing this result, *see Conpasture*, 140 S. Ct. at 1849-50. To the contrary, the Sackler release is incompatible with the text and structure of the Code, to say nothing of the Code's history and purposes. The Code's general residual-authority provisions do not supply the requisite clarity either, especially given the Supreme Court's interpretation of those provisions in cases such as *Jevic* and *Law*. This Court should therefore reject appellants' invitation to interpret the Code in a manner that would grant bankruptcy courts virtually boundless authority to terminate a property interest without consent.

The unconstitutionality of the Sackler release informs the statutory-interpretation question in a second distinct respect. Appellants have raised several arguments in defense of the release's constitutionality, which all lack merit as set forth in greater detail below. *See infra* pp. 77-87. But this Court need not decide those

50

constitutional issues because there is, at a minimum, "substantial doubt whether" accepting appellants' interpretation would comport with due process. *See United States v. Security Indus. Bank*, 459 U.S. 70, 78 (1982). "[I]n the absence of a clear expression of Congress' intent to" permit bankruptcy courts to extinguish non-debtors' claims against other non-debtors without consent, this Court should not "construe the [Code] in a manner that could in turn call upon the Court to resolve" the due-process issues presented by this appeal. *Id.* at 82 (quotation omitted).

## II. Appellants' Contrary Arguments Lack Merit.

Appellants raise numerous arguments in defense of the Sackler release. None has merit.

### A. The Supreme Court Has Repeatedly Rejected Appellants' Attempts To Conflate Statutory Silence With Statutory Authorization.

Appellants principally argue that, unless the Bankruptcy Code specifically prohibits it, a bankruptcy court may do whatever it deems necessary to ensure that a plan of reorganization is confirmed or succeeds. This argument is foreclosed by at least three Supreme Court cases.

1. The Supreme Court most recently rejected appellants' argument in *Jevic*. There, to effectuate a settlement, a bankruptcy court dismissed a bankruptcy case on the condition that the estate distribute its assets in a manner that prioritized secured creditors and general unsecured creditors over certain mid-priority creditors. 137 S. Ct. at 978. Those mid-priority creditors would have been entitled to payment ahead

51

of the general unsecured creditors had the bankruptcy court approved a plan of reorganization or liquidation. *Id.* The debtors defended the dismissal order by arguing that the Code gives bankruptcy courts broad authority to condition dismissal orders on particular distribution mechanisms. *Id.* at 980; *see* 11 U.S.C. § 349(b). The debtors further emphasized that the Code "does not explicitly state what priority rules—if any—apply to a distribution" upon dismissal. *Jevic*, 137 S. Ct. at 980.

The Court rejected all of debtors' arguments. The Court acknowledged that, by its terms, the Bankruptcy Code's priority system applies only to Chapter 7 liquidations and Chapter 11 reorganizations. *Jevic*, 137 S. Ct. at 984. But the Court noted that the priority system "has long been considered fundamental to the Bankruptcy Code's operation." *Id.* The Court thus held that "some affirmative indication of intent" was necessary before a court could conclude that "Congress actually meant to make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions" that are not permissible in Chapter 7 liquidations and Chapter 11 reorganizations. *Id.*

The Supreme Court reached the same conclusion in *Law*. There, a bankruptcy trustee obtained an order "surcharging" a debtor's homestead exemption as a sanction on the debtor for committing fraud. 571 U.S. at 419-20. The surcharge made "those funds available to defray . . . attorney's fees." *Id.* The Bankruptcy Code does not expressly state that bankruptcy courts lack discretion to surcharge a homestead exemption as an equitable remedy for a debtor's misconduct. But the Court inferred

52

that no such discretion existed in light of the Code's "carefully calibrated exceptions and limitations." *Id.* at 424. In other words, the Court held that the surcharge order was unlawful because the bankruptcy court's exercise of discretion contravened the Code's structure and purposes, notwithstanding the absence of an explicit prohibition.

The Supreme Court's holding in *RadLAX* is also instructive. There, the debtor proposed a so-called "cramdown" plan that had to "meet one of three requirements" to be confirmed under the Code. 566 U.S. at 643. The proposed plan provided that the debtor's assets would be sold at an auction at which the debtor's main creditor would not be permitted to "credit-bid"—that is, to submit a bid that relied on the amount of the debtor's debt to offset some or all of the purchase price. *Id.* at 641. The debtor argued that the plan was lawful because the Code's cramdown provisions "do[] not expressly foreclose the possibility of a sale without credit-bidding." *Id.* at 644. But the Court rejected that argument because one cramdown provision states that a cramdown plan may be confirmed if it provides for an auction with credit-bidding permitted. *Id.* The Court declined to interpret the Code to "permit[] precisely what" the Code elsewhere "proscribe[d]." *Id.* at 645; *see id.* (explaining that where "a general authorization and a more limited, specific authorization exist side-by-side," the "well-established canon" that "the specific governs the general" avoids the problem of the specific provision being "swallowed by the general one").

Taken together, these holdings confirm that a bankruptcy court cannot rely on general grants of residual authority to reach outcomes incompatible with the structure

53

and purposes of the Code. If appellants' contrary view were correct, each of these cases would have come out the other way.

2. The Supreme Court's decision in *Energy Resources* does not support appellants. In that case, the Court affirmed a bankruptcy court's exercise of its residual authority to order that tax payments from the debtor to the Internal Revenue Service (a creditor) be allocated in a particular manner. The Court held that the order was lawful notwithstanding the absence of an express statutory authorization because the challenged plan provision was "wholly consistent" with the Bankruptcy Code and not prohibited by the Internal Revenue Code. 495 U.S. at 549-51. The Court had no occasion to decide whether a bankruptcy court may use its residual authority to subvert the Code's structure or purposes. Nor did the Court have occasion to decide whether a bankruptcy court's residual authority permits the termination of claims against non-debtors. To the extent that *Energy Resources* addressed that latter issue at all, it recognized that the Code's residual-authority provisions merely codify bankruptcy courts' "broad authority to modify creditor-debtor relationships." *Id.* at 549; *cf. In re Prescription Home Health Care*, 316 F.3d 542, 549 (5th Cir. 2002) ("Nothing in *Energy Resources* suggests that bankruptcy courts have jurisdiction to determine the tax liabilities of non-debtors.").

3. The Supreme Court's decision in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), is even further afield. That case simply held that a bankruptcy court has statutory jurisdiction to enjoin a judgment creditor from executing such judgment on

54

a supersedeas bond that the debtor had obtained because the "immediate execution

on the supersedeas bond" was "at least 'related to'" the bankruptcy. *Id.* at 310. The

Court declined to "address whether the Bankruptcy Court [had] acted properly in

issuing" the injunction. *Id.* at 312. The injunction, moreover, simply prohibited a

creditor from executing on a bond belonging to the debtor. *Id.* at 310.

### B. Appellants Could Not Prevail Even Accepting Their Mistaken Interpretation Of Controlling Precedent.

Appellants could not prevail even under their own view of *Jevic*, *Law*, and

*RadLAX* because the Sackler release conflicts with several express provisions of the

Bankruptcy Code.

1. Appellants do not dispute that the Sackler release extinguishes claims for

fraud and other forms of misconduct that the Bankruptcy Code generally excepts

from discharge in individual bankruptcies. 11 U.S.C. § 523(a)(2), (4), (6). But

appellants argue (Debtors' Br. 59-61; M. Sackler Br. 31-35) that the release is

consistent with the fraud exception because the exception applies only to debtors,

which the Sacklers and other released people and entities are not. That is too clever

by half. In *Jevic*, the Supreme Court rejected debtors' attempt to rely on a similarly

technical distinction: that, because the Code's priority scheme applied only to

liquidations and reorganizations, a bankruptcy court could evade the priority scheme

by entering a structured order of dismissal (which was neither a liquidation nor a

reorganization). 137 S. Ct. at 983-85. That the Sackler release exclusively benefits

non-debtors only confirms the extent to which it deviates from fundamental bankruptcy principles.

Appellants similarly argue (Debtors' Br. 59-61; M. Sackler Br. 31-35) that the release is consistent with § 523(a)(2) because a release is not a discharge. This "hyperliteral" argument is "contrary to common sense." *See RadLAX*, 566 U.S. at 645. A discharge is defined as an "injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover[,] or offset" a debt. 11 U.S.C. § 524(a)(2). Put in plainer terms, a discharge does not void a liability; it simply erects a "legal bar to . . . recovery" on that liability. *In re American Hardwoods, Inc.*, 885 F.2d 621, 626 (9th Cir. 1989). The Sackler release— which likewise enjoins claimants' ability to recover on their claims—operates in precisely the same fashion. It is therefore the functional equivalent of a "bankruptcy discharge," except that it was "arranged without a [bankruptcy] filing" and was approved "without the safeguards of the Code." *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

Finally, appellants contend (Debtors' Br. 59-61) that, in individual bankruptcies, § 523(a)(2) does not actually prohibit the discharge of debts for fraud. But the text of that provision—unlike other discharge exceptions, such as the one applicable to student loans, 11 U.S.C. § 523(a)(8)—grants bankruptcy courts no flexibility. It bars discharge "under any circumstances" so long as a timely objection is made. *See United Student Aid Funds Inc. v. Espinosa*, 559 U.S. 260, 273 n.10 (2010); 11 U.S.C. § 523(c);

56

*accord Brown v. Felsen*, 442 U.S. 127, 138 (1979) (explaining that Congress enacted the fraud exception "to exclude beyond peradventure certain liabilities growing out of offenses against good morals" (quotation omitted)). This conclusion is buttressed by the Code's discharge provisions, which confirm that the exceptions at issue are mandatory commands in individual bankruptcies. *See, e.g.*, 11 U.S.C. § 727(b) (explaining that a Chapter 7 discharge operates "[e]xcept as provided in section 523"); *id.* § 1141(d)(2) (explaining that a Chapter 11 discharge "does not discharge" an individual debtor "from any debt of a kind specified in" § 523(a)(2)).

      **2.**      Appellants' arguments with respect to § 524(e) are also flawed. They emphasize (Debtors' Br. 51-52; UCC Br. 60-61; AHCGCC Br. 31-33; MSGE Br. 27-28; M. Sackler Br. 31-34), as the district court did, that the text of that provision does not strictly bar the bankruptcy court from adopting the Sackler release. But this interpretation cannot be squared with how Congress crafted § 524(g), the only Code provision to authorize non-debtor releases. Section 524(g)(4)(A)(ii) states that such releases are permissible in the asbestos context "[n]otwithstanding the provisions of section 524(e)." As the district court elsewhere recognized, "[t]he word 'notwithstanding[]' suggests that the type of [release] Congress was authorizing in § 524(g) would [otherwise] be barred by § 524(e)." SPA.97. Appellants respond (Debtors' Br. 56) that Congress included the "notwithstanding" clause solely out of an abundance of caution. But if § 524(e) meant as little as debtors suggest, it is difficult to imagine why Congress would have included the clause at all.

In any event, the Sackler release is inconsistent with § 524(e) even if that provision does not expressly forbid its adoption. Section 524(e) expresses the fundamental principle that bankruptcy is a mechanism for adjusting the debtor-creditor relationship. *See supra* pp. 36-38 (explaining that non-debtors who have not submitted to the burdens of bankruptcy should not reap its rewards). That principle suffuses the Bankruptcy Code in its entirety. Many Code provisions specify who may obtain a discharge (the debtor), what a discharge achieves (relief for the debtor), and what a discharge cannot accomplish (relief for the debtor that is barred by statute). Many other Code provisions specify the ways in which bankruptcy can alter the debtor-creditor relationship. Given the centrality of the debtor-creditor relationship to bankruptcy, one "would expect to see some affirmative indication of intent if Congress actually meant" to extend the benefits of a discharge to non-debtors who have not accepted the Bankruptcy Code's *quid pro quo*. *See Jevic*, 137 S. Ct. at 984. Appellants have failed to cite anything in the Code that "evinces this intent." *See id.*

**3.** Appellants contend (Debtors' Br. 53-54; UCC Br. 62-65; AHCGCC Br. 28-31; MSGE Br. 28-31; M. Sackler Br. 36-37) that no inference can be drawn from Congress's enactment of § 524(g). Appellants cannot reasonably dispute that, in the ordinary case, Congress's decision to authorize limited third-party releases in asbestos bankruptcies but in no other bankruptcies would foreclose their interpretation of the Code. *Cf. RadLAX*, 566 U.S. at 645 (explaining in a similar circumstance that a "limited, specific authorization" governs over a "general authorization"). To avoid

58

that result, appellants argue that Congress enacted § 524(g) alongside a "rule of construction" that forbids courts from drawing any inference from the provision's existence.  That argument misunderstands the rule, which simply states that the adoption of § 524(g) should not be "construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  Pub. L. No. 103-394, § 111(b).  The rule does not state that bankruptcy courts have authority to approve injunctions such as the one in the Sackler release.  It does not forbid courts from referring to § 524(g) when determining whether the Code impliedly authorizes such approvals.  And it certainly does not prohibit courts from relying on Congress's "deafening[] silen[ce]" on non-debtor releases since § 524(g)'s enactment, SPA.100, to support the inference that Congress did not intend to extend such releases to additional industries.

Finally, even if appellants' understanding of this rule of construction were correct, that would only preclude courts from drawing inferences from § 524(g)'s existence.  And as explained, *supra* pp. 36-41, the Sackler release is incompatible with the Bankruptcy Code even setting § 524(g) to one side.

### C. Appellants' Statutory Arguments Would Lack Merit Even Setting Aside Controlling Precedent.

Appellants' specific statutory arguments would lack merit even if they were not foreclosed by the Supreme Court's decisions in *Jevic*, *Law*, and *RadLAX*.

1.     With respect to § 105(a), one appellant urges (UCC Br. 56-58) this Court to disregard its prior decision in *Dairy Mart*, which held that § 105(a) extends only to "carrying out the provisions of the Bankruptcy Code." 351 F.3d at 92. But *Dairy Mart*'s holding flows directly from the text of § 105(a), which makes clear that bankruptcy courts' equitable powers "must and can only be exercised within the confines of the Bankruptcy Code" itself. *Norwest Bank Worthington*, 485 U.S. at 206; *see supra* pp. 44-47. The Court's holding finds further support in the Supreme Court's recognition that "[b]ankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides." *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 24-25 (2000). Indeed, the Court has rejected an "expansive view of equity" that would give courts "a general power to grant relief whenever legal remedies are not practical and efficient[] unless there is a statute to the contrary." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321-22 (1999) (quotations omitted).

One appellant further suggests (UCC Br. 55-56) that *Dairy Mart* is inconsistent with *Energy Resources*, but that argument is also mistaken. *Energy Resources* held only that bankruptcy courts have authority to enter orders that are "wholly consistent" with the Code. 495 U.S. at 549-51. That holding is consistent with *Dairy Mart*'s holding that § 105(a) only authorizes courts to enter orders that carry out other provisions of the Code.

60

That bankruptcy courts had power to "issue ancillary orders enforcing their *in rem* adjudications" "at the time of the framing," *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006), is true but irrelevant.  Appellants have not cited, and we are not aware of, any Framing-era example of a bankruptcy court's exercising its equitable authority to extinguish claims against non-debtors—including claims belonging to other non-debtors who have not consented to the termination of their causes of action.  Debtors analogize (Debtors' Br. 39) the power to approve the Sackler release to bankruptcy courts' Framing-era powers to "imprison recalcitrant third parties in possession of the estate's assets" and to "recover preferential transfers" from the estate to third parties.  *Katz*, 546 U.S. at 370.  Those examples only demonstrate that, when a bankruptcy court attempts to extinguish claims against non-debtors that are not part of the bankruptcy estate, it is exercising authority "previously unknown to equity jurisprudence."  *Grupo Mexicano*, 527 U.S. at 332.

Debtors contend (Debtors' Br. 45) that § 1123(b)(3)(A) supplies the requisite link.  But that provision merely states that a plan "may" provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  It does not allow the "settlement or adjustment" of claims against non-debtors that do *not* belong to the debtor or to the estate—which are among the vast universe of claims that the Sackler release extinguishes.  Debtors speculate (Debtors' Br. 45) that, as a practical matter, they cannot settle their claims in the absence of the Sackler release.  But as the district court recognized, that is simply

61

an appeal to the general purposes of bankruptcy. SPA.125; *accord Dairy Mart*, 351 F.3d at 92 (explaining that § 105(a) is not satisfied simply because the requested relief "implicates" a given Code section or is "consistent with the policies" of the Code). The argument also proves too much. Non-debtors could insist on any number of conditions as a predicate for agreeing to settle claims involving debtors. The mere fact that non-debtors have held a plan hostage to a condition that contravenes the Code does not give the bankruptcy court *carte blanche* to approve a plan containing it.

Other appellants contend (MSGE Br. 17-19) that the requisite link can be found in other Code provisions allowing debtors-in-possession and bankruptcy trustees to sue and settle claims held by the estate in a manner that maximizes the estate's value. *See* 11 U.S.C. §§ 323(b), 363(b). Those provisions, like § 1123(b)(3)(A), relate solely to claims belonging to the estate. Still other appellants suggest (UCC Br. 45) that § 1123(a)(5) grants the requisite link by requiring each plan to "provide adequate means for the plan's implementation." That provision merely specifies what a lawful plan must contain, as evinced by the title of the section in which it appears: "Contents of plan." *See supra* pp. 47-48. None of these provisions authorizes bankruptcy courts to extinguish causes of action against non-debtors that do not belong to the estate.

Finally, some appellants (Group of Individual Victims Br. 11-12) argue that the Sackler release is necessary for the plan to comply with § 502(e)(1)'s alleged prohibition on double recoveries. Appellants appear to have misunderstood that

62

provision, which requires courts to disallow "contingent claim[s] for contribution or reimbursement" when such claims would expose the estate to "'double-dipping' by holders of the same underlying claim." *In re Hemingway Transp., Inc.*, 993 F.2d 915, 923 (1st Cir. 1993). The "sole purpose" of § 502(e)(1) is to preclude "redundant recoveries on identical claims against insolvent estates." *Id.* But the Sackler release extends even to claims that pose no such risk.

**2.** With respect to § 1123(b)(6), some appellants argue (Debtors' Br. 46-47; UCC Br. 45-46) that the text of that provision means that the Supreme Court's holdings in *Jevic*, *Law*, and *RadLAX* do not apply to it. In their view, § 1123(b)(6) allows bankruptcy courts to do anything that the Code does not specifically forbid. This interpretation ignores the Supreme Court's reasoning, which turned on two familiar maxims of statutory interpretation: (1) that specific statutory provisions override general ones, *Law*, 571 U.S. at 422; *RadLAX*, 566 U.S. at 646; and (2) that courts "expect more than simple statutory silence if, and when, Congress were to intend a major departure" from a statutory scheme, *Jevic*, 137 S. Ct. at 984.

These principles apply with full force to § 1123(b)(6)—which, like § 105(a), codifies bankruptcy courts' equitable authority to modify creditor-debtor relationships, *Energy Res.*, 495 U.S. at 549. If they did not, the Supreme Court's careful limitations on bankruptcy courts' residual authority would have been for naught. In all three of those cases, the Code did not expressly prohibit the bankruptcy-court action that the Court invalidated as an unlawful exercise of § 105(a) authority. But in

appellants' telling, bankruptcy courts could take those actions simply by including them in a plan and deeming those provisions to be "appropriate" exercises of § 1123(b)(6) authority. And appellants' suggestion (Debtors' Br. 47) that a provision is "appropriate" if it is "important" to a plan is so capacious as to supply no limiting principle whatsoever.

Appellants argue (M. Sackler Br. 25-26) that § 1123(b)(6) is immune to long-standing interpretive canons because it permits plans to include "any . . . appropriate provision." But although the term "any" is expansive, Congress limited its sweep by confining courts' § 1123(b)(6) power to exercises "not inconsistent with" the Bankruptcy Code. Appellants respond by noting that Congress did not require that the exercise of § 1123(b)(6) be "consistent with" the Code; Congress instead required that the exercise of § 1123(b)(6) be "not inconsistent with" the Code. But such hair-splitting does not support the conclusion that § 1123(b)(6) forbids only one form of inconsistency: an inconsistency that arises from a specific textual prohibition. The ordinary meaning of "inconsistent" is "not compatible with" or "containing incompatible elements" from. *Inconsistent*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/inconsistent (last visited Mar. 11, 2022). Section 1123(b)(6) thus proscribes a degree of inconsistency far broader than that contemplated by appellants. And the double-negative term "not inconsistent" differs from the term "consistent" only with regard to the applicable burden of proof. *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir. 1992).

64

Appellants further argue (Debtors' Br. 46; M. Sackler Br. 39-40) that their atextual interpretation of § 1123(b)(6) is necessary to avoid rendering the provision superfluous in light of § 105(a). But to describe the provisions is to confirm that they are distinct. Section 105(a) allows bankruptcy courts to issue ancillary orders in equity to carry out specific provisions of the Bankruptcy Code. By contrast, § 1123(b)(6) allows bankruptcy courts to approve "any appropriate provision" in a plan that is not expressly contemplated by the Code so long as the provision is "not inconsistent with" the Code. Indeed, appellants' interpretation of § 1123(b)(6) would render other Code provisions superfluous. Other subsections of § 1123(b) set forth specific provisions that a plan "may" include. If § 1123(b)(6) authorizes the confirmation of any plan provision that the Code does not expressly forbid, Congress would not have needed to enact the rest of § 1123(b). *See RadLAX*, 566 U.S. at 645 (cautioning against reading a "general authorization" so broadly as to "swallow[]" a related "limited, specific authorization").

One appellant argues (M. Sackler Br. 65-66) that, in a brief filed in a different case, the United States conceded that bankruptcy courts have statutory authority to approve third-party releases. But the cited brief addressed the question whether a different, narrower release was permissible under the law of a different circuit. *See* J.A.__[D.Ct.Dkt.No.165-51.at.24] (analyzing whether the release satisfied the Third Circuit's standard for "permissible non-consensual releases"). By contrast, the Sackler release is of unparalleled breadth and is unlawful under any standard. And the United

65

States has consistently opposed non-debtor releases in other cases, in this Circuit and in others.[3]

### D. The District Court's Holding Is Consistent With This Court's Precedent.

With their arguments from first principles unavailing, appellants argue (Debtors' Br. 33-37; UCC Br. 26-31, 49-53; AHCGCC Br. 21-23; MSGE Br. 23-26; M. Sackler Br. 17-23) that the district court must be reversed because its holding is incompatible with this Court's precedent. None of appellants' cited authorities supports that conclusion.

1.      Appellants rely mainly (Debtors' Br. 34-35; UCC Br. 27-30, 52-53; M. Sackler Br. 19-23) on *Metromedia*. But that case cannot bear the weight that appellants have given it. To begin with, the parties in *Metromedia* did not discuss the serious due-

---

[3] *See, e.g.,* Br. for the United States as Amicus Curiae at 12, ECF No. 119, *Lynch v. Mascini Holdings, Ltd. (In re Kirwan Offices S.a.R.L.)*, No. 18-3371 (2d Cir. Oct. 7, 2019); *Patterson v. Mahah Bergen Retail Grp., Inc.*, --- B.R. ---, No. 21-cv-167, 2022 WL 135398, at *1 & n.1 (E.D. Va. Jan. 13, 2022) (noting the U.S. Trustee's objection to release and the U.S. Securities and Exchange Commission's support of the U.S. Trustee's position); *In re Ditech Holding Corp.*, 606 B.R. 544, 626 (Bankr. S.D.N.Y. 2019) (noting U.S. Trustee's objection to release); *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019) (noting objections to release filed by both the Securities and Exchange Commission and the U.S. Trustee); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 77 (Bankr. S.D.N.Y. 2015) (noting U.S. Trustee's objection to release); Supplemental Objection of the U.S. Securities and Exchange Commission at 1-2, ECF No. 652, *In re RTW Retailwinds, Inc.*, No. 20-18445 (Bankr. N.J. Dec. 2, 2020); Objection of the U.S. Securities and Exchange Commission at 1, ECF No. 849, *In re Ascena Retail Grp.*, No. 20-33113 (Bankr. E.D. Va. Oct. 13, 2020); Objection of the U.S. Trustee at 1, ECF No. 628, *In re Aro Liquidation, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. Aug. 12, 2016).

process problems that the approval of nonconsensual third-party releases of non-debtors would raise. *See* 416 F.3d at 141 ("Appellants' sole argument—and the only argument that we consider—is that these nondebtor releases [a]re unauthorized by the Bankruptcy Code . . . ."). The Court's statutory analysis was therefore rendered without reference to the Constitution. Those constitutional arguments do not merely supply an independent basis for affirmance. *See infra* pp. 77-87. They also refute any argument that Congress *sub silentio* authorized bankruptcy courts to approve releases as expansive as the Sackler release. *See supra* pp. 49-51.

In addition, *Metromedia*'s analysis of the Code is inconsistent with appellants' arguments in many crucial respects. *Metromedia* recognized that the "only explicit authorization in the Code for nondebtor releases" is § 524(g), which does not apply to the Sackler release. 416 F.3d at 142. *Metromedia* further recognized, relying on this Court's prior holding in *Dairy Mart*, that any authority exercised under § 105(a) "must derive ultimately from some other provision of the Bankruptcy Code." *Id.* Yet *Metromedia* failed to identify any Code provision from which authority to enter nonconsensual non-debtor releases could derive. Finally, *Metromedia* did not suggest that non-debtor releases are authorized under § 1123(a)(5) or (b)(6), the only two other sources of statutory power that appellants have identified.

Appellants argue (Debtors' Br. 34-37; UCC Br. 29-31, 52-53; M. Sackler Br. 19-23) that *Metromedia* held that non-debtor releases are lawful if a court makes certain findings. That misunderstands *Metromedia*'s reasoning. The Court indicated that the

67

release at issue was unlawful because the bankruptcy court had not made certain findings. *See* 416 F.3d at 143. The conclusion that a particular release is *impermissible* because it does not satisfy certain conditions is different from the conclusion that a hypothetical release is *permissible* if those conditions are met. After concluding that the challenged release was unlawful, *Metromedia* went on to dismiss the appeal as equitably moot, *id.* at 143-45—a result that further undermines the suggestion that *Metromedia* held that third-party releases are lawful under the Code. And although *Metromedia* recognized that this Court has approved non-debtor releases in certain prior cases, the Sackler release differs from those releases in kind. *See infra* pp. 70-77.

Even if *Metromedia* could be read as holding that bankruptcy courts may approve releases such as the Sackler release "in rare cases," 416 F.3d at 141, any such holding would directly conflict with the Supreme Court's subsequent decision in *Jevic*. In that case, the Court emphatically rejected the argument that courts may invent "rare-case exceptions" that turn on the importance of a given provision to a settlement. 137 S. Ct. at 986-87; *accord Law*, 571 U.S. at 427 ("[I]t is not for courts to alter the balance struck by the [Bankruptcy Code]."). The Court did so because "it is difficult to give precise content to the concept," meaning that "'rare case' exception[s]" risk transforming into a "more general rule." 137 S. Ct. at 986-87. Debtors' own arguments illustrate the danger. By their count, "83 decisions— including six from this Court, 14 from other courts of appeals, 35 from the district courts and bankruptcy courts in this Circuit, and 28 lower court decisions in other

68

circuits"—have "recognize[d] that in the Second Circuit," "nonconsensual third-party releases are authorized." Debtors' Br. 35-36. Those cases do not support debtors' interpretation of this Court's precedent. But they powerfully illustrate how a "rare case" exception can metastasize.

**2.** The Sackler release is inappropriate even under appellants' mistaken interpretation of *Metromedia* as authorizing nonconsensual releases if a court finds that certain factors are met. Most significantly, because the release "afford[s]" the Sacklers and other released non-debtors "blanket immunity," it "operate[s] as a bankruptcy discharge arranged without a filing and without the safeguards of the Code." *Compare Metromedia*, 416 F.3d at 142, *with supra* pp. 40-41. Such a release may not be approved because it "lends itself to abuse." *Metromedia*, 416 F.3d at 142. When individuals must negotiate with creditors, both sides have leverage—as evinced by the fact that the Sacklers agreed to pay substantially more money after the Sackler release was vacated on appeal. J.A.__[Bk.Ct.ECF.No.4410.Mot.at.3]. But when individuals may obtain the functional equivalent of a discharge without themselves declaring bankruptcy, they have power to dictate their desired outcome even over their creditors' strenuous objections. That result is at odds with the Bankruptcy Code, which grants individual debtors a discharge only if they agree to devote substantially all of their assets to their creditors.

Other features of the Sackler release reinforce the point. For example, the Sackler release does not "channel[]" the enjoined claims "to a settlement fund";

instead, the claims are permanently "extinguished." *Compare Metromedia*, 416 F.3d at

142 (quotation omitted), *with infra* pp. 79-81. There is no way to know whether the

release "otherwise provide[s] for the full payment of the enjoined claims." *Compare*

*Metromedia*, 416 F.3d at 142, *with infra* pp. 79-80. And no one was given the

opportunity to opt in or out of the release when voting on the plan. Rather, the

release binds not only those claimants who voted for the plan but also every claimant

except the United States, including claimants who objected to the plan and claimants

who did not vote at all. *Compare Metromedia*, 416 F.3d at 142, *with infra* p. 79.

Appellants argue (Debtors' Br. 61-66; UCC Br. 40-43; AHCGCC Br. 33-39;

MSGE Br. 40-45) that, without the release, the Sacklers would not have agreed to pay

$4.3 billion to the estate. But that is not the only relevant consideration even

assuming that appellants' reading of *Metromedia* is correct. And even accepting

appellants' assertions about the Sacklers' negotiating position would not justify

extending the release to the hundreds if not thousands of other released non-debtors,

such as the Sacklers' current and former spouses as well as the Sacklers' descendants

(including children not yet born). SPA.831.

**3.** Appellants emphasize (Debtors' Br. 33-37; UCC Br. 27-28; M. Sackler

Br. 18-19; MSGE Br. 19-22) that, *Metromedia* notwithstanding, this Court has

approved third-party releases in a handful of other cases. But, unlike the Sackler

release, those cases all involved either derivative claims or certified class actions, and

thus do not support the conclusion that the Code authorizes the Sackler release.

70

Appellants principally rely (Debtors' Br. 33; M. Sackler Br. 18; MSGE Br. 19-21) on *Manville I*. There, the Court held that a bankruptcy court had authority to enjoin derivative suits against an asbestos company's insurers because "a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction." 837 F.2d at 92. The Court reasoned that third parties attempting to bring such lawsuits against insurers were "seek[ing] to collect out of the proceeds of [the debtor's] insurance policies on the basis of [the debtor's] conduct." *Id.* at 92-93. In consequence, these claims "[were] inseparable from [the debtor's] own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over [debtor's] assets." *Id.* As the Court later explained, however, the release at issue in *Manville I* "was limited to third-party actions against non-debtors in which the liability alleged was derivative of the debtor." *Manville III*, 517 F.3d 52, 68 (2d Cir. 2008) (quotation omitted), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137. Thus, *Manville I* does not support the proposition that a bankruptcy court may enjoin even *direct* claims against a non-debtor—which the Sackler release plainly does.

Many of appellants' other authorities are inapposite for the same reason. In *In re Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), the bankruptcy trustee settled certain fraudulent-transfer claims against certain non-debtors on behalf of the estate. The bankruptcy court then approved a release enjoining creditors from asserting any claims against those non-debtors that were "derivative of the claims brought by the Trustee, or which could have been brought

71

by the Trustee." *Id.* at 86-87 (quotation omitted). Applying *Manville I*, the Court held that the release was permissible because it was plainly limited to derivative claims. *Id.* at 89-90. But the Court clarified that a release barring third parties from bringing their own direct claims against the same non-debtors would be impermissible. *Id.* In *In re Tronox Inc.*, 855 F.3d 84 (2d Cir. 2017), the Court dismissed on jurisdictional grounds a collateral attack on a confirmation order containing a functionally identical release because the order had not been appealed. In dicta, the court suggested that the challenged release was lawful because it covered only "generalized 'derivative' claims that fall within the property of the bankruptcy estate." *Id.* at 89. But the Sackler release was the subject of multiple objections, and it encompasses direct claims that cannot be deemed property of the estate by any stretch of the imagination.

One appellant contends (Group of Individual Victims Br. 15-23) that the Sackler release is lawful because it covers only derivative claims. *But see* UCC Br. 18 n.3 ("Only so-called *direct* third-party claims are at issue in this appeal."). This argument is difficult to fathom. A derivative claim "arise[s] from harm done to the estate" and is "based on rights derivative of, or derived from, the debtor's" own claims. *Tronox*, 855 F.3d at 99 (quotation omitted). The archetypal example is a claim that a debtor has fraudulently transferred estate assets to a non-debtor third party. A fraudulent-transfer claim is a derivative claim because the tortfeasor is alleged to have looted the estate of assets that rightfully belong to all creditors. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989). By contrast, a direct

claim arises from injury "directly trace[able] to" the non-debtor third party for the non-debtor's own misconduct. *Tronox*, 855 F.3d at 100 (quotation omitted).

This Court's decision in *Manville III* illustrates the distinction. There, the Court held that victims who had brought state-law claims against an asbestos debtor's insurer based on the insurer's own "failure to disclose knowledge about asbestos hazards" were bringing direct claims and not derivative ones. 517 F.3d at 58 (quotation omitted). The victims' claims were based on an alleged state-law duty owed to plaintiffs by the insurer "independent of [the insurer's] contractual obligations to indemnify those injured by the" debtor. *Id.* at 67. The Court therefore held that the victims' claims against the insurer could not be released without the victims' consent.

The Sackler release clearly encompasses both direct and derivative claims. The release states that it applies not only to "derivative claims asserted or assertible by or on behalf of the Debtors or their Estates" but also to "any claims that any Releasing Party . . . would have presently or in the future been legally entitled to assert in its own right." SPA.920-21. The release also covers claims against Sackler family members who acted as debtors' officers and directors—and under many statutory and common-law tort regimes, officers and directors are directly liable to victims for torts that they commit. *See, e.g., Joseph Gen. Contracting, Inc. v. Couto*, 119 A.3d 570, 583, 585, 586 n.11 (Conn. 2015) (collecting cases). Indeed, many courts have either upheld their jurisdiction over, or declined to dismiss complaints against, individual Sacklers

73

and non-Sackler Purdue officers notwithstanding the argument that the claims against them were derivative and not direct.  *E.g.*, *Massachusetts v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 5617817, at *4-8 (Mass. Super. Ct. Oct. 8, 2019); *Rhode Island v. Purdue Pharma L.P.*, No. PC-2018-4555, 2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019); *In re Opioid Litig.*, No. 400000/2017, 2019 WL2996570, at *7-11 (N.Y. Sup. Ct. June 21, 2019); *accord* Order, Dkt. No. 1588, *In re Opioid Litig.*, No. 400000/2017 (N.Y. Sup. Ct. Sept. 16, 2019) (denying motion to dismiss on identical grounds by non-Sackler Purdue executive); *Massachusetts v. Purdue Pharma, L.P.*, NO. 1884CV01808, 2019 WL 5495716 (Mass. Super. Ct. Oct. 8, 2019) (same).  Thus, both the bankruptcy court and the district court correctly concluded that the Sackler release covers direct claims.  *See* SPA.68 ("Judge Drain carefully noted that the release in this case extended beyond so-called 'derivative' claims[.]"); SPA.93-95 (explaining the difference between direct and derivative claims and explaining why the Sackler release extends to direct claims).

4.     The remaining cases cited by appellants are even less relevant.  For example, *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012), did not involve any form of release.  *Quigley* instead concerned a temporary stay of litigation, which by definition cannot permanently and irrevocably extinguish claims.  Moreover, the stay applied to asbestos-related litigation against non-debtors who shared an insurance policy with debtors, meaning that the policy was property of the debtor's estate.  In holding that

the objector was not actually subject to the stay, the Court expressly declined to address the question whether the stay was statutorily authorized. *Id.* at 58 n.15.

As for *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992), that decision did not involve the Bankruptcy Code at all. That case instead arose in the context of a class action to resolve claims against a bank that had declared bankruptcy. The district court certified a subclass of plaintiffs under Fed. R. Civ. P. 23(b)(1)(B), and approved a settlement agreement between that subclass, a different subclass, and the bank. 960 F.2d at 288-89. The agreement contained a release of all subclass members' claims against the bank's directors and officers, who were not debtors in bankruptcy. The Court held that the district court had not abused its discretion in certifying the subclass or in approving the settlement. *Id.* at 289. But that holding—which arose in the separate context of a Rule 23 class action—says nothing about whether a bankruptcy court has authority under the Bankruptcy Code to confirm a plan containing a nonconsensual third-party release outside the context of Rule 23.

Appellants emphasize (Debtors' Br. 36-37; UCC Br. 27-28; MSGE Br. 22; M. Sackler Br. 18-19) the *Drexel* Court's suggestion that bankruptcy courts have authority to enter non-debtor releases under the Code. That suggestion is dictum because it was not essential to the Court's holding, which was confined to issues arising from the Rule 23 settlement. Moreover, the only case the Court cited in support of that dictum—the Fourth Circuit's decision in *A.H. Robins*—located the bankruptcy court's alleged authority to enter such releases in 11 U.S.C. § 105(a). But the Fourth Circuit's

75

reasoning is inconsistent with the text of § 105(a), with this Court's discussion of § 105(a) in *Metromedia*, *see supra* p. 67, with the Court's interpretation of § 105(a) as requiring an independent source of substantive authority in *Dairy Mart*, *see supra* pp. 46-47, and with a litany of subsequent Supreme Court cases confirming that a bankruptcy court's residual authority cannot be exercised in a manner inconsistent with the Code.

Appellants also rely on several unpublished cases, but none sheds light on the question presented. In *Clain v. International Steel Group*, 156 F. App'x 398 (2d Cir. 2005), the Court affirmed the district court's holding that there was no appellate jurisdiction because the appeal was untimely. *Id.* at 399. The Court stated that a bankruptcy court could lawfully approve the sale of debtor's assets to a third party and enjoin entities who had previously held interests in the debtor from suing the buyer. *Id.* at 399-400. Here, by contrast, the bankruptcy court purported to release claims that at no point flowed against Purdue. In *Ad Hoc Committee of Kenton County Bondholders v. Delta Air Lines, Inc.*, 309 F. App'x 455 (2d Cir. 2009), the Court dismissed an appeal of a third-party release as equitably moot. The Court's alternative suggestion that the releases were lawful was both dictum and unaccompanied by any analysis. And in *In re Kirwan Offices S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019), the Court expressly declined to decide whether the releases at issue were lawful because those arguments were "barred . . . by the doctrine of *res judicata*," "resolved . . . by

76

[appellant's] implicit consent" to the release, and forfeited "by [appellant's] fail[ure] to object at the time of confirmation." *Id.* at 102-04.

Finally, appellants (UCC Br. 29-30) urge this Court to join the circuits that have concluded that the Code gives bankruptcy courts authority to approve plans containing non-debtor releases. But the courts of appeals are divided on this question. *See In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) ("[W]e must overturn a § 105 injunction if it effectively discharges a nondebtor."); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995); *Western Real Estate Fund*, 922 F.2d at 600-02. For the reasons discussed, the Fifth, Ninth, and Tenth Circuits have the better of the argument.

## III. Alternatively, The District Court's Decision Should Be Affirmed Because The Sackler Release Violates Due Process.

Although the district court did not reach the issue, its judgment can be affirmed on the alternate ground that the Sackler release violates the Due Process Clause in two critical respects.

### A. The Sackler Release Impermissibly Extinguishes Property Interests Without Consent.

**1.** The Sackler release permanently extinguishes property interests without due process of law. "[A] cause of action is a species of property." *Logan*, 455 U.S. at 428; *see Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 158 (2d Cir. 2016) ("[L]egal claims are sufficient to constitute property such that a deprivation would trigger due process scrutiny."). It follows that "a reasonable opportunity to be

77

heard must precede judicial denial of a party's claimed rights." *City of New York*, 344

U.S. at 297. This principle reflects the Nation's "deep-rooted historic tradition that

everyone should have his own day in court." *Martin*, 490 U.S. at 762 (quotation

omitted).

These due-process principles manifest in many ways. For example, "[i]t is a

principle of general application in Anglo-American jurisprudence that one is not

bound by a judgment *in personam* in a litigation in which he is not designated as a party

or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311

U.S. 32, 40 (1940). As a corollary, due process protects "litigants . . . who never

appeared in a prior action" from being "collaterally estopped without litigating the

issue," since they "have never had a chance to present their evidence and arguments

on the[ir] claims." *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 329

(1971). For similar reasons, "parties who choose to resolve litigation through

settlement may not dispose of the claims of a third party[.]" *Local No. 93, Int'l Ass'n of

Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986); *accord Martin*, 490 U.S. at 768.

These principles even apply in the context of Rule 23 class actions, which

Congress designed specifically to facilitate the mass resolution of claims. "[D]ue

process requires at a minimum that an absent plaintiff be provided with an

opportunity to remove himself from the class[.]" *Phillips Petroleum Co v. Shutts*, 472

U.S. 797, 812-13 (1985); *accord Lindsay v. Government Emps. Ins. Co.*, 448 F.3d 416, 420

(D.C. Cir. 2006) ("Because members of a class seeking substantial monetary damages

78

may have divergent interests, due process requires that putative class members receive notice and an opportunity to opt out." (quotation omitted)).  Indeed, the Supreme Court has twice rebuffed efforts to resolve mass torts by using class-action settlements to bind entire groups of plaintiffs without first giving those plaintiffs the chance to decline the settlement.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-48 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597-98 (1997).

The Sackler release is inconsistent with these principles.  The release permanently extinguishes virtually every opioid-related claim against the Sacklers and the other released non-debtors.  The release constitutes final judgment on each claim, *see Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995), and has res judicata effect, *see Bailey*, 557 U.S. at 151-54.  The release binds every claimant except the United States, whether the claimant has consented to the release or not.  The release thus deprives claimants of property interests without due process of law.

The release compounds this problem by depriving nonconsenting claimants of compensation for released claims.  By its terms, the plan only compensates claimants for claims against Purdue.  SPA.634, 693, 734.  The plan does not purport to compensate claimants for the value of their separate claims against the Sacklers or other released non-debtors.  Indeed, at the confirmation hearing, debtors disclaimed any need to value the direct claims against the Sacklers and other released non-debtors that the release would extinguish.  Debtors did not retain an expert to analyze those claims; to the contrary, debtors stated that they did not "feel that it was possible to

adequately or accurately estimate" the claims' value.

J.A.__[Bk.Ct.ECF.No.3572.at.Tr.73:4-9]; J.A.__[Bk.Ct.ECF.No.3602.at.Tr.57:19-58:6]. The bankruptcy court likewise "limited" the hearing to "the merits of the settlement of . . . the Debtor's own claims." J.A.__[Bk.Ct.ECF.No.3572.at.Tr.68:10-15].

2. Appellants respond (UCC Br. 80-81; M. Sackler Br. 49-50; Group of Individual Victims Br. 13-15) that the Sackler release is constitutional because the plan compensates every claimant for every released claim—which in appellants' telling are nearly worthless. The record forecloses such self-serving speculation. Because neither debtors nor the bankruptcy court ever attempted to value the extinguished claims, appellants may not now contend that claimants are being compensated for their released claims, whether directly or as part of the settlement of claimant's claims against Purdue. The Sacklers' insistence on the release as a condition of their proposed $4.3 billion payment further undermines appellants' suggestion that the released claims lack value, particularly given the Sacklers' subsequent agreement to pay over a billion dollars more.

In any event, appellants are wrong to suggest that claimants are being compensated for their claims against the Sacklers and other released non-debtors. Under the plan, claimants may be paid only for their claims against Purdue. The plan does not purport to compensate claimants for their separate claims against the Sacklers. *See supra* pp. 21-22. Appellants dismiss this distinction as an irrelevant

80

formality.  But for purposes of due process, the distinction makes all the difference.

"When two or more persons' torts together cause injury, each [person] is fully liable to

the victim."  *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 718 (2d Cir. 1978); *cf.*

Restatement (Second) of Torts § 875 (1979) (Oct. 2021 update) ("Each of two or

more persons whose tortious conduct is a legal cause of a single and indivisible harm

to the injured party is subject to liability to the injured party for the entire harm.").

Thus, each cause of action is a distinct property interest that due process protects.  *See*

*Logan*, 455 U.S. at 428.

    **3.**    Appellants also contend (UCC Br. 80-81; M. Sackler Br. 67-68) that the

Sackler release is constitutional because the Due Process Clause does not give

claimants the right to litigate their claims to judgment; it merely gives claimants the

right to an adequate opportunity to object to any potential settlement.  That argument

is contrary to law.  As the Supreme Court has held in the consent-decree context,

"parties who choose to resolve litigation through settlement may not dispose of the

claims of a third party" even if the third party was given the "opportunity to

participate" in settlement proceedings.  *City of Cleveland*, 478 U.S. at 529.  And this

Court has stated that due process protects the right to be "fully compensated through

a lawsuit for one's injuries."  *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982)

(recognizing a protected property interest in the lost additional value of a settled

claim, where defendants' alleged misconduct had prevented plaintiffs from achieving a

higher settlement).

**4.** Some appellants argue (UCC Br. 80-81; AHCGCC Br. 43-44) that consent is not required because bankruptcy is a "special remedial scheme" that may "terminate pre-existing rights" even over a rights-holder's objections. *See Richards v. Jefferson County*, 517 U.S. 793, 799 (1996). But that exception to generally applicable due-process doctrines reflects the fact that the Bankruptcy Code contains a host of procedures to protect creditors. A debtor must submit to these procedures to gain the benefit of a discharge. But the Sacklers and other released non-debtors have not. And this Court has held that bankruptcy's "special remedial scheme" is "insufficient to sustain" an attempt to enjoin one non-debtor's direct claim against another non-debtor. *In re Johns-Manville Corp.*, 600 F.3d 135, 153 n.13 & 154 (2d Cir. 2010).

Indeed, appellants' invocation of the special-remedial-scheme exception only underscores why the Sackler release is improper. It is Congress, not the judiciary, that has authority to "structure and accommodate the burdens and benefits of economic life." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 83-84 (1978) (quotation omitted). In the one instance where Congress has authorized non-debtor releases, Congress crafted substantive and procedural requirements in response to the obvious constitutional issues that such releases raise. *See* 11 U.S.C. § 524(g); *see also* H.R. Rep. No. 103-835, at 41 (1994) (explaining that Congress drafted § 524(g) to ensure that any non-debtor release would meet a "high standard[] with respect to regard for the rights of claimants, present and future"). "Congress could have, but did not," extend those procedures to non-asbestos bankruptcies. *See United States v.*

82

*Noland*, 517 U.S. 535, 543 (1996). So "bankruptcy courts cannot take it upon themselves" to approve such an extension "under the guise of" their equitable authority. *Id.*

The unconstitutionality of the Sackler release is underscored by the fact that the release violates several of the safeguards that Congress deemed appropriate in § 524(g) (the sole instance where it has authorized nonconsensual non-debtor releases). For example, § 524(g) only authorizes the release of claims that "arise[] by reason of" one of four enumerated relationships between a debtor and the released non-debtor. 11 U.S.C. § 524(g)(4)(A)(ii). By contrast, the Sackler release covers "all civil claims . . . that relate in any way to the operations of Purdue." SPA.5. For another, § 524(g) allows non-debtor releases to be approved only after the bankruptcy court has "appoint[ed] a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands" covered by the release. 11 U.S.C. § 524(g)(4)(B)(i). Here, the bankruptcy court did not appoint any such representative.

**5.** Finally, one appellant attempts (AHCGCC Br. 44-49) to analogize the approval of the Sackler release to class-action settlements where a defendant does not have enough money to pay every class claim in full. In such circumstances, Federal Rule of Civil Procedure 23(b)(1)(B) allows a district court to certify a class without granting class members the right to opt out of the settlement. But as the Supreme Court has held, such limited-fund class actions may proceed only if certain rigorous requirements are satisfied. The district court must first find that the usual

prerequisites to class certification—numerosity, commonality, typicality, and adequacy—are met. *See* Fed. R. Civ. P. 23(a). The class proponents must then demonstrate that the amount of funds available are limited "independently of the agreement of the parties." *Ortiz*, 527 U.S. at 864. The "whole of the inadequate fund" must "be devoted to" the claims, and claimants must be treated equitably among themselves. *Id.* at 838-42. These procedures—which Congress adopted solely in the context of class actions—do not apply to the Sackler release because this litigation does not involve any certified class. Just as bankruptcy courts may not extend procedures established in one bankruptcy context to a different bankruptcy context, *see Noland*, 517 U.S. at 543, bankruptcy courts may not extend class-action procedures to bankruptcies where no class has been certified.

In any event, the Sackler release does not satisfy the requirements of Rule 23(b)(1)(B). Most significantly, debtors have failed to show that the relevant funds are not limited "independently of the agreement of the parties." *Ortiz*, 527 U.S. at 864. The available funds appear bounded only by the Sacklers' willingness to pay—a fact highlighted by the Sacklers' agreement to pay over a billion more dollars after the district court vacated the plan. It is also far from clear that the Sacklers did not cause the estate's inability to pay for the reorganization plan with debtors' own assets. As the district court explained, there is at least a fair possibility that the estate's funds are limited because some Sacklers embarked upon a years-long venture to strip billions of dollars from Purdue in anticipation of litigation. *See* SPA.36-42.

84

## B.  The Sackler Release Was Adopted Without Adequate Notice To Affected Claimants.

The district court's judgment may independently be affirmed because the bankruptcy court failed to give adequate notice of the Sackler release to claimants affected by it.  Neither the plan itself nor debtors' notice of the plan adequately informs claimants of the Sackler release's scope.  The release spans fifty-two lines of text and features a thicket of cross-references to other terms of art defined in an equally impenetrable fashion.  SPA.920-21.  It covers hundreds if not thousands of individuals both named and unnamed, as well as descendants of the Sacklers who have not yet been born.  *Id.*; *see also* SPA.831.  As Richard Sackler testified with respect to a prior (but functionally identical) version of the release, he gave up trying to understand the release because it was "extremely dense" and would take "an enormous amount of time to fully understand." J.A.___[Bk.Ct.ECF.No.3614.at.Tr.133].  And neither Purdue's chief financial officer nor Mortimer Sackler was able to identify all of the released non-debtors when pressed.  J.A.___[Bk.Ct.ECF.No.3564.at.Tr.110-12], ___[Bk.Ct.ECF.No.3638.at.Tr.135-36], ___[Bk.Ct.ECF.No.3638.at.Tr.139].  It is difficult to believe that the average opioid claimant could have identified all of the people and entities whom he or she would be releasing.

Debtors' notice of the plan did not cure this deficiency.  The notice simply said that the plan contemplated a broad release of the "Sackler [f]amily members[] and

certain other individuals and related entities." J.A.__[Bk.Ct.ECF.No.2988.at.296-99]. That formulation elides the release's extraordinary scope. It also elides the fact that, under the plan, claimants would not be compensated for the value of their claims against the Sacklers and other released non-debtors. Finally, the deadline by which personal-injury claimants had to file their proofs of claim against Purdue had lapsed when notice of the release was given. *Compare* J.A.__[Bk.Ct.ECF.No.1221.at.1-4] (setting July 30, 2020 deadline to file proofs of claim), *with* J.A.__[Bk.Ct.ECF.No.2988.at.16] (order approving proposed notice on June 3, 2021). The timing of debtors' notice left claimants who had not filed proofs of claim against Purdue in the cold. Such claimants cannot be compensated by the plan unless certain stringent conditions are met. *See* SPA.635 n.6, 694 n.5. And the Sackler release prohibits them from litigating any opioid-related claim against the Sacklers or any other released non-debtor. At least one opioid victim objected to the plan for this reason. *See* Bk. Ct. ECF. No. 3793.

Appellants emphasize (Debtors' Br. 77; UCC Br. 77) that the bankruptcy court found that debtors' notice comported with due process. But because the Sackler release terminates claims that involve matters of private right, *see infra* pp. 88-89, these findings receive no deference and are subject to de novo review. *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 31 (2014). Moreover, those findings mostly pertain to the sheer number of people that the notice allegedly reached. *See* SPA.147-48. As the

notice was neither clear nor timely, the fact that many people may have received it is irrelevant.

## IV. The Court Should Affirm That The Sackler Release May Be Approved Only By An Article III Court Even If The Court Holds That The Release Is Lawful.

The district court correctly held that, whether or not the Sackler release is lawful, the release may only be approved by an Article III court under the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011). This Court should affirm that holding even if it holds that the release is both statutorily authorized and constitutionally sound.

In *Stern*, the Supreme Court held that Article III forbids bankruptcy courts from entering final judgment on "matters 'of private right'"—that is, "'of the liability of one individual to another under the law as defined.'" 564 U.S. at 489 (quoting *Crowell v. Benson*, 285 U.S. 22, 50-51 (1932)). The Sackler release extinguishes claims at the core of this definition, including state-law claims for fraud and personal injury that belong to private individuals and sovereign States. These causes of action are "independent of the federal bankruptcy law" because they are independent from any claim against debtors. *See id.* at 487 (explaining that a cross-claim sounding in tort by the debtor against a claim-holder "is a state law action independent of the federal bankruptcy law"). They also would not be "resolved in the claims allowance process" mandated by the Code because that process applies only to claims against debtors. *Id.* at 499. Accordingly, a bankruptcy court lacks authority to enter judgment upon them

87

unless every claimant has consented to the court's jurisdiction—and many claimants have not. The bankruptcy court's approval of the Sackler release thus violates Article III. *See* SPA.76-81.

Appellants respond (MSGE Br. 35-37; M. Sackler Br. 61-62) that the Sackler release does not adjudicate any given claim on the merits; it simply terminates all covered claims without any merits determination. That argument misses the point. The confirmation order offends Article III because, in approving the Sackler release, the bankruptcy court arrogated to itself "the most prototypical exercise of judicial power": the "entry of a final, binding judgment by a court . . . on a common law cause of action." *Stern*, 564 U.S. at 494. The release accomplishes this by enjoining claimants from bringing any form of action to vindicate all claims that it covers, thus terminating them as a matter of law. *See* SPA.922-24 ("[A]ll Persons that have held or asserted, that hold or assert[,] or that may in the future hold or assert any [Shareholder Released Claims] shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form" on such claim.). And if the release becomes final, it will have res judicata effect. *See Bailey*, 557 U.S. at 151-54. Allowing bankruptcy courts to evade *Stern* by recharacterizing final dispositions as releases of liability would undermine Article III.

Appellants rely (Debtors' Br. 67-69; MSGE Br. 33-35; M. Sackler Br. 60-63) on *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019). There, the Third

88

Circuit held that a bankruptcy court may release a claim implicating private rights if the court finds that "the release provision[] . . . [is] absolutely required to" effectuate a bankruptcy plan. *Id.* at 137. If that were correct, a bankruptcy court could enter final judgment on *any* claim—even claims that implicate quintessentially private rights, such as state-law claims for personal-injury brought by opioid victims against the Sacklers—so long as it found that, as a practical matter, the proposed plan could not otherwise be confirmed. That result is incompatible with *Stern*, which held that "Congress may not bypass Article III simply because a [claim] may have *some* bearing on a bankruptcy case." 564 U.S. at 499 (emphasis in original). The key question is whether a claim is "derived from or dependent upon bankruptcy law." *Id.* If so, the bankruptcy court may enter judgment upon it. But if the claim "exists without regard to any bankruptcy proceeding," as the claims covered by the Sackler release do, it must be adjudicated by an Article III court. *Id.*

89

## CONCLUSION

For these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

RAMONA D. ELLIOTT
*Deputy Director/General
Counsel*
P. MATTHEW SUTKO
*Associate General Counsel*
BETH A. LEVENE
SUMI K. SAKATA
*Trial Attorneys
Executive Office for
United States Trustees
U.S. Department of
Justice
441 G Street, NW
Suite 6150
Washington, DC 20530
(202) 307-1399*

DAMIAN WILLIAMS
*United States Attorney
Southern District of New York*

*s/ Lawrence H. Fogelman*
LAWRENCE H.
FOGELMAN
PETER ARONOFF
DANIELLE J. LEVINE
*Assistant United States
Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2800
Lawrence.Fogelman@usdoj.gov
Peter.Aronoff@usdoj.gov
Danielle.Levine@usdoj.gov*

SARAH E. HARRINGTON
*Deputy Assistant Attorney
General* *

MICHAEL S. RAAB
MICHAEL SHIH

*s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff
Civil Division, Room 7260
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3388
sean.r.janda@usdoj.gov*

March 2022

---

* The Principal Deputy Assistant Attorney General is recused in this matter.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit established in this Court's Order of March 1, 2022, ECF No. 466, because it contains 22,615 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 11, 2022, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

Second Circuit by using the appellate CM/ECF system. Service will be accomplished

by the appellate CM/ECF system, except for the following, who will be served via

USPS:

Ellen Isaacs, on behalf of Patrick Ryan Wroblewski
P.O. Box 725
Floyd, VA 24091

Ronald Bass
450 Little Place, Apt. 53
N. Plainfield, NJ 07060

Maria Ecke
8 Glenbrook Drive
West Simsbury, CT 06092

Andrew Ecke
18 Meadowlark Rd.
West Simsbury, CT 06092

Richard Ecke
18 Meadowlark Rd.
West Simsbury, CT 06092

/s/ *Sean R. Janda*
SEAN R. JANDA

ADDENDUM

# TABLE OF CONTENTS

11 U.S.C. § 105(a) ....................................................................... A1

11 U.S.C. § 523 .......................................................................... A1

11 U.S.C. § 524(e)-(h) ................................................................ A6

11 U.S.C. § 1123 ....................................................................... A11

**11 U.S.C. § 105(a)**

**§ 105. Power of court**

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

. . .

**11 U.S.C. § 523**

**§ 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1192[,] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

(A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;

(B) with respect to which a return, or equivalent report or notice, if required—

(i) was not filed or given; or

(ii) was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

A1

(iv) that the debtor caused to be made or published with intent to deceive; or

(C)(i) for purposes of subparagraph (A)—

(I) consumer debts owed to a single creditor and aggregating more than $500 2 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief under this title are presumed to be nondischargeable; and

(II) cash advances aggregating more than $750 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief under this title, are presumed to be nondischargeable; and

(ii) for purposes of this subparagraph—

(I) the terms "consumer", "credit", and "open end credit plan" have the same meanings as in section 103 of the Truth in Lending Act; and

(II) the term "luxury goods or services" does not include goods or services reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor;

(3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(5) for a domestic support obligation;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

(7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty—

(A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or

(B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition;

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

(9) for death or personal injury caused by the debtor's operation of a motor vehicle, vessel, or aircraft if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance;

(10) that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge, or was denied a discharge under section 727(a)(2), (3), (4), (5), (6), or (7) of this title, or under section 14c(1), (2), (3), (4), (6), or (7) of such Act;

(11) provided in any final judgment, unreviewable order, or consent order or decree entered in any court of the United States or of any State, issued by a Federal depository institutions regulatory agency, or contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union;

(12) for malicious or reckless failure to fulfill any commitment by the debtor to a Federal depository institutions regulatory agency to maintain the capital of an insured depository institution, except that this paragraph shall not extend any such commitment which would otherwise be terminated due to any act of such agency;

(13) for any payment of an order of restitution issued under title 18, United States Code;

(14) incurred to pay a tax to the United States that would be nondischargeable pursuant to paragraph (1);

A3

(14A) incurred to pay a tax to a governmental unit, other than the United States, that would be nondischargeable under paragraph (1);

(14B) incurred to pay fines or penalties imposed under Federal election law;

(15) to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit;

(16) for a fee or assessment that becomes due and payable after the order for relief to a membership association with respect to the debtor's interest in a unit that has condominium ownership, in a share of a cooperative corporation, or a lot in a homeowners association, for as long as the debtor or the trustee has a legal, equitable, or possessory ownership interest in such unit, such corporation, or such lot, but nothing in this paragraph shall except from discharge the debt of a debtor for a membership association fee or assessment for a period arising before entry of the order for relief in a pending or subsequent bankruptcy case;

(17) for a fee imposed on a prisoner by any court for the filing of a case, motion, complaint, or appeal, or for other costs and expenses assessed with respect to such filing, regardless of an assertion of poverty by the debtor under subsection (b) or (f)(2) of section 1915 of title 28 (or a similar non-Federal law), or the debtor's status as a prisoner, as defined in section 1915(h) of title 28 (or a similar nonFederal law);

(18) owed to a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, under—

(A) a loan permitted under section 408(b)(1) of the Employee Retirement Income Security Act of 1974, or subject to section 72(p) of the Internal Revenue Code of 1986; or

(B) a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title; but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title; or

(19) that—

(A) is for—

A4

        (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

        (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

      (B) results, before, on, or after the date on which the petition was filed, from—

        (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

        (ii) any settlement agreement entered into by the debtor; or

        (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

For purposes of this subsection, the term "return" means a return that satisfies the requirements of applicable nonbankruptcy law (including applicable filing requirements). Such term includes a return prepared pursuant to section 6020(a) of the Internal Revenue Code of 1986, or similar State or local law, or a written stipulation to a judgment or a final order entered by a nonbankruptcy tribunal, but does not include a return made pursuant to section 6020(b) of the Internal Revenue Code of 1986, or a similar State or local law.

  (b) Notwithstanding subsection (a) of this section, a debt that was excepted from discharge under subsection (a)(1), (a)(3), or (a)(8) of this section, under section 17a(1), 17a(3), or 17a(5) of the Bankruptcy Act, under section 439A of the Higher Education Act of 1965, or under section 733(g) 3 of the Public Health Service Act in a prior case concerning the debtor under this title, or under the Bankruptcy Act, is dischargeable in a case under this title unless, by the terms of subsection (a) of this section, such debt is not dischargeable in the case under this title.

  (c)(1) Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

      (2) Paragraph (1) shall not apply in the case of a Federal depository institutions regulatory agency seeking, in its capacity as conservator, receiver, or liquidating agent for an insured depository institution, to recover a debt described in

subsection (a)(2), (a)(4), (a)(6), or (a)(11) owed to such institution by an institution-affiliated party unless the receiver, conservator, or liquidating agent was appointed in time to reasonably comply, or for a Federal depository institutions regulatory agency acting in its corporate capacity as a successor to such receiver, conservator, or liquidating agent to reasonably comply, with subsection (a)(3)(B) as a creditor of such institution-affiliated party with respect to such debt.

(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

(e) Any institution-affiliated party of an insured depository institution shall be considered to be acting in a fiduciary capacity with respect to the purposes of subsection (a)(4) or (11).

## 11 U.S.C. § 524(e)-(h)

### § 524. Effect of discharge

. . .

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

(f) Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt.

(g)(1)(A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

(B) An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

(2)(A) Subject to subsection (h), if the requirements of subparagraph (B) are met at the time an injunction described in paragraph (1) is entered, then after entry of

A6

such injunction, any proceeding that involves the validity, application, construction, or modification of such injunction, or of this subsection with respect to such injunction, may be commenced only in the district court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy.

    (B) The requirements of this subparagraph are that—

        (i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization—

        (I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

        (II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

        (III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of—

            (aa) each such debtor;

            (bb) the parent corporation of each such debtor; or

            (cc) a subsidiary of each such debtor that is also a debtor; and

        (IV) is to use its assets or income to pay claims and demands; and

        (ii) subject to subsection (h), the court determines that—

        (I) the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

        (II) the actual amounts, numbers, and timing of such future demands cannot be determined;

        (III) pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

        (IV) as part of the process of seeking confirmation of such plan—

            (aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties

pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

          (bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

          (V) subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

    (3)(A) If the requirements of paragraph (2)(B) are met and the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan—

          (i) the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);

          (ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

          (iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

    (B) Subparagraph (A) shall not be construed to—

          (i) imply that an entity described in subparagraph (A)(ii) or (iii) would, if this paragraph were not applicable, necessarily be liable to any entity by reason of any of the acts described in subparagraph (A);

          (ii) relieve any such entity of the duty to comply with, or of liability under, any Federal or State law regarding the making of a fraudulent conveyance in a transaction described in subparagraph (A)(ii) or (iii); or

(iii) relieve a debtor of the debtor's obligation to comply with the terms of the plan of reorganization, or affect the power of the court to exercise its authority under sections 1141 and 1142 to compel the debtor to do so.

(4)(A)(i) Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.

(ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

(iii) As used in this subparagraph, the term "related party" means—

(I) a past or present affiliate of the debtor;

(II) a predecessor in interest of the debtor; or

(III) any entity that owned a financial interest in—

(aa) the debtor;

(bb) a past or present affiliate of the debtor; or

(cc) a predecessor in interest of the debtor.

(B) Subject to subsection (h), if, under a plan of reorganization, a kind of demand described in such plan is to be paid in whole or in part by a trust described in

A9

paragraph (2)(B)(i) in connection with which an injunction described in paragraph (1) is to be implemented, then such injunction shall be valid and enforceable with respect to a demand of such kind made, after such plan is confirmed, against the debtor or debtors involved, or against a third party described in subparagraph (A)(ii), if—

       (i) as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind, and

       (ii) the court determines, before entering the order confirming such plan, that identifying such debtor or debtors, or such third party (by name or as part of an identifiable group), in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

    (5) In this subsection, the term "demand" means a demand for payment, present or future, that—

       (A) was not a claim during the proceedings leading to the confirmation of a plan of reorganization;

       (B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and

       (C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

    (6) Paragraph (3)(A)(i) does not bar an action taken by or at the direction of an appellate court on appeal of an injunction issued under paragraph (1) or of the order of confirmation that relates to the injunction.

    (7) This subsection does not affect the operation of section 1144 or the power of the district court to refer a proceeding under section 157 of title 28 or any reference of a proceeding made prior to the date of the enactment of this subsection.

   (h) APPLICATION TO EXISTING INJUNCTIONS.—

For purposes of subsection (g)—

    (1) subject to paragraph (2), if an injunction of the kind described in subsection (g)(1)(B) was issued before the date of the enactment of this Act, as part of a plan of reorganization confirmed by an order entered before such date, then the injunction shall be considered to meet the requirements of subsection (g)(2)(B) for purposes of subsection (g)(2)(A), and to satisfy subsection (g)(4)(A)(ii), if—

(A) the court determined at the time the plan was confirmed that the plan was fair and equitable in accordance with the requirements of section 1129(b);

(B) as part of the proceedings leading to issuance of such injunction and confirmation of such plan, the court had appointed a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands described in subsection (g)(4)(B) with respect to such plan; and

(C) such legal representative did not object to confirmation of such plan or issuance of such injunction; and

(2) for purposes of paragraph (1), if a trust described in subsection (g)(2)(B)(i) is subject to a court order on the date of the enactment of this Act staying such trust from settling or paying further claims—

(A) the requirements of subsection (g)(2)(B)(ii)(V) shall not apply with respect to such trust until such stay is lifted or dissolved; and

(B) if such trust meets such requirements on the date such stay is lifted or dissolved, such trust shall be considered to have met such requirements continuously from the date of the enactment of this Act.

. . .

## 11 U.S.C. § 1123

### § 1123. Contents of plan

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as—

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

(8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

(b) Subject to subsection (a) of this section, a plan may—

(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

(3) provide for—

    (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

    (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

(c) In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.

(d) Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.