RICHARD C. WESLEY, *Circuit Judge*, concurring in the judgment:

Does a bankruptcy court have the power to release direct or particularized claims asserted by third parties against nondebtors without the third parties' consent? Yes—this Court said so in *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992). *Drexel* has not been overruled either by the Supreme Court or by this Court sitting *en banc*. It is binding. Consequently, although the parties have sacrificed a forest on the matter—and rightly so, weighty as it is—that ship has, for better or worse, sailed. I therefore reluctantly concur with the majority's conclusion that a bankruptcy court has the authority to approve a Chapter 11 reorganization plan that includes nonconsensual nondebtor releases. Again: *Drexel* says so.

That said, neither *Drexel*, nor our subsequent discussion of nonconsensual nondebtor releases in *Metromedia*, traces that power back to any provision of the Bankruptcy Code. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). In fact, although *Metromedia* acknowledged that *Drexel* had already crossed the bridge, it also appreciated its questionable structure, and was wary to traverse it once more. To the point, Judge Jacobs carefully explained "the reluctance to approve nondebtor releases," and cautioned that nowhere—apart

1

from asbestos-related bankruptcies—does the Code authorize them. *See id*. The majority concedes as much; it recognizes that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014). Today, it fills that gap with §§ 105 and 1123(b)(6).

Those provisions of the Bankruptcy Code say nothing about nondebtor releases, and I am not convinced that statutory footing is up to the task. Accordingly, although mindful that, for this Court, the issue has already been settled (albeit without any basis in the Code), I write separately to highlight my concerns.

Those concerns are, in brief: extinguishing direct, particularized claims against nondebtors without the claimholder's consent, and without compensating the claimholder, is an extraordinarily powerful tool for a bankruptcy court to wield—indeed, for any court to wield. Congress once before provided clarity on the propriety of third-party releases in bankruptcy. It could do so again, but, since 1994, has not. Absent any movement on that front, the question, which has divided the courts of appeals for decades, would benefit from nationwide

resolution by the Supreme Court. In that event, a uniform view of the problem would emerge.

# I

The majority's overview of the facts, procedural history, and opinions below, is thorough and well stated. For present purposes, it is sufficient to emphasize exactly what the Shareholder Release[1] purports to do.

Prior to Purdue's Chapter 11 filing, widespread efforts to hold Purdue legally accountable for its role in the opioid epidemic eventually revealed, at least in the eyes of countless plaintiffs, that certain members of the Sackler family were heavily involved with unlawful efforts to boost Purdue's opioid sales. *See In re Purdue Pharma, L.P.* ("*Purdue II*"), 635 B.R. 26, 50–51 (S.D.N.Y. 2021). Seeking to hold the Sackler family members directly liable for their part in perpetuating the opioid epidemic, both private litigants as well as state Attorneys General turned to various state statutes, including consumer protection laws, which, notwithstanding considerable factual overlap with allegations of corporate liability, impose a separate and independent duty on individuals who, by virtue

---

[1] Defined terms here coincide with the those in the majority opinion.

3

of their role as either officer, manager, or director of a corporation, personally participated in corporate wrongdoing. *See id*. As Judge McMahon aptly put it:

> [I]t is undisputed that these laws impose liability, and even penalties, on such persons independent of any corporate liability (or lack of same), and independent of any claim the corporation could assert against them for faithless service as a result of those same acts.

*Id.* at 91. These claims "arise out of the Sacklers' own conduct." *Id.*

The Shareholder Release forever halts those proceedings in their tracks. It permanently enjoins the private and state litigants, as well as all future plaintiffs, from pursuing those claims against the Sacklers—indeed, any claim "of any kind, character[,] or nature whatsoever, Special App'x 798—so long as the Debtors' "conduct, omission, or liability" is "the legal cause or is otherwise a legally relevant factor."[2] *Id.* at 920. No carveout exists for claims based on fraud—claims

---

[2] The limiting effect of the "legally relevant" requirement is elusive, and its precise reach has, understandably, not been articulated either by the parties, the bankruptcy court, or the majority. Their failure to do so is no fault of their own; it is difficult to predict the various claims which might be asserted directly against the Sacklers, and future litigation will determine whether any given claim falls within the provision. Still, one can envision an exceedingly broad understanding of "legal relevance," and I, for one, am skeptical of the requirement's limiting effect. To illustrate, at issue in *Manville III* were direct claims against Manville's primary insurer alleging that the insurer violated purported state-imposed duties to disclose certain asbestos-related information it learned from Manville. *See In re Johns-Manville Corp.* ("*Manville III*"), 517 F.3d 52, 66 (2d Cir. 2008) *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). We held that notwithstanding the factual overlap of those claims with claims which might be asserted against Manville, or by Manville against the insurer, the bankruptcy

from which a debtor *could not* seek a discharge under the Code. *See* 11 U.S.C. § 523(a)(2)(A); *see also Archer v. Warner*, 538 U.S. 314, 321 (2003) ("[The Code] ensure[s] that all debts arising out of fraud are excepted from discharge no matter their form." (quotation omitted)). Appellants seek a release broader than that which Congress decided was wise to make available to a debtor in bankruptcy.

On top of that, the Release does not "channel[]" the enjoined claims "to a settlement fund" for compensation, *Metromedia*, 416 F.3d at 142, but instead mandates that any value paid to personal injury claimants regarding, for example, the opioid-related death of another person, be based only upon claims "held against the Debtors, and not to any associated . . . Channeled Claim against a non-Debtor party." Special App'x 634, 693, 734–35. In other words, the value of a channeled claim is only the value of claims against the estate.[3]

---

court was without jurisdiction to release the direct claims against the insurer. *See id.* As to those direct claims, Manville's "conduct" or "omission" might be described as legally relevant: they were based on what the insurer learned *from Manville*. I am concerned that "legal relevance" might release claims mirroring those which we have previously held did not fall within bankruptcy jurisdiction.

[3] Consider this example. Someone has a claim against only Purdue and it's worth $100,000. They file a proof of claim and receive a check for some percentage of that claim. Another person has the same claim for the same amount, *and* a direct claim against the Sacklers worth another $100,000. Under the Plan, that party receives only the same amount as the first claimant; they receive no payout on their direct claim against the Sacklers, even though the Sacklers are released from that claim.

This aspect of the Release substantially broadens its reach as compared with the release approved in *Manville I*. *See MacArthur Co. v. Johns-Manville Corp.* ("*Manville I*"), 837 F.2d 89 (2d Cir. 1988). There, we rejected the notion that a release constituted a bankruptcy discharge because the released claims were not extinguished, but were "channeled away from the insurers and redirected at the proceeds of the settlement." *Id.* at 91. Here, the Plan expressly disallows value being paid based on claims against nondebtors, that is, the Sacklers.[4] *Manville I* therefore does not lay the groundwork for the Release's approval.

Finally, the Release is non-consensual; it binds consenting and objecting parties, without providing an opt-out option to those who object.

In summary, the Release enjoins a broader swath of claims than a debtor himself could seek to discharge under the Bankruptcy Code, and it does so without providing any compensation to the claimholders, who must abide by its terms whether they like it or not. The Release encompasses a potentially wide range of

---

[4] Appellants dispute that characterization; they point to the Plan's language that any distribution "is deemed to be a distribution in satisfaction of all [personal injury] Channeled Claims," and argue that payments from the personal injury trust is in satisfaction of claims both against the Debtors and Sacklers. Mortimer Side Br. at 49 (quoting Special App'x 693). Yet simply stating as much does not make it so where, as here, the amount of distribution is based only upon claims as against the Debtors.

claims and cloaks the Sacklers with blanket immunity. It is "in effect . . . a [] discharge." *Metromedia*, 416 F.3d at 142.

In exchange, the Sacklers have agreed, under the Plan, to offer a substantial sum of money to the Debtors' estate.[5] No doubt, those funds help make possible (a) a more meaningful distribution of the Debtors' estate to its creditors and (b) recovery for those who hold claims against the Debtors. It is equally apparent that the Sacklers mean what they've said: no release, no money. However, our task today is not to decide whether, as a policy matter, the Release is justified. Instead, without ignoring that the Sacklers' substantial contribution will likely play a meaningful role in providing some measure of finality to the countless families who have suffered as a result of the opioid crisis, the dispositive question is whether, under the Bankruptcy Code, a bankruptcy court is authorized to approve the Release.[6]

---

[5] Again, however, their contribution is not directed at the satisfaction of third parties' direct claims against them in their individual capacity, but, instead, at the satisfaction of either claims against the Debtors, or claims held by the estate against the Sacklers. As to the latter set of claims, the Sacklers have, in essence, settled derivative claims belonging to the estate and, in return, received a release not just from those derivative claims, but also from claims independently held by third parties.

[6] Of course, the majority correctly recognizes that the antecedent question to the statutory authority analysis is whether the bankruptcy court had jurisdiction under the Code to approve the Release. I do not dispute its conclusion that it did; it is settled law in this

## II

The Bankruptcy Code is silent on the matter. That is no surprise. Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14 (1938). To that end, Congress created a "comprehensive federal system . . . to govern the orderly conduct of debtors' affairs and creditors' rights." *Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001). In short, the Bankruptcy Code's central focus is on the adjustment of the debtor-creditor relationship. Of course, that adjustment can implicate the interests

---

Circuit that a bankruptcy court has broad "related to" jurisdiction over any civil proceedings that "might have any conceivable effect" on the estate. *See SPV OSUS Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018). In the easy case, that effect can be direct, as it was in *Manville I*. There, the claims asserted against the insurer sought recovery from the *res* itself. *See Manville I*, 837 F.2d at 93. The bankruptcy court had jurisdiction to prevent the third party from "collect[ing] out of the proceeds of Manville's insurance policies…." *Id.* In the harder case, the effect is less direct. In *SPV*, for example, the plaintiffs asserted direct claims against, among other defendants, UBS AG, alleging principally that UBS had aided and abetted the infamous fraud perpetrated by the debtor, Bernard L. Madoff Investment Securities LLC. *See SPV*, 992 F.3d at 338. Although the plaintiffs sought recovery from UBS itself, UBS, in turn, had viable claims for indemnification and contribution against the debtor. *See id.* at 340–42. The possibility that those claims might succeed—and the fact that the debtor would incur expense in litigating such claims—was enough to confer jurisdiction on the bankruptcy court to enjoin the plaintiff's direct claims against UBS. *See id.* at 341–42. This case looks more like *SPV*, and the majority's explanation as to how the direct claims against the Sacklers might affect the Debtors' estate is sound.

8

of third-party nondebtors.[7] But as to their own independent obligations, third-party nondebtors are, simply, a nonconcern.

Against that backdrop, there is little to glean from Congressional silence where, as Judge McMahon put it, "one would not expect Congress to speak." *Purdue II*, 635 B.R. at 110. Appellants ask us to accept the remarkable premise that Congress, while believing it wise to except certain claims (*i.e.*, claims for fraud) from a debtor's discharge, took no issue with the idea that such claims could be effectively discharged for nondebtors, who might contribute funds to settle claims against the *debtor*, but who would face *no* consequences from their own, independent liability—even though state laws mandate otherwise. Not only that, appellants ask us to ground this grant of authority in congressional silence, as, again, the Bankruptcy Code does not expressly authorize the practice.

And yet that silence is, effectively, what the majority sees as granting the bankruptcy court a power that is nothing short of extraordinary. It points to 11 U.S.C. § 1123(b)(6), which it says encompasses a bankruptcy court's residual

---

[7] For example, the automatic stay triggered by a debtor's bankruptcy filing can apply to nondebtors in certain circumstances. *See, e.g.*, *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).

9

equitable authority, and empowers a bankruptcy court to do all but that which the Code expressly forbids. Maj. Op. at 52–53.[8]

To be sure, the Court in *Energy Resources* characterized § 1123(b)(6) as Congress's recognition of a bankruptcy court's residual equitable authority. But it did so in connection with its observation that "bankruptcy courts, as courts of equity, have broad authority to modify *creditor-debtor relationships*." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549 (1990) (emphasis added). That case concerned whether a *debtor's* tax liabilities could be satisfied in an order as determined by the bankruptcy court, over the objection of the Internal Revenue Service. Nothing in *Energy Resources* suggests that within § 1123(b)(6)'s equitable repository is the power to extinguish an individual's claims against a nondebtor without their consent, and without providing them any value in return. Indeed, that case says nothing about a nondebtor's obligations under the Bankruptcy Code whatsoever.

---

[8] The majority recognizes that the Release cannot be justified solely by § 105. *See Metromedia*, 416 F.3d at 142 ("Any power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." (internal citation omitted)). In other words, the Release turns on § 1123(b)(6). I focus my analysis there.

10

Instead, *Energy Resources* reminds us that bankruptcy courts are courts of equity, and that their ability to carry out the Code's provisions must be understood with that principle in mind. But it does not answer whether under that umbrella of equitable authority exists the power to release, on a nonconsensual basis, nondebtors from direct claims held by third parties. Nor does *Energy Resources* suggest that a bankruptcy court's well of residual equitable authority, so long as it does not run up against a more specific provision of the Code, is bottomless.

Again: that case concerned the adjustment of a creditor-debtor relationship, which, as provided above, is a bankruptcy court's *raison d'etre*. Courts should understand any congressional grant of equitable authority to the bankruptcy court with that principal purpose in mind. Releasing nondebtors from their own liability—provided for under state law—over the objection of a claimholder and without compensating that claimholder is so far afield from that purpose that plugging-and-playing *Energy Resources*' description of § 1123(b)(6) can't be right.[9]

---

[9] The decisions from our sister circuits cited by the majority are no more persuasive. Those decisions also rely on *Energy Resources'* characterization of § 1123(b)(6). *See, e.g.*, *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008). In any event, in *Airadigm* itself, the release did not cover, as the Release here does, claims for willful misconduct, a fact emphasized by the Seventh Circuit as justifying its confirmation. *See id.* That case does not signal a green light to the approval of the Shareholder Release. Neither does *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002). There, the Sixth Circuit rejected the

11

Moreover, the Court has, in other contexts, explained that a bankruptcy court's equitable authority is not "unlimited," but instead incorporates "traditional standards in equity practice," and that courts can look to "cases outside the bankruptcy context" to help understand the limits of that authority. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801–02 (2019).[10] The majority does not liken the equitable authority recognized today to anything traditionally recognized at equity. I too am at a loss. Indeed, the idea that bankruptcy courts can order the involuntary release of direct claims against nondebtors is "an extraordinary thing" that is "different . . . from what courts ordinarily do." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723 (S.D.N.Y. 2019).

At bottom, if Congress intended so extraordinary a grant of authority, it should say so. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) (requiring "more than simple statutory silence if, and when, Congress were to

---

third-party release *because* it did not provide an opportunity for objecting claimholders to recover in full. *See id.* at 659–61.

[10] In *Taggart*, the Court drew on traditional equitable standards for civil contempt sanctions outside the bankruptcy context to define a bankruptcy court's authority to hold a party in civil contempt for violating § 523(a)(2)'s discharge injunction. If, as the majority and appellants would have us believe, a bankruptcy court's ability to enforce its injunction were limited only by that which the Code did not forbid, then *Taggart*'s invocation of traditional civil contempt standards would seem misplaced.

intend a major departure" from the Code). It has before; in 1994, it amended the Bankruptcy Code to provide express authorization for nondebtor releases in asbestos-related bankruptcies, subject to a stringent set of requirements. *See* 11 U.S.C. 524(g).[11] That amendment occurred when, at that time, courts, such as in *Drexel*, were then approving nondebtor releases in non-asbestos bankruptcies. Yet Congress endorsed nondebtor releases in only the asbestos context. The parties debate whether Congress' express but limited approval in § 524(g) was an implicit rejection of nondebtor releases in non-asbestos contexts. The majority says no. Regardless of the right answer, the majority's answer pins this Circuit firmly on one side of a weighty issue that, for too long, has split the courts of appeals.

This difference in views has consequences. As it stands, a nondebtor's ability to be released through bankruptcy turns on where a debtor files. Forum-dependent results are anathema to the establishment of "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8,

---

[11] Even there, however, the injunction may extend to nondebtors only where the nondebtor is "directly liable or indirectly liable for the conduct of, claims against, or demands on the debtor…." 11 U.S.C. § 524(g)(4)(A)(ii). The Release here is broader; it covers claims aimed at the Sacklers' liability even if it is *independent* from the Debtors' liability. Even under § 524(g), it's far from clear the Release would survive.

cl. 4. Finding implicit grants of extraordinary powers in congressional silence is at cross purposes with the Code's "comprehensive scheme." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Absent direction from Congress—and, since 1994, there has been none—or the High Court, the answer is a function of geography.