**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): 22-110(L) and consolidated cases _____ Caption [use short title] _____

Motion for: stay of mandate pending disposition of petition

for writ of certiorari

_____

_____

Set forth below precise, complete statement of relief sought:

(1) Stay of issuance of mandate pending disposition of          **In Re: Purdue Pharma L.P.**

petition for writ of certiorari;

_____

(2) If the motion is denied, an administrative stay of

mandate for 21 days so the Solicitor General may renew

the request for a stay of mandate in the Supreme Court.

MOVING PARTY: U.S. Trustee William K. Harrington          OPPOSING PARTY: See addendum _____

- ☐ Plaintiff          ☐ Defendant
- ☐ Appellant/Petitioner          ☑ Appellee/Respondent

MOVING ATTORNEY: Sean R. Janda          OPPOSING ATTORNEY: See addendum _____

[name of attorney, with firm, address, phone number and e-mail]

U.S. Department of Justice, Civil Division, Appellate Staff          _____

950 Pennsylvania Avenue NW, Room 7260, Washington, DC 20530          _____

(202) 305-1754; sean.r.janda@usdoj.gov          _____

Court- Judge/ Agency appealed from: U.S. District Court for the Southern District of New York/The Honorable Colleen McMahon

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☑ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes   ☐ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☑ Yes ☐ No If yes, enter date: Case argued on April 29, 2022

**Signature of Moving Attorney:**

/s/ Sean R. Janda _____ Date: 07/07/2023 _____ Service by: ☑ CM/ECF   ☑ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# ADDENDUM

| Appellees' and Appellants' Counsel and *Pro Se* Appellees | Position on Motion |
|---|---|
| *Counsel for Debtors-Appellants*:<br><br>Gregory G. Garre     Marshall S. Huebner<br>Charles S. Dameron     Benjamin S. Kaminetzky<br>Eric J. Konopka     Eli J. Vonnegut<br>Latham & Watkins LLP     James I. McClammy<br>555 Eleventh Street NW, Suite 1000     Marc J. Tobak<br>Washington, DC 20004     Christopher S. Robertson<br>202-637-2207     Garrett L. Cardillo<br>gregory.garre@lw.com     Davis Polk & Wardwell LLP<br>charles.dameron@lw.com     450 Lexington Avenue<br>eric.konopka@lw.com     New York, NY 10117<br>212-450-400<br>marshall.huebner@davispolk.com<br>ben.kaminetzky@davispolk.com<br>eli.vonnegut@davispolk.com<br>james.mcclammy@davispolk.com<br>marc.tobak@davispolk.com<br>christopher.robertson@davispolk.com<br>garrett.cardillo@davispolk.com | Does not consent |
| *Counsel for Appellant Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*:<br><br>Z.W. Julius Chen     Arik Y. Preis<br>Akin Gump Strauss Hauer & Feld LLP     Mitchell P. Hurley<br>2001 K Street NW     Sara L. Brauner<br>Washington, DC 20006     Akin Gump Strauss Hauer & Feld LLP<br>202-887-4000     One Bryant Park, 44th Floor<br>chenj@akingump.com     New York, NY 10036<br>212-872-1000<br>apreis@akingump.com<br>mhurley@akingump.com<br>sbrauner@akingump.com | Opposes |
| *Counsel for Appellant Multi-State Governmental Entities Group*:<br><br>Kevin C. Maclay<br>Jeffrey A. Liesemer<br>Lucas H. Self<br>Caplin & Drysdale, Chartered<br>One Thomas Circle NW, Suite 1100<br>Washington, D.C. 20005<br>202-862-5000<br>kmaclay@capdale.com<br>jliesemer@capdale.com | Does not consent |

| | |
|---|---|
| lself@capdale.com | |
| *Counsel for Appellant Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*:<br><br>Kenneth H. Eckstein<br>Rachel Ringer<br>David E. Blabey Jr.<br>Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, NY 10036<br>212-715-9100<br>keckstein@kramerlevin.com<br>rringer@kramerlevin.com<br>dblabey@kramerlevin.com<br><br>Richard J. Leveridge<br>Richard D. Shore<br>Daniel I. Wolf<br>Gilbert LLP<br>700 Pennsylvania Avenue SE<br>Washington, DC 20003<br>202-772-2200<br>leveridger@gilbertlegal.com<br>shorer@gilbertlegal.com<br>wolfd@gilbertlegal.com<br><br>Lawrence S. Robbins<br>Roy T. Englert, Jr.<br>Robbins, Russell, Englert, Orseck & Untereiner LLP<br>2000 K Street NW, 4th Floor<br>Washington, DC<br>202-775-4500<br>lrobbins@robbinsrussell.com<br>renglert@robbinsrussell.com<br><br>Melanie L. Cyganowski<br>Otterbourg P.C.<br>230 Park Avenue<br>New York, NY 10169<br>212-661-9100<br>mcyganowski@otterbourg.com<br><br>David J. Molton<br>Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>212-209-4800<br>dmolton@brownrudnick.com | Opposes |
| *Counsel for Appellant Ad Hoc Group of Individual Victims of Purdue Pharma, L.P.*:<br><br>J. Christopher Shore<br>Michele J. Meises<br>Alice Tsier<br>White & Case LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br>212-819-8200<br>cshore@whitecase.com<br>michele.meises@whitecase.com<br>atsier@whitecase.com<br><br>Edward E. Neiger<br>Jennifer Christian<br>Ask LLP<br>151 West 46th Street, 4th Floor<br>New York, NY 10036<br>212-267-7342<br>eneiger@askllp.com | Opposes |
| *Counsel for Appellant the Raymond Sackler Family*:<br><br>Gerard Uzzi<br>Alexander B. Lees<br>Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>212-530-5000<br><br>Gregory P. Joseph<br>Mara Leventhal<br>Joseph Hage Aaronson LLC<br>485 Lexington Avenue, 30th Floor<br>New York, NY 10017<br>212-407-1200 | No position |

| | | |
|---|---|---|
| guzzi@milbank.com<br>alees@milbank.com | gjoseph@jhany.com<br>mleventhal@jhany.com | |
| *Counsel for Appellant Mortimer-Side Initial Covered Sackler Persons:*<br><br>Maura Kathleen Monaghan<br>Jasmine Ball<br>Debevoise & Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022<br>212-909-6000<br>mkmonaghan@debevoise.com<br>jball@debevoise.com | | No response |
| *Counsel for Appellee the State of California and the People of California, by and through Attorney General Rob Bonta:* | | No position |
| Bernard Ardavan Eskandari<br>California Department of Justice, Office of the Attorney General<br>300 South Spring Street, Ste 1702<br>Los Angeles, CA 90013<br>213-269-6348<br>bernard.eskandari@doj.ca.gov | Nicklas Arnold Akers<br>California Attorney General's Office<br>455 Golden Gate Avenue, Ste 11000<br>San Francisco, CA 94102<br>415-510-3364<br>nicklas.akers@doj.ca.gov | |
| *Counsel for Appellee the State of Connecticut:* | | No position |
| Michael Skold<br>Connecticut Office of the Attorney General<br>165 Capitol Avenue<br>Hartford, CT 06106<br>860-808-5020<br>michael.skold@ct.gov | Irve J. Goldman<br>Pullman & Comley, LLC<br>Bridgeport, CT 06601, 8th Floor<br>203-330-2213<br>igoldman@pullcom.com | |
| *Counsel for Appellee the State of Delaware:*<br><br>Christian Douglas Wright<br>Marion Quirk<br>Delaware Department of Justice<br>820 N. French Street<br>Wilmington, DE 19801<br>302-683-8880<br>christian.wright@delaware.gov<br>marion.quirk@delaware.gov | | No position |
| *Counsel for Appellee the District of Columbia:*<br><br>Ashwin Phatak<br>Wendy Weinberg<br>Sonya Lebsack | | No position |

| | |
|---|---|
| D.C. Office of the Attorney General<br>400 6th Street NW, Suite 8100<br>Washington, DC 20001<br>202-724-5667<br>ashwin.phatak@dc.gov<br>wendy.weinberg@dc.gov<br>sonya.lebsack@dc.gov | |
| *Counsel for Appellee the State of Maryland*:<br><br>Brian T. Edmunds<br>Office of the Attorney General<br>200 Saint Paul Place<br>Baltimore, MD 21202<br>410-576-6578<br>bedmunds@oag.state.md.us | No position |
| *Counsel for Appellee the State of Oregon*:<br>Jeffrey J. Payne<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301<br>503-378-4402<br>jeff.j.payne@doj.state.or.us | No position |
| *Counsel for Appellee the State of Rhode Island*:<br><br>Kathryn Sabatini<br>Nicholas M. Vaz<br>Rhode Island Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903<br>401-274-4400<br>ksabatini@riag.ri.gov | No position |
| *Counsel for Appellee the State of Vermont*:<br><br>Jill Abrams<br>Eleanor Laurel Pullin Spottswood<br>Vermont Office of the Attorney General<br>109 State Street<br>Montpelier, VT 05609<br>802-828-1106<br>jill.abrams@vermont.gov | No position |
| *Counsel for Appellee the State of Washington*:<br><br>Tad Robinson O'Neill   Matthew J. Gold<br>Tera Heintz   Robert Michael Tuchman<br>Washington Office of the Attorney   Kleinberg, Kaplan, Wolff & Cohen P.C.<br>General   500 Fifth Avenue<br>PO Box 40100   New York, NY 10110 | No position |

| | | |
|---|---|---|
| Olympia, WA 98504<br>360-752-6200<br>tad.oneill@atg.wa.gov<br>tera.heintz@atg.wa.gov | 212-880-9827<br>mgold@kkwc.com<br>rtuchman@kkwc.com | |
| *Counsel for Appellees-Cross-Appellants Certain Canadian Municipalities and First Nations Creditors:*<br><br>Allen J. Underwood II<br>Lite DePalma Greenberg & Afanador LLC<br>570 Broad Street, Suite 1201<br>Newark, NJ 07102<br>973-877-3814<br>aunderwood@litedepalma.com | J. Carl Cecere<br>Cecere PC<br>6035 McCommas Boulevard<br>Dallas, TX 75206<br>469-600-9455<br>ccecere@cecerepc.com | No opposition |
| *Pro Se Appellee Ronald Bass:*<br><br>Ronald Bass<br>450 Little Place, Apt. 53<br>N. Plainfield, NJ 07060<br>ronaldbass12345@gmail.com | | Unknown |
| *Pro Se Appellee Ellen Isaacs, on behalf of Patrick Ryan Wroblewski:*<br><br>Michael S. Quinn<br>Eisenberg & Baum, LLP<br>24 Union Square East<br>New York, NY 10003<br>845-242-8400<br>mquinn@eandblaw.com<br><br>Ellen Isaacs, on behalf of Patrick Ryan Wroblewski<br>P.O. Box 725<br>Floyd, VA 24091<br>ryansopc@gmail.com | | Supports |
| *Pro Se Appellee Maria Ecke:*<br><br>Maria Ecke<br>8 Glenbrook Drive<br>West Simsbury, CT 06092<br>sagitarianm2004@yahoo.com | | No response |
| *Pro Se Appellee Andrew Ecke:*<br><br>Andrew Ecke<br>18 Meadowlark Road<br>West Simsbury, CT 06092<br>sagitarianm2004@yahoo.com | | No response |
| | | |

| *Pro Se Appellee Richard Ecke*: | No response |
|---|---|
| Richard Ecke<br>18 Meadowlark Road<br>West Simsbury, CT 06092<br>sagitarianm2004@yahoo.com | |

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

In Re: PURDUE PHARMA L.P., PURDUE PHARMA INC, PURDUE TRANSDERMAL TECHNOLOGIES L.P., PURDUE PHARMA MANUFACTURING L.P., PURDUE PHARMACEUTICALS L.P., IMBRIUM THERAPEUTICS L.P., ADLON THERAPEUTICS L.P., GREENFIELD BIOVENTURES L.P., SEVEN SEAS HILL CORP., OPHIR GREEN CORP., PURDUE PHARMA OF PUERTO RICO, AVRIO HEALTH L.P., PURDUE PHARMACEUTICAL PRODUCTS L.P., PURDUE NEUROSCIENCE COMPANY, NAYATT COVE LIFESCIENCE INC., BUTTON LAND L.P., RHODES ASSOCIATES L.P., PAUL LAND INC., QUIDNICK LAND L.P., RHODES PHARMACEUTICALS L.P., RHODES TECHNOLOGIES, UDF LP, SVC PHARMA LP, SVC PHARMA INC.,

Debtors.

_____

PURDUE PHARMA, L. P., PURDUE PHARMA INC, PURDUE TRANSDERMAL TECHNOLOGIES L.P., PURDUE PHARMA MANUFACTURING L.P., PURDUE PHARMACEUTICALS L.P., IMBRIUM THERAPEUTICS L.P., ADLON THERAPEUTICS L.P., GREENFIELD BIOVENTURES L.P., SEVEN SEAS HILL CORP., OPHIR GREEN CORP., PURDUE PHARMA OF PUERTO RICO, AVRIO HEALTH L.P., PURDUE PHARMACEUTICAL PRODUCTS L.P., PURDUE NEUROSCIENCE COMPANY, NAYATT COVE LIFESCIENCE INC., BUTTON LAND L.P., RHODES ASSOCIATES L.P., PAUL LAND INC., QUIDNICK LAND L.P., RHODES PHARMACEUTICALS L.P., RHODES TECHNOLOGIES, UDF LP, SVC PHARMA LP, SVC PHARMA INC.,

Debtors-Appellants-Cross-Appellees,

Nos. 22-110(L), 22-113, 22-115, 22-116, 22-117, 22-119, 22-121, 22-203, 22-299

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF PURDUE PHARMA L.P., et al., AD
HOC COMMITTEE OF GOVERNMENTAL AND
OTHER CONTINGENT LITIGATION CLAIMANTS,
THE RAYMOND SACKLER FAMILY, AD HOC
GROUP OF INDIVIDUAL VICTIMS OF PURDUE
PHARMA, L.P., MULTI-STATE GOVERNMENTAL
ENTITIES GROUP, MORTIMER-SIDE INITIAL
COVERED SACKLER PERSONS,

Appellants-Cross-Appellees,

v.

THE CITY OF GRANDE PRAIRIE, as Representative
Plaintiff for a Class Consisting of All Canadian Municipalities,
THE CITIES OF BRANTFORD, GRAND PRAIRIE,
LETHBRIDGE, AND WETASKIWIN, THE PETER
BALLANTYNE CREE NATION, on behalf of All
Canadian First Nations and Metis People, The PETER
BALLANTYNE CREE NATION on behalf itself, and The
LAC LA RONGE INDIAN BAND,

Appellees-Cross-Appellants,

THE STATE OF WASHINGTON, STATE OF
MARYLAND, DISTRICT OF COLUMBIA, U.S.
TRUSTEE WILLIAM K. HARRINGTON, STATE OF
CONNECTICUT, RONALD BASS, STATE OF
CALIFORNIA, PEOPLE OF THE STATE OF
CALIFORNIA by and through ATTORNEY GENERAL
ROB BONTA, STATE OF OREGON, STATE OF
DELAWARE, by and through ATTORNEY GENERAL
JENNINGS, STATE OF RHODE ISLAND, STATE OF
VERMONT, ELLEN ISAACS, on behalf of Patrick Ryan
Wroblewski, MARIA ECKE, ANDREW ECKE, RICHARD
ECKE,

Appellees.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO STAY MANDATE PENDING DISPOSITION OF
PETITION FOR A WRIT OF CERTIORARI**

Pursuant to Federal Rule of Appellate Procedure 41(d) and Local Rule 27.1, United States Trustee William K. Harrington respectfully moves to stay issuance of the mandate pending the disposition of a petition for a writ of certiorari. On July 7, 2023, the Solicitor General authorized the United States Trustee to file a petition for a writ of certiorari in this case. The United States Trustee intends to file such a petition on or before the deadline of August 28, 2023. That will enable the Supreme Court to consider the petition and, under the Court's normal practices, to resolve the case on the merits before the end of its next Term if it decides to grant review.

These appeals arise out of the reorganization in bankruptcy of Purdue Pharma L.P. and its affiliates (Purdue or debtors), stemming from their role in fueling the opioid epidemic that has plagued and continues to plague this country. Until recently, Purdue was controlled by members of the Raymond and Mortimer Sackler families. Members of those families, who withdrew billions of dollars from Purdue in the decade before the company filed for bankruptcy, have agreed to contribute a portion of those billions to fund Purdue's reorganization plan, but only on the condition that the Sacklers and a host of other individuals and entities—who have not themselves sought bankruptcy protection—receive a release of liability of exceptional and unprecedented breadth. The release provision "absolutely, unconditionally, irrevocably, fully, finally, forever[,] and permanently release[s]" the Sacklers from

1

every conceivable type of opioid-related civil claim—including claims based on fraud and other forms of willful misconduct that could not have been discharged had the Sacklers filed for bankruptcy in their individual capacities.  Op. 23 (quotation omitted).  The Sackler release extinguishes the claims of all opioid claimants except the United States—including those belonging to an untold number of claimants who did not consent to the release's terms.

As the government argued to the panel, the Sackler release is not authorized by the Bankruptcy Code, constitutes an abuse of the bankruptcy system, and violates due-process principles by extinguishing the property rights of non-debtors against individuals or entities not themselves in bankruptcy without consent.  The Bankruptcy Code grants courts unusual powers specifically authorized by the Constitution for addressing true insolvency.  Allowing the panel's decision to stand would leave in place a roadmap for wealthy corporations and individuals who are not in financial distress to misuse the bankruptcy system to avoid mass tort liability.  That is not what Congress enacted the Bankruptcy Code to accomplish.  And if such abuses are permitted, the gamesmanship that is sure to follow will only amplify the harms to victims in the future.  Given the substantial legal problems and serious threat to the public interest posed by nonconsensual third-party releases, the Solicitor General has determined to seek review of the panel's decision in the Supreme Court.

There is a reasonable probability that the Supreme Court will grant the government's certiorari petition.  There is no dispute that the courts of appeals are

sharply and intractably divided on the question whether nonconsensual third-party releases are lawful. Likewise, the practical and legal importance of the question both in this case and for the bankruptcy system cannot seriously be disputed. Indeed, Judge Wesley specifically recognized that the question presented here "would benefit from nationwide resolution by the Supreme Court." Concurring Op. 1-2. There is also at least a fair prospect that the government will prevail before the Supreme Court. No provision of the Code authorizes the sweeping power of releasing nonconsenting third parties' claims against non-debtors, and the Supreme Court has repeatedly rejected the premise at the heart of the panel's reasoning: that courts sitting in bankruptcy may take virtually any action not expressly forbidden by the Bankruptcy Code. In addition, that interpretation of the Code would raise serious constitutional problems.

Despite the strength of the government's legal arguments and the certworthiness of the question presented in this case, the government does not take lightly the step of pursuing further review. The opioid crisis is an urgent national problem. Because the Sacklers have refused to allow potential opioid claimants to opt in or opt out of the release (even as they have agreed to pay more and more during successive rounds of negotiations, Op. 15-23, 28-29), continuing to litigate this question would delay the plan's confirmation and thus the distribution of certain benefits to opioid victims. But the current plan, as negotiated by the Sacklers, would not result in the imminent distribution of benefits on a large scale. To the contrary,

the plan grants the Sacklers permanent litigation peace while allowing them to continue benefiting from the billions they have agreed to contribute to the reorganization plan by staggering their monetary contributions over a period of decades. *See* J.A.1570, J.A.3490. Moreover, the timeline for distribution already needs to be renegotiated due to the time that the case has been pending in this Court. So Purdue and the Sacklers should be able to compensate for any additional period of review by the Supreme Court by accelerating the payment schedule. And if the government prevails before the Supreme Court, there will be several alternative routes to confirm a reorganization plan that would not undermine the bankruptcy system and offend third parties' due-process rights.

The government seeks a stay of this Court's mandate out of an abundance of caution to preserve the Supreme Court's ability to review the forthcoming petition without needing to address threshold questions about the validity and applicability of the equitable-mootness doctrine. If the mandate is not stayed, we expect that the plan proponents will act swiftly to consummate the plan and thereby (in their view) render equitably moot any appeal of the Sackler release. The government vigorously disputes the potential applicability of the equitable-mootness doctrine to this case. But if the government's arguments are rejected, a stay of the mandate would also be necessary to prevent the government's petition from evading Supreme Court review. Especially considering the vast number of claimants in the underlying bankruptcies, including all fifty States and the District of Columbia, the public interest will be served by ensuring

certainty about whether a key component of the current reorganization plan is lawful before the plan's many components are allowed to take effect and be implemented— preserving the status quo that has been in place while these appeals were pending before this Court.

If this Court determines that a stay of the mandate is not warranted, the government respectfully requests that the Court administratively stay the issuance of the mandate for 21 days to permit the Solicitor General to renew the government's request for a stay in the Supreme Court and to allow the Circuit Justice to consider that request.

## BACKGROUND

1. These appeals arise from several Chapter 11 cases filed by Purdue Pharma L.P. and its corporate affiliates. Purdue manufactured, sold, and distributed OxyContin and other medications that contributed to the opioid epidemic. Op. 15. Until recently, Purdue was controlled by members of the Raymond and Mortimer Sackler families. Op. 14-15. Under the Sacklers' leadership, Purdue aggressively marketed OxyContin to doctors and pain patients while downplaying the risks of addiction. Op. 15. But many patients who had been prescribed OxyContin became addicted to the drug. SPA.16. Many other people began using OxyContin recreationally. *Id.* Nearly 247,000 people in the United States died from prescription-opioid overdoses between 1999 and 2019. SPA.18.

The opioid crisis spawned a flood of litigation against both Purdue and the Sacklers. To protect themselves from potential money judgments, the Sacklers withdrew $11 billion from Purdue and transferred a significant portion of their wealth overseas. Op. 17. Purdue then filed for bankruptcy relief. The Sacklers did not. Instead, the Sacklers negotiated a separate settlement with Purdue and a subset of plaintiffs, which Purdue implemented in its proposed plan of reorganization. Under the plan, Purdue would reinvent itself as a public-benefit company tasked with abating the opioid crisis. The estate's remaining funds would be used to pay administrative expenses before being distributed to various creditor trusts. Under this distribution scheme, an opioid victim—even one who had suffered catastrophic injuries—is likely to receive between $3,500 and $48,000, with payments to some victims to be spread out over ten years. *See* J.A.1695, 1697, 1800, 1805, 1812; *see also* SPA.640 ("[I]t may take years before you receive all of your Award.").

The bankruptcy estate does not hold sufficient assets to fund the plan, in part because the Sacklers "drained Purdue's total assets by 75%" and reduced Purdue's "'solvency cushion' by 82%." Op. 17 (quotation omitted). The Sacklers—who were worth approximately $11 billion as of June 2021, J.A.1852—initially agreed to fund the plan by contributing $4.325 billion spread over nearly a decade, Op. 22. In exchange, the plan would extinguish virtually all opioid-related claims against the Sacklers and against hundreds if not thousands of other non-debtors without the consent of all affected claimants. The plan attracted overwhelming support from

6

those creditors (including personal-injury claimants) who voted.  But fewer than 20%

of 618,194 claimants entitled to vote—and fewer than 50% of the subset of claimants

with personal-injury claims—voted on the plan.  J.A.6253, 6258.  Of those who did

vote, over 2,600 personal-injury claimants and several States opposed confirmation.

*See* J.A.6258, 6260.

    **2.**    The bankruptcy court confirmed the plan over the objections of, among

others, the United States Trustee, eight States, and the District of Columbia.

SPA.143-301.  On appeal, the district court vacated the confirmation order,

concluding that the Bankruptcy Code does not authorize courts to extinguish direct

claims held by non-debtors against non-debtors.  SPA.1-142.  Debtors and several

plan proponents appealed to this Court.

    While the appeals were pending before this Court, the objecting States and the

District of Columbia reached a separate deal with debtors and the Sacklers.  Under the

deal, the Sacklers again increased their proposed contribution, agreeing to pay an

additional "$1.175 billion in guaranteed payments" and "up to $500 million in

contingent payments."  J.A.1542, 1565-70.  The States and the District of Columbia

agreed "not [to] oppose" the pending appeals, J.A.1543, but reserved their right to file

"amicus briefs only at the merits stage in the Supreme Court should the Supreme

Court grant certiorari," J.A.1551.  The State of Connecticut (which was one of the

objecting States) has already indicated that it "will firmly stand behind" the district

court if certiorari is granted because "[n]on-consensual third-party releases are wrong,

and . . . the law should not[] and does not permit them."  Office of the Attorney General, Conn., *Attorney General Tong Statement on Appeals Court Decision Enabling Purdue Settlement to Proceed* (May 30, 2023), https://perma.cc/52MQ-BM3D.

**3.**     On May 30, 2023, a divided panel of this Court reversed the district court's decision.  At the threshold, the majority held that the bankruptcy court had subject-matter jurisdiction over third-party direct claims against non-debtors.  Op. 47.  On the merits, the majority held that two provisions of the Bankruptcy Code, read together, provide statutory authorization for courts sitting in bankruptcy to approve nonconsensual third-party releases.  The first provision states that "[t]he [bankruptcy] court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code.  11 U.S.C. § 105(a).  The second provision states that "a plan may[] . . . include any other appropriate provision not inconsistent with the applicable provisions of" the Code.  *Id.* § 1123(b)(6).

The majority acknowledged that § 105(a) does not confer any independent authority on bankruptcy courts; any invocation of § 105(a) must instead be "tied to another Bankruptcy Code section."  Op. 51-52 (quoting *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003)).  But the majority interpreted § 1123(b)(6) to permit courts sitting in bankruptcy to take any action not "expressly forbid[den]" by the Code.  Op. 53.  The majority concluded that, because the Code does not expressly prohibit the approval of nonconsensual third-party releases in bankruptcy, such releases are authorized by both § 105(a) and § 1123(b)(6).  That conclusion, the

majority held, was consistent with this Court's prior decisions approving such releases in other contexts. Op. 56-62.

As to the government's constitutional arguments, the majority acknowledged that the extinguished claims were a species of property interest. Op. 76. But the majority held that affected claimants had been afforded constitutionally sufficient notice. Op. 77-78. The majority also held that the bankruptcy court did not violate due process by terminating non-debtors' opioid claims against other non-debtors without consent. Op. 78-79.

The majority then adopted a seven-factor balancing test to govern the approval of such releases. These factors are: (1) whether there is an identity of interests between debtors and released parties; (2) whether the released claims are factually and legally intertwined with claims against the debtor; (3) whether the breadth of release is necessary to the plan; (4) whether the releases are essential to the reorganization; (5) whether the released non-debtors contributed substantial assets to the reorganization; (6) whether the impacted claimants expressed overwhelming support for the plan; and (7) whether the plan provides for the fair payment of enjoined claims. Op. 64-67. These factors do not include any consideration of the public interest. Concluding that the Sackler release satisfied this test, the majority affirmed "the bankruptcy court's approval of the plan" and remanded the case to district court for further proceedings. Op. 83.

Concurring in the judgment, Judge Wesley "reluctantly" agreed with the majority's conclusion that a bankruptcy court has authority to approve nonconsensual third-party releases given his reading of Second Circuit precedent. Concurring Op. 1. But he expressed considerable skepticism of the Court's reasoning in those cases (which, in his view, was "without any basis in the Code") and urged the Supreme Court to resolve the question (which "has divided the courts of appeals for decades"). Concurring Op. 2.

4.    On June 23, 2023, appellee Maria Ecke (proceeding *pro se*) filed a petition for rehearing. The deadline for seeking rehearing is July 14, 2023. Absent further order of this Court, the mandate "must issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later." Fed. R. App. P. 41(b). The government does not intend to file a petition for panel rehearing or rehearing en banc. The government will file a petition for certiorari no later than August 28, 2023.

# DISCUSSION

The Federal Rules of Appellate Procedure provide that "[a] party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court" if it shows that "the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1); *see United States v. Silver*, 954 F.3d 455, 457-58 (2d Cir. 2020) (per curiam). Those criteria are more than satisfied here.

1. The government's forthcoming petition will present a "substantial question" within the meaning of Rule 41(d) because there is a "'reasonable probability' that four [J]ustices will vote to grant certiorari." *Silver*, 954 F.3d at 458. Certiorari is appropriate when a court of appeals "has decided an important question of federal law that has not been, but should be, settled by th[e] [Supreme] Court" or "has entered a decision in conflict with the decision of another United States court of appeals on the same important matter." Sup. Ct. R. 10(a), (c).

As the panel acknowledged, the courts of appeals are sharply and intractably divided on the question whether nonconsensual third-party releases such as the Sackler release are lawful. *See* Op. 53-54 (listing cases). Three circuits have held that the Bankruptcy Code does not authorize releases of that sort. *See In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012); *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990) (per curiam). Six circuits, including this one, have approved such releases in certain circumstances. Op. 56-62;

*see In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019); *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640 (7th Cir. 2008); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070 (11th Cir. 2015). As Judge Wesley noted, the panel's decision "pins this Circuit firmly on one side of a weighty issue that, for too long, has split the courts of appeals." Concurring Op. 13.

**2.** There is also a "'fair prospect' that five [J]ustices will vote" in the government's favor on the merits. *Silver*, 954 F.3d at 458. The traditional tools of statutory interpretation confirm that the Sackler release cannot be reconciled with the Bankruptcy Code. Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To balance those relations, the Code establishes a basic *quid pro quo*. A debtor seeking bankruptcy relief must shoulder a host of obligations—such as the obligation to disclose all its creditors, its assets and liabilities, its current income and expenditures, and the nature of its financial affairs. 11 U.S.C. § 521(a). The debtor must then apply all its assets (with certain narrow exemptions, *see generally id.* § 522) to the satisfaction of its creditors' claims. In exchange, the debtor receives a discharge of its debts, except for those that Congress deemed nondischargeable as a matter of public policy, such as an individual debtor's debts "for money[] . . . to the extent obtained by[] . . . fraud." *Id.* § 523(a)(2)(A).

With a single exception not applicable here, *see id.* § 524(g), no Code provision specifically authorizes courts in bankruptcy to discharge a non-debtor's claim against another non-debtor without consent. That textual silence makes sense. The Code is designed "to free the debtor of [its] personal obligations while ensuring that no one else reaps a similar benefit." *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992). A non-debtor has not assumed the many duties and obligations specified by the Code, so it should not be permitted to reap the Code's rewards.

The structure of the Code underscores this point. The Code contains hundreds of provisions addressing the relationship between a debtor and its creditors. Indeed, the Code states that a discharge in bankruptcy generally "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). By contrast, just one Code provision, § 524(g), authorizes the discharge of claims against non-debtors. That narrow provision applies solely to bankruptcies arising from the manufacture and sale of asbestos. *Id.* § 524(g)(2)(B)(i)(I). The overwhelming number of Code provisions relating to the discharge of a debtor's liabilities, combined with the absence of any applicable Code provision relating to the discharge of a non-debtor's liabilities outside the asbestos context, confirms that Congress intended to authorize non-debtor releases in asbestos bankruptcies alone.

The Sackler release conflicts with the Code in other ways as well. When Purdue filed for bankruptcy, the Sacklers and other released individuals were

13

defendants in hundreds of civil actions alleging causes of action such as fraud. None of those individual defendants would have been able to discharge such claims had they filed for bankruptcy themselves. *See* 11 U.S.C. § 523(a)(2), (4), (6) (forbidding the discharge of debts for fraud, breach of fiduciary duty, and willful and malicious injury in individual bankruptcies when creditors have timely objected); *Archer v. Warner*, 538 U.S. 314, 321 (2003) ("[The Code] ensure[s] that all debts arising out of fraud are excepted from discharge[] no matter what their form." (quotation omitted)). The Sacklers also would not have been able to shield most of their wealth from execution because, in bankruptcy, debtors must apply substantially all their assets to the satisfaction of the claims against them. Yet the Sacklers obtained a discharge of virtually all opioid-related causes of action—including claims for fraud—*not* by declaring bankruptcy but by stripping billions of dollars from Purdue in the years before its bankruptcy and then offering to reinfuse only a portion of their assets into the estate.

The panel grounded its decision in two generic Code provisions embodying the "traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify *creditor-debtor relationships*." *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (emphasis added); *see* 11 U.S.C. §§ 105(a), 1123(b)(6); Op. 51-53. The panel interpreted those provisions to mean that the equitable power of a court sitting in bankruptcy "is limited only by what the Code expressly forbids, not what the Code explicitly allows." Op. 53. That interpretation would permit the approval of

bankruptcy plans containing all manner of other provisions that are not expressly forbidden by the Code—granting habeas relief to corporate officers in prison, for example, or granting easements to the real property of the debtor's neighbors—so long as the court found such actions to be "appropriate" in ensuring the successful reorganization of the debtor. *See* 11 U.S.C. § 1123(b)(6).

The Supreme Court has repeatedly refused to give general provisions of the Code such sweeping reach, holding instead that a bankruptcy court may not rely on general grants of residual equitable authority to reach outcomes incompatible with the structure and purposes of the Code. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017); *Law v. Siegel*, 571 U.S. 415, 423-24 (2014); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). "[M]ore than simple statutory silence" is required "if, and when, Congress were to intend a major departure" from foundational bankruptcy principles. *Jevic*, 580 U.S. at 465; *accord* Concurring Op. 12 ("[I]f Congress intended so extraordinary a grant of authority, it should say so."). There is at least a fair prospect that five or more Justices will reach a similar conclusion here.

Even if the Code's residual-authority provisions were susceptible to the panel's interpretation, there is also a fair prospect that the Supreme Court would reject that interpretation given the serious constitutional questions it raises. "[A] cause of action is a species of property." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Yet the Sackler release permanently extinguishes virtually all opioid-related claims against

15

the Sacklers and other non-debtors without the consent of every affected claimant and without an opportunity for an objecting claimant to opt in or opt out of the release. Even in the context of Rule 23 class actions, which Congress designed specifically to facilitate the mass resolution of claims, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class[.]" *Phillips Petroleum Co v. Shutts*, 472 U.S. 797, 812-13 (1985). Because the Sackler release extinguishes claims of objecting claimants, there is "substantial doubt" whether such releases comport with due process, and the Supreme Court will not "construe the [Code] in a manner that could in turn call upon the Court to resolve" "difficult and sensitive" constitutional questions if a contrary construction is "fairly possible." *United States v. Security Indus. Bank*, 459 U.S. 70, 78, 82 (1982) (quotation omitted). Just as importantly, if Congress "wishes to significantly alter . . . the power of the Government over private property," it must "enact exceedingly clear language." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020). The bankruptcy court's approval of the Sackler release extinguishing non-debtors' rights against other non-debtors unquestionably effectuates such an alteration. But neither § 105(a) nor § 1123(b)(6) contains the "exceedingly clear language" required to sustain that result.

    **3.**    Finally, "good cause" exists to stay the mandate. Fed. R. App. P. 41(d)(1). Once the mandate issues, the district court will be required to enter final

judgment consistent with this Court's analysis.[1]  At that point, debtors will be free to

substantially consummate the plan.  The plan proponents have made clear that, once

the plan is substantially consummated, they will seek dismissal of any appeal from the

plan confirmation order under the judge-made doctrine of equitable mootness.  *See*

J.A.2000 ("[A]bsent a stay pending appeal, . . . the Plan may be substantially

consummated during the pendency of the appeal.  Upon substantial consummation of

the Plan, any appeal of the Confirmation Order may become equitably moot.");

*see also, e.g.*, D. Ct. Case No. 21-07532, Dkt. No. 66, at 7 n.3 (declining to "waive the

right to argue . . . equitabl[e] moot[ness]").  That doctrine permits a court to dismiss

an appeal from a confirmation order once the plan has been substantially

consummated—even if the court determines that the underlying plan is unlawful—

unless "the appellant pursued with diligence all available remedies to obtain a stay of

execution of the objectionable order."  *In re BGI, Inc.*, 772 F.3d 102, 108 (2d Cir. 2014)

(quotation omitted).

The government vigorously disputes the applicability of the equitable-mootness

doctrine.  But any assertion of equitable mootness would require the Supreme Court

to address questions about the validity and applicability of that doctrine alongside the

---

[1] The panel correctly held that the Sackler release encompassed non-core claims
that an Article III court must approve under *Stern v. Marshall*, 564 U.S. 462 (2011), and
properly "decide[d] all pertinent issues necessary to confirm the [p]lan."  Op. 42.
Although the panel indicated that it was affirming the bankruptcy court's approval of
the plan, Op. 83, the resolution required under *Stern* was a remand to the district court
with instructions to enter final judgment approving the plan.  *See* 564 U.S. at 502-03.

important merits question presented here.  A stay of the mandate is necessary to remove any question of the doctrine's potential application and preserve the Supreme Court's opportunity to review the government's meritorious petition for certiorari on an issue of exceptional public importance.

The government and the public interest would be harmed if the panel's decision evades Supreme Court review.  As this case reveals, nonconsensual third-party releases enable wealthy and powerful tortfeasors to obtain legal immunity from tort victims—for a far broader array of claims than could be discharged by declaring bankruptcy themselves—without ever having to subject themselves to scrutiny under the procedures set forth by the Bankruptcy Code.  They permit tortfeasors to choose what portion of their non-exempt assets to give up in exchange for full repose (including for claims based on fraud), defying the basic *quid pro quo* at the heart of the Code.  They deprive tort victims of their day in court without consent.  And they erode public confidence in the bankruptcy system, which Congress established to restructure a debtor's relationship with its creditors—not to resolve mass-tort liability against non-debtors by terminating claims belonging to other non-debtors who wish to proceed outside of bankruptcy.

Indeed, this Court's endorsement of the legality of the Sackler release threatens to make subsequent releases even less favorable to tort victims by further redistributing bargaining power to tortfeasors.  To insulate themselves from the risk of an adverse decision in this Court, the Sacklers paid the objecting States and the

District of Columbia an additional $1.675 billion to obtain their non-opposition. If nonconsensual releases are unavailable, tortfeasors will have to continue to provide substantial compensation for claimants in exchange for their consent. By contrast, if the claims of some claimants can be extinguished by a vote of others, the amount paid by non-debtor tortfeasors in future bankruptcies will likely be lower—and the commensurate benefits to future estates fewer.

The panel's reasoning further threatens the public interest because it is not confined to the nonconsensual termination of claims belonging to private citizens. One bankruptcy court has relied on similar reasoning to confirm—over the United States' objection—a plan of reorganization purporting to exculpate non-debtors from future civil and even criminal claims belonging to the United States. *See In re Voyager Digital Holdings, Inc.*, 649 B.R. 111 (Bankr. S.D.N.Y. 2023). And the plan proponents in that case have already invoked this Court's decision on appeal to district court. *See* Debtors' Citation of Supplemental Authority, *In re Voyager Digital Holdings, Inc.*, No. 1:23-cv-2171 (S.D.N.Y. June 8, 2023).

The government is sensitive to the fact that continuing to litigate this important and recurring question could delay the implementation of the reorganization plan, with its concomitant benefits to States, municipalities, and individual opioid victims. But this delay is of the Sacklers' own making. Faced with numerous opportunities to allow opioid claimants to decide whether to be bound by the third-party release, the Sacklers instead insisted on pursuing a nonconsensual release that violates the

Bankruptcy Code and offends due process.  It is also important to put the cost of delay in context.  The current plan—as negotiated by the Sacklers—allows the Sacklers to stagger their initial $4.325 billion contribution over ten years, with only $300 million (less than 7% of that total) due upon the effective date of the plan.  *See* J.A.3490 (establishing schedule for required minimum payments by Sacklers).  The additional contribution that the Sacklers negotiated with the eight objecting States and the District of Columbia will not commence until June 2031 and will be spread over time through June 2039.  J.A.1570.  And those timelines will already have to be renegotiated due to the time that these appeals have been pending in this Court— meaning that Purdue and the Sacklers should be able to compensate for any additional period of Supreme Court review by agreeing to an accelerated payment schedule. Accordingly, the cost of delay cannot justify depriving the Supreme Court of the opportunity to address the government's meritorious petition for certiorari and to resolve a critical question of bankruptcy law that has divided the courts of appeals.

## CONCLUSION

For these reasons, this Court should stay its mandate pursuant to Fed. R. App. P. 41(d). If this Court determines that a stay of the mandate is not warranted, the government respectfully requests that the Court administratively stay the mandate for 21 days to permit the Solicitor General to renew the government's request for a stay in the Supreme Court and to allow the Circuit Justice to consider that request.

Respectfully submitted,

MICHAEL S. RAAB
MICHAEL SHIH

*/s/ Sean R. Janda*
SEAN R. JANDA
  Attorneys, Civil Division, Appellate Staff
  U.S. Department of Justice
  950 Pennsylvania Ave. NW, Rm. 7260
  Washington, DC 20530
  Phone: (202) 305-1754

JULY 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because it contains 5,042 words according to the count of Microsoft Word 2016. The motion complies with Fed. R. App. P. 27(d)(1)(E) because it has been prepared using Microsoft Word 2016 in 14-point Garamond, a proportionally spaced typeface.

/s/ Sean R. Janda
SEAN R. JANDA

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2023, I electronically filed the foregoing motion with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system, except for the following, who will be served via USPS:

Ellen Isaacs, on behalf of Patrick Ryan Wroblewski
P.O. Box 725
Floyd, VA 24091

Ronald Bass
450 Little Place, Apt. 53
N. Plainfield, NJ 07060

Maria Ecke
8 Glenbrook Drive
West Simsbury, CT 06092

Andrew Ecke
18 Meadowlark Rd.
West Simsbury, CT 06092

Richard Ecke
18 Meadowlark Rd.
West Simsbury, CT 06092

/s/ Sean R. Janda
SEAN R. JANDA