IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

In Re: PURDUE PHARMA L.P., PURDUE
PHARMA INC, PURDUE TRANSDERMAL
TECHNOLOGIES L.P., PURDUE PHARMA
MANUFACTURING L.P., PURDUE
PHARMACEUTICALS L.P., IMBRIUM
THERAPEUTICS L.P., ADLON THERAPEUTICS
L.P., GREENFIELD BIOVENTURES L.P., SEVEN
SEAS HILL CORP., OPHIR GREEN CORP.,
PURDUE PHARMA OF PUERTO RICO, AVRIO
HEALTH L.P., PURDUE PHARMACEUTICAL
PRODUCTS L.P., PURDUE NEUROSCIENCE
COMPANY, NAYATT COVE LIFESCIENCE INC.,
BUTTON LAND L.P., RHODES ASSOCIATES
L.P., PAUL LAND INC., QUIDNICK LAND L.P.,
RHODES PHARMACEUTICALS L.P., RHODES
TECHNOLOGIES, UDF LP, SVC PHARMA LP,
SVC PHARMA INC.,

Debtors.

Nos. 22-110(L),
22-113, 22-115,
22-116, 22-117,
22-119, 22-121,
22-203, 22-299

---

PURDUE PHARMA, L. P., PURDUE PHARMA
INC, PURDUE TRANSDERMAL
TECHNOLOGIES L.P., PURDUE PHARMA
MANUFACTURING L.P., PURDUE
PHARMACEUTICALS L.P., IMBRIUM
THERAPEUTICS L.P., ADLON THERAPEUTICS
L.P., GREENFIELD BIOVENTURES L.P., SEVEN
SEAS HILL CORP., OPHIR GREEN CORP.,
PURDUE PHARMA OF PUERTO RICO, AVRIO
HEALTH L.P., PURDUE PHARMACEUTICAL
PRODUCTS L.P., PURDUE NEUROSCIENCE
COMPANY, NAYATT COVE LIFESCIENCE INC.,
BUTTON LAND L.P., RHODES ASSOCIATES
L.P., PAUL LAND INC., QUIDNICK LAND L.P.,
RHODES PHARMACEUTICALS L.P., RHODES

TECHNOLOGIES, UDF LP, SVC PHARMA LP, SVC PHARMA INC.,

Debtors-Appellants-Cross-Appellees,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PURDUE PHARMA L.P., *et al.*, AD HOC COMMITTEE OF GOVERNMENTAL AND OTHER CONTINGENT LITIGATION CLAIMANTS, THE RAYMOND SACKLER FAMILY, AD HOC GROUP OF INDIVIDUAL VICTIMS OF PURDUE PHARMA, L.P., MULTI-STATE GOVERNMENTAL ENTITIES GROUP, MORTIMER-SIDE INITIAL COVERED SACKLER PERSONS,

Appellants-Cross-Appellees,

v.

THE CITY OF GRANDE PRAIRIE, as Representative Plaintiff for a Class Consisting of All Canadian Municipalities, THE CITIES OF BRANTFORD, GRAND PRAIRIE, LETHBRIDGE, AND WETASKIWIN, THE PETER BALLANTYNE CREE NATION, on behalf of All Canadian First Nations and Metis People, The PETER BALLANTYNE CREE NATION on behalf itself, and The LAC LA RONGE INDIAN BAND,

Appellees-Cross-Appellants,

THE STATE OF WASHINGTON, STATE OF MARYLAND, DISTRICT OF COLUMBIA, U.S. TRUSTEE WILLIAM K. HARRINGTON, STATE OF CONNECTICUT, RONALD BASS, STATE OF CALIFORNIA, PEOPLE OF THE STATE OF CALIFORNIA by and through ATTORNEY GENERAL ROB BONTA, STATE OF OREGON, STATE OF DELAWARE, by and through ATTORNEY GENERAL JENNINGS, STATE OF

RHODE ISLAND, STATE OF VERMONT, ELLEN
ISAACS, on behalf of Patrick Ryan Wroblewski,
MARIA ECKE, ANDREW ECKE, RICHARD
ECKE,

       Appellees.

## AD HOC COMMITTEE'S OPPOSITION
## TO MOTION TO STAY THE MANDATE

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

LEGAL STANDARD .........................................................................4

ARGUMENT ......................................................................................4

    I.   This Case Does Not Present A Substantial Question.............................4

    II.  There Is Not Good Cause For A Stay ........................................7

    III. The Public Interest Weighs Strongly Against A Stay............................9

CONCLUSION ................................................................................14

The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**") respectfully submits this response in opposition to the motion (the "**Motion**") of the United States Trustee (the "**UST**") for a stay of the issuance of the mandate pending a petition for a writ of certiorari.

## INTRODUCTION

Purdue's creditors – the governmental and individual victims of one of the worst public health crises in this nation's history – have waited four long years for distributions in this case. Their struggle for recompense from Purdue and the Sacklers dates, in many cases, to long before the bankruptcy. At times, it has appeared that justice, in whatever form, might remain forever out of reach. Yet through dogged persistence, and the slow but steady resolution of a series of seemingly intractable disputes not just with Purdue and the Sacklers but also between and among the largest creditor body the Bankruptcy Court had ever seen, those creditors crafted an innovative and value-maximizing abatement-focused plan to which virtually every single creditor constituency has now finally agreed. That plan was tested and improved through extensive litigation in three courts, including this one. Obtaining this Court's blessing was the apparent capstone to this enormous creditor project. Now, the UST, which is not a creditor and which has no economic stake in the outcome of these cases, seeks through a stay of the mandate to postpone

creditor distributions even longer – and perhaps forever, if its appeals succeed.  It is a baffling decision; indeed, to many, an unconscionable one.

The Motion should be denied.  The standard for stay of the mandate is "stringent and extraordinary," and has not been met here.

First, there is no "reasonable probability" that four Justices of the Supreme Court will vote to grant certiorari.  The Supreme Court has repeatedly declined to review third-party releases.  This Court's decision, which largely reaffirmed existing Second Circuit precedent, did not work the sort of fundamental reordering of the legal landscape that might prompt a different outcome here.  On top of this history, the UST's petition presents no true circuit split on the central legal issue:  whether section 1123(b)(6) supplies a statutory basis for a third-party release.  The circuits that have considered that issue agree that it does.  The cases on which the UST relies do not address, let alone reject, this Court's analysis.

Second, there is not a "fair prospect" that five Justices will vote to reverse the Panel's judgment.  As the Panel majority persuasively explained, that judgment is firmly grounded in the Bankruptcy Code and in existing Supreme Court precedent, including *United States v. Energy Resources Co.*, 495 U.S. 545 (1990).  Judge Wesley's concurrence, though it raises significant issues that may get additional attention in the lower courts going forward, does not by itself tip the balance enough

2

to make Supreme Court reversal likely, and relies on grounds different from those accepted by other courts of appeals.

Third, there is no "good cause" for a stay, as the UST has not shown that it will be irreparably harmed without one. The sole "harm" that the UST alleges is the hypothetical risk that it might be called on to defend its appeal against assertions that it has become equitably moot. But equitable mootness is far from certain (among other things, the Supreme Court has never ruled upon it), and the risk that the UST might be forced to overcome legal arguments adverse to its position is not an irreparable harm – it is a natural outgrowth of an adversarial legal system.

Fourth, and most important, the public interest weighs decisively against a stay of the mandate. Purdue's abatement-focused plan promises wide-ranging societal benefits to public and private claimants alike. The ongoing opioid crisis claims new victims every day, and it is no exaggeration to say that each moment that distributions under Purdue's plan are delayed, the health and well-being of American citizens is put at risk. The Department of Justice is well aware of the importance of the timely deployment of funds for abatement. Notwithstanding its current position in opposition to Purdue's plan, the DOJ itself was integrally involved in that plan's creation, and advocated for its abatement-related provisions.

Against the dire public health consequences of delay, the UST advances objections that go not so much to Purdue's plan – which the UST acknowledges will

3

accomplish much good – but to abstract principles of bankruptcy law. Those principles, whatever their importance, should not stand in the way of creditor distributions. If the UST, for whatever reason, fails to obtain Supreme Court review in this case, it will have the opportunity to do so in others. Purdue's creditors, who are in desperate need of the lifesaving funds that the plan will provide, should not be forced to bear the costs of the UST's crusade against third-party releases.

**LEGAL STANDARD**

The standard for granting a stay pending writ of certiorari is "stringent and extraordinary." *United States v. Silver*, 954 F.3d 455, 457 (2d Cir. 2020). The movant must show that its petition "would present a substantial question," FED R. APP. P. 41(d)(1), and that "there is good cause for a stay," *id*., because the movant would be irreparably harmed without a stay, *see Silver*, 954 F.3d at 460. The public interest is also relevant. *See Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009) (per curiam), *cited in Silver*, 954 F.3d at 458. Even if movant makes the required "exceptional" showing, the Court "need not grant" the motion, as its decision "is a matter of discretion." *Silver*, 954 F.3d at 458 (citations omitted).

**ARGUMENT**

**I.    This Case Does Not Present A Substantial Question**

"[T]he standard for presenting a 'substantial question' is high." *Silver*, 954 F.3d at 458. The UST must show a "reasonable probability" that four Justices will

4

vote to grant certiorari and a "fair prospect" that five Justices will vote to reverse this Court's judgment. *Id*. (citations omitted). The first point is determinative here.

On at least four occasions in the past twenty years, the Supreme Court has been asked to review chapter 11 plans containing third-party releases and/or exculpations. On each occasion – including twice in the last three years – it has declined the invitation. *See Blixseth v. Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394 (2021); *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020); *SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070 (11th Cir. 2015), *cert. denied*, 577 U.S. 823 (2015); *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002), *cert. denied*, 537 U.S. 816 (2002).

The UST's forthcoming petition is unlikely to buck this trend. The primary criterion that allows a confident prediction of a grant of certiorari is a conflict in the circuits. On the central legal issue presented here, there is none.

In approving Purdue's plan, this Court concluded that "two sections of the Bankruptcy Code, 11 U.S.C. §§ 105(a), 1123(b)(6), jointly provide the statutory basis for the bankruptcy court's authority to approve a plan that includes nonconsensual releases of third-party claims against non-debtors." Op. 13. No circuit decision conflicts with this construction of these statutory provisions –

indeed, all to have considered them in this context have *agreed* with this Court. *See, e.g.*, *Dow Corning*, 280 F.3d at 656-57 (holding a third-party release is "not inconsistent with the Code, and is authorized by section 1123(b)(6)") (quotations omitted); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008) (finding support for third-party release in sections 105(a) and 1123(b)(6) of the Code).

In averring a circuit conflict, the UST instead relies on cases addressing the import of section 524(e) of the Bankruptcy Code. *See* Motion at 11 (citing decisions from the Fifth, Ninth, and Tenth Circuits). But none of those cases considered, let alone rejected, the proposition that section 1123(b)(6) might provide a statutory basis for inclusion of a third-party release in a reorganization plan. *See generally In re Vitro S.A.B. de CV*, 701 F.3d 1031(5th Cir. 2012) (no mention of 1123(b)(6)); *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995) (same); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990) (per curiam) (same).

The statutory grounding for this Court's opinion – left unaddressed in the UST's allegedly conflicting case law – is more than a trivial detail. The Supreme Court has long stressed the value of "percolation" of legal issues in the lower courts. *See, e.g.*, *Calvert v. Texas*, 141 S. Ct. 1605, 1606 (2021) (Sotomayor, J.) (certiorari denied where the "legal question…is complex and would benefit from further percolation in the lower courts"); *Box v. Planned Parenthood of Indiana and Kentucky, Inc.*, 139 S. Ct. 1780, 1782 (2019) ("We follow our ordinary practice of

6

denying petitions insofar as they raise legal issues that have not been considered by additional Courts of Appeals.") Thus, unless and until a circuit split develops on the meaning and scope of section 1123(b)(6), the Court is unlikely to grant certiorari.

To be sure, the panel *also* addressed section 524(e), and rejected the argument accepted by some other circuits, that the limited "effect of a discharge" under that subsection somehow limits the powers of a court approving a plan of reorganization. Despite its acceptance by the Fifth and perhaps the Ninth and Tenth Circuits (*but see Blixseth*, 961 F.3d at 1082-83), that argument is weak—so weak that Judge Wesley's concurrence in the judgment does not even mention that statutory provision, and the government's Stay Motion makes only one glancing allusion to it. The real issue here is whether, as Judge Wesley put it, sections 105(a) and 1123(b)(6) are "up to the task." On *that* issue, no circuit conflict has yet developed, and it is entirely possible that one will never develop. The Supreme Court is highly unlikely to take the issue up at this time.

## II.    There Is Not Good Cause For A Stay

The UST also fails to demonstrate good cause for a stay. A stay "is not a matter of right, even if irreparable injury might otherwise result," *Chrysler*, 556 U.S. at 961, and here the UST has not even shown a likelihood of irreparable harm.

The sole harm that the UST identifies is the prospect of equitable mootness. *See* Motion at 17. That prospect is far from imminent. Equitable mootness could

7

be relevant, if at all, only if certiorari is granted and only if Purdue's plan goes effective in the interim; neither is certain, or even likely, to occur. Any claim of irreparable injury is speculative in the extreme.

Moreover, the UST does not concede that its petition for certiorari *will* be equitably moot if a stay is denied, and instead asserts only that the Supreme Court might be required "to address questions about the validity and applicability of" the equitable mootness doctrine. *Id*. The possibility that the UST might be forced to confront and overcome legal arguments adverse to its position is hardly a cognizable form of harm. *Cf. New York v. Trump*, 490 F. Supp. 3d 736, 741 (S.D.N.Y. 2020) (per curiam) (holding it is not enough, for stay purposes, to assert that movant "*may* suffer irreparable injury without a stay") (emphasis in original).

In any event, as the panel pointed out, the UST has *no fiscal interest* in overturning the third-party release at the heart of this case. The parties that *do* have such interests helped craft and overwhelmingly favor the plan of reorganization, including the third-party release. The mere litigation interests of the UST present at best an ephemeral "irreparable injury," whereas the *grant* of a stay would inflict true and material irreparable injury on thousands of States, municipalities, Tribes, and individual victims.

## III. The Public Interest Weighs Strongly Against A Stay

Finally, the public interest weighs strongly against a stay of the mandate. Purdue filed for bankruptcy in September 2019 – nearly four years ago – yet its creditors have yet to receive any recoveries on their claims. The federal government, for its part, insisted on a pre-plan, $225 million payout from the Sacklers as a part of a criminal settlement with Purdue. JA-4895. The continued delay in plan distributions deprives States, municipalities, and Tribes of desperately needed funds for abatement of the opioid crisis and threatens the health and survival of thousands of individual victims and their families. As just one measure of the daily toll of the opioid crisis, government statistics show there were more than 80,000 opioid-related deaths in 2021 (the latest year for which final statistics are available).[1] For every day that Purdue's plan is delayed, human lives are put at risk.[2]

Allowing Purdue's plan to go effective would help mitigate these effects. Among its many benefits, the plan will establish and fund a series of public and private creditor trusts dedicated, respectively, to abatement of the opioid crisis and the compensation of individual victims. The plan also establishes a document

---

[1] The National Institute on Drug Abuse reports that: "Opioid-involved overdose deaths rose from 21,089 in 2010 to 47,600 in 2017 and remained steady through 2019. This was followed by a significant increase in 2020 with 68,630 reported deaths and again in 2021 with 80,411 reported overdose deaths." *See* https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.

[2] A letter submitted by the parents of an opioid victim provides a stark reminder of the costs of delay. *See* Dkt. No. 973 (letter to Clerk of Court from the Scott family).

repository that will provide public access to over a hundred million documents detailing Purdue's and the Sacklers' role in the opioid crisis, and transfers the Debtors' business to a "Newco" for the benefit of the abatement trusts, while subjecting Newco to a detailed operating injunction, governance covenants, and the oversight of an independent monitor.

Ironically, the beneficial features of Purdue's plan are at least partly attributable to the efforts of the Department of Justice, which was involved in the plan's creation. As the Ad Hoc Committee's witness testified below, the federal government helped to craft, and ultimately signed off on, the abatement strategies in the plan. JA-6409. And as this Court recognized, Purdue's criminal plea agreement "stipulated that the DOJ would agree to release $1.775 billion of its $2 billion claim so long as a future distribution plan met certain requirements, specifically that an abatement trust for the public benefit would be established and a document repository created." Op. 19; *see also* JA-465-66 (DOJ attorney explaining that "the government believes that these funds would be better used if put towards the abatement objectives of federal, state and tribal governments that they had achieved in the mediation").

While the benefits of Purdue's plan are clear, the Court need not speculate as to where the public interest lies, as the public itself has spoken. Purdue's creditors comprise, among others, nearly all of the Nation's States, Territories, municipalities,

10

and Tribes, and thousands of individual victims. Those creditors – the entities with a concrete stake in the outcome of this litigation – overwhelmingly support the plan, with each of the governmental and personal injury claimant classes having voted in favor of the plan by margins exceeding 95% (even before accounting for subsequent settlements). *See* JA-6258. Thus, as this Court so cogently observed: "with the Nine [initially objecting States] no longer pursuing their objection, the main challenge to this appeal is not by creditors, but by the [UST] – a government entity without a financial stake in the litigation." Op. 74.

The UST concedes the plan's benefits, *see* Motion at 3, 19, yet downplays the disruptive effect of a stay. Each of its arguments fails.

First, in an effort to "put the cost of delay in context," the UST points out that "only $300 million" is due upon the effective date of the plan. Motion at 20. There is no small irony in the fact that the government itself insisted upon a pre-plan payment of $225 million from the Sacklers, *see* JA-4895, yet now dismisses the importance of the payment of an even greater amount to creditors. But the UST's calculations are wrong, in any event. Yes, the plan as confirmed by the Bankruptcy Court required an effective date Sackler contribution of $300 million, *see* JA-3490, but that amount has since been increased to $500 million by virtue of the settlement with the Nine, *see* JA-1570. The UST's figure also ignores the assets that Purdue itself will distribute to creditors on the effective date. Purdue's cash exceeds $1

11

billion, *see* Monthly Operating Report [Bankr. Dk. No. 5751], a substantial portion of which will be distributed to creditors on the effective date, *see* SPA-896.

Beyond the UST's misstatement of the true amount of the effective date payments due under the plan, it is not just those payments that would be delayed by a stay, but subsequent ones as well. A grant of certiorari would almost certainly delay the effective date of the plan until, at the earliest, the fourth quarter of 2024 (as even a Supreme Court affirmance would require a remand and various steps to implement the plan). Correcting for the UST's errors and omissions, and accounting for the cascading effects of a delayed effective date, the true costs of a stay are much greater than the UST acknowledges. Based on the distribution schedule in the plan, as modified by the settlement with the Nine, the Ad Hoc Committee's financial advisor calculates that as much as $1.3 billion in Sackler contributions would be delayed by a stay, in addition to the value of Purdue itself.

Second, the UST glibly suggests that the harms of delay could be mitigated by the Sacklers "agreeing to an accelerated payment schedule," Motion at 20, or even by the possibility of unspecified "alternative routes" to a confirmed plan, *id*. at 4. Neither suggestion is remotely realistic. As to the first scenario, it is the Sacklers that benefit most from delay; they will not gratuitously agree to accelerated payments, especially because the shareholder settlement agreement already addresses the prospect of appellate delay at length. JA-3501-02. As to the second,

12

the Bankruptcy Court has already found, as an unchallenged fact, that the most likely alternative to the current plan is a liquidation, and that in a liquidation, unsecured creditors would likely recover nothing. *See* SPA-283.

The UST's allusion to alternative plan constructs not involving a third-party release reflects its persistent and fundamental misunderstanding of the release. Far from the Sackler overreach that the UST portrays, *see* Motion at 19, the release is a feature insisted upon by the *creditors*, including the Ad Hoc Committee. The plan is structured so that non-federal governmental claimants will receive distributions from the Sacklers over the course of 16 years. The Ad Hoc Committee would not have agreed to deferred payments of this nature if it was possible that hold-out creditors could sue the Sacklers in the interim and deplete their assets, thereby impairing the negotiated stream of payments. As an Ad Hoc Committee witness testified below, "[t]he Sackler settlement is predicated on the understanding that no state will retain its claims against the Sacklers, an outcome that could cause all other states to revisit allocation and settlement." JA-6415.

Third, the UST contends that the costs of delay are justified by the stakes. Motion at 20 (noting "cost of delay cannot justify depriving the Supreme Court of the opportunity to…resolve a critical question of bankruptcy law"). But the choice between using this case to resolve a "critical question of bankruptcy law" and serving the public good is a false one. That the issues presented by the UST's petition may

13

be important does not mean that they must be resolved by the Supreme Court *in this case* – a case in which all parties agree that the plan stands to accomplish much good. The UST can challenge third-party releases in other cases where doing so will not risk the public health. *See, e.g.*, Motion at 19 (referencing ongoing litigation in *In re Voyager Digital Holdings, Inc*., 649 B.R. 111 (Bankr. S.D.N.Y. 2023)).

## CONCLUSION

Because the UST has not presented a substantial question and has failed to show good cause, and because the public interest weighs so heavily against a stay, the Court should deny the Motion and should issue the mandate.

Dated:     July 17, 2023            Respectfully submitted

/s/ *Kenneth H. Eckstein*
Kenneth H. Eckstein
Roy T. Englert, Jr.
Rachael Ringer
David E. Blabey Jr.
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email:      keckstein@kramerlevin.com
            renglert@kramerlevin.com
            rringer@kramerlevin.com
            dblabey@kramerlevin.com

David J. Molton
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email:      dmolton@brownrudnick.com

Melanie L. Cyganowski
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email:      mcyganowski@otterbourg.com

Richard J. Leveridge
Richard D. Shore
Daniel I. Wolf
GILBERT LLP
700 Pennsylvania Avenue SE
Washington, DC 20003
Telephone: (202) 772-2200
Email:      leveridger@gilbertlegal.com
             shorer@gilbertlegal.com
             wolfd@gilbertlegal.com

*Attorneys for the Ad Hoc Committee*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit prescribed in Federal Rule of Appellate Procedure 27(d)(2), because it contains 3,382 words, excluding the parts exempted by Federal Rule of Appellate Procedure 27(a)(2)(B).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Dated:  July 17, 2023                                    By:     /s/ *Kenneth H. Eckstein*
                                                                      Kenneth H. Eckstein

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2023, I electronically filed the foregoing opposition with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. Service will be accomplished by the appellate CM/ECF system, except for the parties below, who will be served by USPS first class mail service:

**Ronald Bass, Sr.**
450 Little Place, Apt. 53
N. Plainfield, NJ 07060

**Ellen Isaacs, on behalf of Patrick Ryan Wroblewski**
P.O. Box 6553
Delray Beach, FL 33482

**Maria Ecke**
8 Glenbrook Drive
West Simsbury, CT 06092

**Andrew Ecke**
18 Meadowlark Rd.
West Simsbury, CT 06092

**Richard Ecke**
18 Meadowlark Rd.
West Simsbury, CT 06092

/s/ *Kenneth H. Eckstein*
Kenneth H. Eckstein