# 22-110(L),

## 22-113(CON), 22-115(CON), 22-116(CON), 22-117(CON), 22-119(CON), 22-121(CON), 22-299(CON), 22-203(XAP)

## United States Court of Appeals
### *for the*
### Second Circuit

IN RE: PURDUE PHARMA L.P., PURDUE PHARMA INC., PURDUE TRANSDERMAL TECHNOLOGIES L.P., PURDUE PHARMA MANUFACTURING L.P., PURDUE PHARMACEUTICALS L.P., IMBRIUM THERAPEUTICS L.P., ADLON THERAPEUTICS L.P., GREENFIELD BIOVENTURES L.P., SEVEN SEAS HILL CORP., OPHIR GREEN CORP., PURDUE PHARMA OF PUERTO RICO, AVRIO HEALTH L.P., PURDUE PHARMACEUTICAL PRODUCTS L.P., PURDUE NEUROSCIENCE COMPANY, NAYATT COVE LIFESCIENCE INC., BUTTON LAND L.P., RHODES ASSOCIATES L.P., PAUL LAND INC., QUIDNICK LAND L.P., RHODES PHARMACEUTICALS L.P., RHODES TECHNOLOGIES, UDF LP, SVC PHARMA LP, SVC PHARMA INC.,

*Debtors.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN CASE NOS. 21-CV-7532, 21-CV-7585 (CM), 21-CV-7961 (CM), 21-CV-7962 (CM), 21-CV-7966 (CM), 21-CV-7969 (CM), 21-CV-8034 (CM), 21-CV-8042 (CM), 21-CV-8049 (CM), 21-CV-8055 (CM), 21-CV-8139 (CM), 21-CV-8258 (CM), 21-CV-8271 (CM), 21-CV-8548 (CM), 21-CV-8557 (CM) and 21-CV-8566 (CM) (HONORABLE McMAHON, JUDGE)

## OPPOSITION OF APPELLANT THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PURDUE PHARMA L.P., ET AL., TO U.S. TRUSTEE'S MOTION TO STAY MANDATE

Z.W. Julius Chen
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000

Erik Y. Preis
Mitchell P. Hurley
Sara L. Brauner
AKIN GUMP STRAUSS HAUER &
  FELD LLP
One Bryant Park
44th Floor
New York, NY 10036
(212) 872-1000
apreis@akingump.com

*Counsel for The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*

PURDUE PHARMA L.P., PURDUE PHARMA INC., PURDUE
TRANSDERMAL TECHNOLOGIES L.P., PURDUE PHARMA
MANUFACTURING L.P., PURDUE PHARMACEUTICALS L.P.,
IMBRIUM THERAPEUTICS L.P., ADLON THERAPEUTICS L.P.,
GREENFIELD BIOVENTURES L.P., SEVEN SEAS HILL CORP.,
OPHIR GREEN CORP., PURDUE PHARMA OF PUERTO RICO,
AVRIO HEALTH L.P., PURDUE PHARMACEUTICAL PRODUCTS
L.P., PURDUE NEUROSCIENCE COMPANY, NAYATT COVE
LIFESCIENCE INC., BUTTON LAND L.P., RHODES ASSOCIATES
L.P., PAUL LAND INC., QUIDNICK LAND L.P., RHODES
PHARMACEUTICALS L.P., RHODES TECHNOLOGIES, UDF LP,
SVC PHARMA LP, SVC PHARMA INC.,

*Debtors-Appellants-Cross-Appellees,*

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
PURDUE PHARMA, L.P., ET AL., AD HOC COMMITTEE OF
GOVERNMENTAL AND OTHER CONTINGENT LITIGATION
CLAIMANTS, THE RAYMOND SACKLER FAMILY, AD HOC
GROUP OF INDIVIDUAL VICTIMS OF PURDUE PHARMA, L.P.,
MULTI-STATE GOVERNMENTAL ENTITIES GROUP, MORTIMER-
SIDE INITIAL COVERED SACKLER PERSONS,

*Appellants-Cross-Appellees,*

– v. –

THE CITY OF GRANDE PRAIRIE AS REPRESENTATIVE
PLAINTIFF FOR A CLASS CONSISTING OF ALL CANADIAN
MUNICIPALITIES, THE CITIES OF BRANTFORD, GRAND
PRAIRIE, LETHBRIDGE AND WETASKIWIN, THE PETER
BALLANTYNE CREE NATION ON BEHALF OF ALL CANADIAN
FIRST NATIONS AND METIS PEOPLE, THE PETER
BALLANTYNE CREE NATION ON BEHALF OF ITSELF, AND THE
LAC LA RONGE INDIAN BAND,

*Appellees-Cross-Appellants,*

THE STATE OF WASHINGTON, THE STATE OF MARYLAND, THE
DISTRICT OF COLUMBIA, U.S. TRUSTEE WILLIAM K.
HARRINGTON, STATE OF CONNECTICUT, RONALD BASS,
STATE OF CALIFORNIA, PEOPLE OF THE STATE OF
CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL ROB
BONTA, STATE OF OREGON, STATE OF DELAWARE, BY AND
THROUGH ATTORNEY GENERAL JENNINGS, STATE OF RHODE
ISLAND, STATE OF VERMONT, ELLEN ISAACS, ON BEHALF OF
PATRICK RYAN WROBLEWSKI, MARIA ECKE,
ANDREW ECKE, RICHARD ECKE,

*Appellees.*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

REASONS FOR DENYING THE MOTION ...........................................6

I.     THE UST CANNOT MEET THE STRINGENT AND EXTRAORDINARY STANDARD FOR STAYING THE MANDATE ...............................................................................6

      A.    The Supreme Court Has Consistently Denied Certiorari In Cases Involving Nonconsensual Third-Party Releases ....................................................6

      B.    The Real-Life Harm From Delayed Implementation Of The Plan Dwarfs The UST's Academic Concern Over Equitable Mootness ..............8

           1.    *Delaying issuance of the mandate and implementation of the Plan will irreparably harm creditors and the public interest.* ...............9

           2.    *The UST's only "harm" is a speculative risk of equitable mootness.* .........................................19

II.     A TWENTY-ONE DAY ADMINISTRATIVE STAY IS NOT WARRANTED ..........................................................24

CONCLUSION ..................................................................................25

i

# TABLE OF AUTHORITIES

<u>CASES</u>:

*Class Five Nev. Claimants v. Down Corning Corp.*,
　537 U.S. 816 (2002)................................................................7

*Conkright v. Frommert*,
　556 U.S. 1401 (2009)..............................................................8

*Hart Holding Co. v. Drexel Burnham Lambert Grp., Inc.*,
　506 U.S. 1088 (1993).............................................................7

*In re Dow Corning Corp.*,
　280 F.3d 648 (6th Cir. 2002)................................................7

*In re Drexel Burnham Lambert Grp., Inc.*,
　960 F.2d 285 (2d Cir. 1992) .................................................7

*In re Lowenschuss*,
　67 F.3d 1394 (9th Cir. 1995)................................................7

*In re Metromedia Fiber Network, Inc.*,
　416 F.3d 136 (2d Cir. 2005) .........................................19, 21

*In re Millennium Lab Holdings II, LLC*,
　945 F.3d 126 (3d Cir. 2019) .................................................6

*In re Seaside Eng'g & Surveying, Inc.*,
　780 F.3d 1070 (11th Cir. 2015)...........................................7

*ISL Loan Tr. v. Millennium Lab Holdings II, LLC*,
　140 S. Ct. 2805 (2020)...........................................................6

*Lowenschuss v. Resorts Int'l, Inc.*,
　517 U.S 1243 (1996)..............................................................7

*National Heritage Found., Inc. v. Highbourne Found.*,
　760 F.3d 344 (4th Cir. 2014) ...............................................7
　574 U.S. 1076 (2015).............................................................7

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................ 19

*Vision-Park Props., LLC v. Seaside Eng'g & Surveying, LLC*,
  577 U.S. 823 (2015) .............................................................................. 7

*United States v. Silver*,
  954 F.3d 455 (2d Cir. 2020) ........................................................... 6, 8

## STATUTES:

28 U.S.C.
  § 2101(f) ................................................................................................. 24

## OTHER AUTHORITIES:

*Data and Statistics About Opioid Use During Pregnancy*,
  CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 21,
  2023) ...................................................................................................... 10

FED. R. APP. P.
  41(d)(1) ................................................................................................... 6
  41(d)(2)(B)(ii) ...................................................................................... 11

Van Schoik, Michael, *Mo. Attorney General Discusses
  Advances on $500 Million Opioid Settlement, Plus Steps
  Still Needed to Secure Funding*, KY3 NEWS, Sept. 24, 2021 ............... 9

U.S. SUPREME COURT, *Case Distribution Schedule
  (Summer)—October Term 2023* ........................................................ 11

**INTRODUCTION**

Nearly four years ago, the Debtors—facing trillions of dollars' worth of opioid liability across thousands of civil actions—filed the chapter 11 cases giving rise to the U.S. Trustee's ("UST") appeal. Following extensive negotiations among a vast body of differently situated non-federal public creditors (such as States, political subdivisions, public school districts, and tribes), private creditors (such as individuals, hospitals, and third-party payors), the U.S. Department of Justice ("DOJ") and certain federal agencies, the Official Committee, the Debtors, and the Debtors' shareholders (the Sackler family), the bankruptcy court in 2021 confirmed a plan of reorganization (the "Plan"). The Plan, supported at unprecedented levels by virtually every creditor constituency, will provide billions of dollars to abate the opioid crisis and compensate victims. But to date, not a dollar of those life-changing and life-saving funds has been distributed, largely due to the UST's continued challenge to longstanding precedent in this Circuit (and the majority of courts of appeals) upholding nonconsensual third-party releases generally and now the release at issue here ("Release") specifically.

1

The UST concedes, as it must, that "[t]he opioid crisis is an urgent national problem." Mot. 3. The UST also appears to appreciate that "continuing to litigate th[e] question" of whether nonconsensual third-party releases are permissible "would delay the plan's confirmation and thus the distribution of certain benefits to opioid victims." *Id.* Yet even after this Court determined that approval of the Release is entirely consistent with the Bankruptcy Code, and paved the way for the Plan to go into effect by "decid[ing] all pertinent issues necessary to confirm the Plan," Op. 42, the UST seeks a stay of the mandate that (if granted) would stall the distribution of funds for potentially another year or more, and at the very least four months.

This Court should reject the UST's stay request. The Supreme Court has declined to take up the subject of nonconsensual third-party releases *each and every time* it has been presented over the past thirty-plus years. But even more importantly, further delay of Plan implementation will unquestionably cause substantial and irreparable harm to individuals, families, and communities across the United States that are set to receive Plan funds. Tragically, the only party that will benefit from the stay will be the Sacklers.

2

The UST—lacking any economic (let alone personal) interest in the outcome of this appeal—attempts to downplay the harm from delay, casting it as acceptable when understood in context. It also criticizes certain aspects of the Plan as not going far enough to deliver benefits to creditors or to exact retribution from the Sacklers. But those positions cannot surmount the reality that the flow of funds is desperately needed *now*. No amount of money can erase the devastation caused by the Debtors and the Sacklers, particularly for those who have lost loved ones or whose lives have been forever altered. Meanwhile, more than a hundred people continue to die every day from opioid overdose, and countless others continue to suffer from opioid use disorder or become embroiled in opioid use, either by themselves or through others. Consequently, the cost of the opioid crisis and the harm that the UST would impose through its motion must be measured in not just dollars, but in time and the impact on human lives.

It is thus no surprise that *all* creditors—apart from three *pro se* individuals (one of whom did not vote on the Plan) that raised unrelated grievances about the Plan, and a small group of Canadian creditors— have thrown their support behind implementing the Plan as soon as

practicable. In fact, aside from perhaps one *pro se* individual, no creditor who voted against the Plan and arguably objected to the Release in the bankruptcy court may even petition for certiorari. As such, no facts support the idea that the UST's intention to seek certiorari, much less a stay of the mandate, serves the creditors' and the public's interests.

On the contrary, as the statutory fiduciary appointed by the UST itself to represent the interests of all creditors, the Official Committee spent years negotiating the series of settlements embodied in the Plan that will bring billions of dollars into the Debtors' estates for creditors and communities around the country. The Official Committee then urged all creditors to support the Plan because it is the only outcome that maximizes and ensures a fair and timely distribution of a limited amount of funds for opioid abatement and victim compensation.

Critically, it was Purdue's *creditors* that insisted on a Release of all claims against the Sacklers with no opt-outs, thereby preventing hold-out litigants from jumping the line and imperiling payments due under the Plan. Accordingly, while the Sacklers certainly bear responsibility for creating and perpetuating the opioid crisis, it is patently incorrect to

claim that the Release—which creditors helped craft and voted for at an overwhelming rate—was forced upon creditors by the Sacklers.

Nor can the UST saddle the Sacklers with responsibility for any stay-related delay in Plan implementation. To state the obvious, it is the UST—not the Sacklers and certainly not the creditors—that continues to appeal the issue of nonconsensual third-party releases and seeks to prevent the mandate from issuing. Notably, the DOJ has abandoned objections to and even *supported* releases in other cases. Given the UST's lack of any concrete interest in this case, the creditors' alignment in favor of the Plan, and this Court's approval of the Release under a rigorous seven-factor test meant to weed out the very abuse of the bankruptcy system that the UST invokes, the UST's alarmist claims about the need to stop this Plan in particular are unavailing.

In sum, it is well past time that the creditors be permitted to implement the Plan and use the value presented in this case to address the worst man-made public health crisis in this Nation's history. This Court should deny the UST's motion and issue the mandate.

## REASONS FOR DENYING THE MOTION

## I. THE UST CANNOT MEET THE STRINGENT AND EXTRAORDINARY STANDARD FOR STAYING THE MANDATE

The standard for staying a mandate pending the filing of a petition for a writ of certiorari is "stringent and extraordinary":  the UST "must show that the petition would present a substantial question and that there is good cause for a stay." *United States v. Silver*, 954 F.3d 455, 457 (2d Cir. 2020) (quoting FED. R. APP. P. 41(d)(1)).  The UST comes up short on both prongs of the analysis.

### A. The Supreme Court Has Consistently Denied Certiorari In Cases Involving Nonconsensual Third-Party Releases

The UST cannot demonstrate that there is "a reasonable probability that four justices will vote to grant certiorari," much less that there is "a fair prospect that five justices will vote to reverse the Panel's judgment." *Silver*, 954 F.3d at 458 (internal quotation marks omitted). Indeed, the Supreme Court has repeatedly and recently declined to review decisions upholding nonconsensual third-party releases— including in several cases that the UST claims are part of a circuit conflict. Mot. 11-12; *see, e.g., In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium*

*Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070 (11th Cir.), *cert. denied sub nom. Vision-Park Props., LLC v. Seaside Eng'g & Surveying, LLC*, 577 U.S. 823 (2015); *National Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344 (4th Cir. 2014), *cert. denied*, 574 U.S. 1076 (2015); *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir.), *cert. denied sub nom. Class Five Nev. Claimants v. Down Corning Corp.*, 537 U.S. 816 (2002); *see also In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), *cert. denied sub nom. Lowenschuss v. Resorts Int'l, Inc.*, 517 U.S 1243 (1996).

In addition, the Panel's decision does not alter the balance of any (alleged) conflict. *See* SPA-261-264. Rather, it simply maintains the status quo by confirming what this Court has held for at least thirty years: "In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." Op. 57 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), *cert. denied sub nom. Hart Holding Co. v. Drexel Burnham Lambert Grp., Inc.*, 506 U.S. 1088 (1993)). If, as the UST insists (Mot. 12-16), the majority of courts of appeals have been misinterpreting the Bankruptcy Code in

7

contravention of Supreme Court precedent for decades, presumably the Court would have accepted one of numerous invitations to say so.

Thus, this case presents the rare occasion where the Supreme Court has already shown its hand on the "substantial question" prong. Plainly, the Court has not shared the UST's view that the propriety of nonconsensual third-party releases warrants further review. The UST's rehash of its merits arguments on appeal—already rejected by this Court as inconsistent with Supreme Court precedent, *see, e.g.*, Op. 52-54—does not make them any more substantial or likely to be taken up and accepted by the Supreme Court. *See Silver*, 954 F.3d at 458.

## B. The Real-Life Harm From Delayed Implementation Of The Plan Dwarfs The UST's Academic Concern Over Equitable Mootness

Even assuming the UST can make the "exceptional showing" of a substantial question, the UST still must demonstrate "good cause" to stay the mandate. That is because the "decision to do so" remains "a matter of discretion," *Silver*, 954 F.3d at 458 (internal quotation marks omitted), which must be exercised in view of "the relative harms to applicant and respondent, as well as the interests of the public at large," *Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009) (Ginsburg, J., in chambers).

Here, the balance of equities tips decidedly *against* staying the mandate. The cost of delaying issuance of the mandate and implementation of the Plan will be measured in, most poignantly, human lives ravaged by the ongoing opioid crisis. By comparison, the UST—a non-creditor with no financial interest in the outcome of this appeal, purporting to proceed in the name of the "public interest"—can claim only the speculative risk of equitable mootness. The UST's inability to demonstrate "good cause" is thus not a close call.

> 1. *Delaying issuance of the mandate and implementation of the Plan will irreparably harm creditors and the public interest.*

**a.** The Plan is critical to addressing the ongoing opioid epidemic, which has seen more than 500,000 American lives already lost. With the emergence of new and more dangerous waves of synthetic opioids, like fentanyl, that number only continues to grow. As one State Attorney General has pointed out in stark terms, deaths from opioid overdoses alone are equivalent to the loss of life from a plane crashing every day for years on end.[1] Similarly, the Centers for Disease Control and Prevention

---

[1] Michael Van Schoik, *Mo. Attorney General Discusses Advances on $500 Million Opioid Settlement, Plus Steps Still Needed to Secure Funding*, KY3 NEWS, Sept. 24, 2021, https://www.ky3.com/2021/09/25/ky3-

have reported that a child is born with neonatal abstinence syndrome ("NAS") due to opioid exposure in utero every 24 minutes.[2]

The Plan combats this ongoing crisis by providing at least $6 billion for opioid abatement. Those funds will be used to finance critical abatement programs, potentially including counseling, peer support, harm reduction, education, various community organizations that serve those with Opioid Use Disorder, medication-assisted treatment centers, clean syringe centers, organizations for children born with NAS, hospital programming, and public school districts' special needs programs.

The Plan also provides $700-750 million to compensate victims of the opioid epidemic directly, helping them support their daily needs and rebuild lives and families devastated by opioid addiction. Notably, that amount of victim compensation is more than *twice* the amount of money that has been provided or agreed upon for victim compensation in the

---

exclusive-mo-attorney-general-discusses-advances-500-million-opioid-settlement-plus-steps-still-needed-secure-funding/ ("'There are over 120 people who die every day from opioid overdoses,' [Missouri Attorney General Eric] Schmitt said. 'That's like a plane going down every day of every week of every month of every year.'").

[2] *Data and Statistics About Opioid Use During Pregnancy*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 21, 2023), https://www.cdc.gov/pregnancy/opioids/data.html.

three other opioid manufacturer bankruptcy cases (Insys Therapeutics, Inc., Mallinckrodt plc, and Endo International plc) *combined*. And it is made all the more important by the fact that the recent, well-publicized non-bankruptcy settlements between public entities and opioid defendants—such as McKesson Corp., Johnson & Johnson, and CVS—have provided no money whatsoever to private claimants.

Given the daily toll that the opioid crisis exacts, the need for those funds *now* cannot be overstated. If the UST obtains a stay, that will mean at least a four-month delay[3] before the Debtors and other parties can even resume setting up the trusts and other structures necessary to effectuate the Plan. And if the Supreme Court grants certiorari, victims of the opioid crisis will face at least another year's delay before they obtain any relief from upwards of $7 billion available in this case. *See* FED. R. APP. P. 41(d)(2)(B)(ii).

---

[3] Based on default briefing deadlines, the Supreme Court will consider a petition filed on August 28, 2023, at its October 27, 2023 conference. *See* U.S. SUPREME COURT, *Case Distribution Schedule (Summer)—October Term 2023*, https://www.supremecourt.gov/casedistribution/casedistributionschedule2023summer.pdf.

Those delays will have dire, real-world consequences for those desperately waiting for the Plan's aid. Each day that funds are held back means another day that abatement programs will not be funded, overdose reversal medicine will not be distributed, community centers will not receive needed funding, children born with NAS will be left to suffer unnecessarily, those alive will be unable to pay for medical and other essential services, and victims and their families will not be compensated. In short, delay means one thing: lives that could have been bettered or saved will instead be imperiled or lost.

*b.* The UST states that it is "sensitive" to those harms and "does not take lightly the step of pursuing further review." Mot. 3, 19. Be that as it may, the stay sought by the UST undoubtedly will exacerbate those harms, and the "justifications" offered by the UST for doing so ring hollow.

*First*, for all of the UST's focus on the Sacklers, it cannot avoid a simple truth: its request for a stay will prevent the flow of funds for opioid abatement and victim compensation. That is not a result "of the Sacklers' own making"; it is the UST that is "continuing to litigate." Mot. 3, 19.

12

The UST nonetheless reasons that the Sacklers have forced the UST's hand by insisting on a Release with no opt-outs. But that ignores the fact that the *creditors* demanded such a Release as the only way to achieve an equitable distribution of funds. Ceding the exclusive right to continue litigation against the Sacklers to a small number of holdout creditors would be unfair and unjust; if litigation by those dissenting creditors were allowed to proceed, recovery under the Plan could be jeopardized by massive damages awards that would deplete the *res*. The Release thus accomplishes a core bankruptcy goal by facilitating the fair and agreed distribution of billions of dollars that cannot possibly cover the trillion-dollar universe of potential claims, even if the Sacklers were to hand over their entire estates to the creditors. *See* Op. 74.

Relatedly, although the UST tries to tie the Plan as a whole as tightly as it can to the Sacklers, it is the *creditors'* Plan and reflects the *creditors'* priorities. That is why the Plan calls for the vast majority of distributions to be used solely for purposes of abating the opioid crisis and compensating personal injury victims. That is also why the Plan is structured around at least twenty interlocking compromises that allocate value among a diverse set of opioid claimants in order to avoid extensive,

13

value-destructive litigation between creditor groups. Claimants took a lead role in formulating this outcome by, among other things: (i) mediating the allocation of value among themselves; (ii) performing a thorough investigation of Purdue and the Sacklers; (iii) negotiating not only an economic settlement with the Sacklers but one that also limits their naming rights and prohibits their involvement in the opioid business; (iv) establishing a framework for reorganizing Purdue; (v) mandating the creation of a document repository with millions of documents, including thousands of privileged documents; and (vi) setting the rules for the use of the money for claimants, including entirely new and bespoke rules for abatement, monitoring, and reporting.

*Second*, the UST attempts to deemphasize the irreparable harm that a stay of the mandate would cause by downplaying the Plan's benefits and the impact of further delay on distributing much-needed funds. In particular, the UST emphasizes (Mot. 6) that most opioid victims will receive "between $3,500 and $48,000" in direct payments, implying that those sums are insubstantial. Not so. As the Official Committee recognizes, and the UST apparently does not, every single dollar maters to those whose lives have been ravaged by the opioid crisis.

14

Even a few thousand dollars can literally be the difference between life and death.

The UST's argument also gives short shrift to the Plan's substantial funding of critical abatement programs, which are likewise desperately needed by the communities and individuals they are designed to aid. *See* pp. 10, 12, *supra.* All of that is part of the compromise that the *creditors* reached in this case. The creditors' acceptance of the Plan's terms, not the UST's view of what those creditors *should* receive, is the relevant data point.

Having misapprehended the Plan's benefits, it is predictable that the UST also misapprehends the immediacy of its impact. The UST wrongly suggests that a stay will cause little harm because the Plan "would not result in the imminent distribution of benefits on a large scale." Mot. 3. To the contrary, on the effective date of the Plan, well in excess of $1 billion will be distributed to a variety of trusts, with nearly half-a-billion dollars more to be distributed within the six months thereafter. But setting aside any abstract debate about how much is enough, what is indisputable is that a stay would push out any payments, compounding delay on delay.

The UST's passing suggestion (Mot. 4, 20) that the parties can make up for any delay by renegotiating an accelerated payment schedule with the Sacklers is rank speculation. Even if this were so—and the UST offers no reason to believe that it is—it could not make up for the lives that would be destroyed or even lost in the meantime.

*Third*, the UST submits (Mot. 7-8) that further review is necessary to vindicate the interests of the silent masses, including because fewer than 20% of the claimants entitled to vote did so. But votes not cast are just that; they are not presumed to be votes *against* the Plan. What counts in a bankruptcy are those who choose to make their voices heard. On that score, claimants in this case "voted overwhelmingly to approve the Plan," with "[o]ver 95% of the personal injury classes vot[ing] to accept." Op. 74.

Specifically, 120,000 votes were cast on the Plan, with over 115,000 in favor (more than any other case of which the Official Committee is aware), including by States, political subdivisions, Native American Tribes, public schools, hospitals, third-party payors—and, of course, individual victims as well as guardians ad litem and parents of children born with NAS. In addition to the Official Committee, each of the eight

16

ad hoc creditor groups formed in this case likewise supported the Plan. Op. 22. And perhaps most importantly, no voting creditor is left objecting to the Plan other than two *pro se* victims (the third did not vote) and a small group of Canadian creditors—out of 620,000 creditors entitled to vote, accounting for approximately one thousandth of one percent. *See* Op. 32-33, 38-39, 74. Accordingly, the factual record refutes the UST's attempt to create a sense of broad opposition to the Release among creditors that simply does not exist.

*Finally*, the UST offers false comfort by suggesting that there are "several alternative routes to confirm a reorganization plan." Mot. 4. The UST's unsubstantiated suggestion ignores that an overwhelming number of creditors—and every organized creditor group in this case—made the considered and hard-fought decision following years of collective efforts to choose *this* Plan as the best available alternative, because *there is no other alternative.* Indeed, given the dire need for money, and the fact that nearly as much time in this case has passed since the Plan was confirmed as before, if the creditors believed there was another route to confirm a plan that would bring this much value to claimants and would be

17

supported by the overwhelming majority that supports this Plan, they would have pursued it.

Furthermore, the U.S. government holds a superpriority claim, with the ability to recover from the estate before any other claimant's number is called. Op. 19. The U.S. government has agreed to relinquish the majority of its superpriority claim given the satisfaction of certain conditions, which the Plan meets. *Id.* Without the Plan, however "the government would recover its $2 billion first, thereby depleting the *res* completely. As a result, many victims of the opioid crisis would go without any assistance and face an uphill battle of litigation (in which a single claimant might disproportionately recover) without fair distribution," because the only estate asset remaining would be litigation claims against the Sacklers. Op. 70-71.

The UST's position throughout this appeal, but especially in its attempt to stay the Court's mandate, discounts the real and difficult choices the vast unsecured claimant body has had to make. The UST has never been harmed by opioids, and it holds no claim based on an injury from opioids or the Sacklers. The UST's lip service to the overwhelming harms that will by caused by a delay of the mandate should not be

countenanced over the creditors' concrete experiences with the opioid crisis.

### 2. The UST's only "harm" is a speculative risk of equitable mootness.

For its part, the UST's only claimed harm in the absence of a stay of the mandate is the prospect that the Supreme Court would dismiss a further appeal under the doctrine of equitable mootness and thus lose this particular opportunity to decide the question presented. But the UST offers only speculation in support of that alleged harm. *Cf. Nken v. Holder*, 556 U.S. 418, 434-435 (2009).

Most fundamentally, equitable mootness is applicable only after substantial consummation of a plan of reorganization, an event typically keyed to a plan's effective date. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005). Although the UST asserts (Mot. 4, 16-17) that substantial consummation would follow "swiftly" from the district court's entry of a final judgment approving the Plan on remand, that is untrue. At the very least, the Plan cannot become effective until after Purdue is criminally sentenced. By agreement, the sentencing cannot occur for at least 75 days following entry of the confirmation order on remand to the district court, and consummation cannot take place

19

until at least 7 days after the sentencing. JA-4800. That is a "best case" scenario, which assumes that all of the trusts and other structures necessary to implement the Plan have been put in place. The UST has not even attempted to demonstrate that all of that is likely to occur prior to the Supreme Court considering a petition, filed no later than August 28, 2023, at its October 27, 2023 conference (under a default briefing schedule). *See* note 3, *supra*. Assuming the Court does grant certiorari, the UST can seek the same relief as it does now at that juncture.

Even in the scenario where the Supreme Court were to grant review but not a stay, and rule solely on equitable mootness grounds, it is unclear how the *UST* would be harmed. The UST's invocation of equitable mootness here is especially weak; it is not a creditor with a released claim that will be affected by the outcome of this appeal. By contrast, the UST has already identified (Mot. 19) another case on appeal in which the U.S. government has objected to a nonconsensual third-party release in its capacity as a creditor, thereby ensuring that the Supreme Court will have ample opportunities in more appropriate cases to take up the issue.

20

In that regard, despite all of the UST's criticisms (Mot. 18-19) of the Release in this case, it has not insisted on continuing to challenge them in other bankruptcy cases involving opioids (*e.g.*, Mallinckrodt plc) or mass tort cases more broadly (*e.g.*, Boy Scouts of America). In fact, the DOJ has recently taken the position that nonconsensual third-party releases are "permissible," endorsing the same types of "legal and factual standards" as the Panel did here. Brief of United States at 23-27, *In re Exide Holdings, Inc.*, No. 1:20-cv-1402-RGA, 2021 WL 3145612 (D. Del. July 26, 2021), ECF No. 59. All of that raises the question of why the UST has taken a hard line against this Release.

The UST views the Panel's decision as having opened the door to "abuse." Mot. 2. But nonconsensual third-party releases have been permitted in "rare cases" for decades, in not just the Second Circuit but most courts of appeals, without upending the bankruptcy system. *In re Metromedia*, 416 F.3d at 141. If anything, the Panel's clarification of the governing standard through a comprehensive seven-factor test—the sole purpose of which is to guard against gamesmanship, most notably by ensuring the type of overwhelming creditor support present here—makes it even more difficult to secure approval of such a release. *See* Op. 62-68.

21

To the extent that the UST finds the approval of the Release here to be inappropriate, that position runs headlong into the Panel's reasoning and the reality of these chapter 11 cases at every turn. Contrary to the UST's characterization that a sweeping release was widely opposed by creditors and foisted upon the parties by the Sacklers in exchange for little value (Mot. 18-19), it bears repeating that:

- the already carefully defined Release, crafted by the creditors and other stakeholders, has been further narrowed by the bankruptcy court to reach only those third-party claims that overlap sufficiently with claims against the Debtors, consistent with settled jurisdictional limits that the UST does not contest;

- obtaining the Sacklers' contribution through a settlement is unmistakably favorable to tort victims, because in its absence the value of the Debtors' estates other than Sackler litigation claims would be wiped away by (ironically) the United States' $2 billion superpriority claim, and recovery against the Sacklers would involve a free-for-all in piecemeal litigation in which a single claimant might be disproportionally compensated relative to others that receive nothing;

- because the valuation of claims at an estimated $40 *trillion* far exceeds the total funds available, as well as the Sacklers' personal wealth of approximately $11 billion, "it is not possible to require full payment of all claims";

- "[f]ive and a half billion dollars—purportedly the largest contribution in history for such releases—is a significant sum";

- notice of the confirmation reached 98% of adults in the United States and 86% of adults in Canada, creditors voted overwhelmingly to accept the Plan, and the bankruptcy court

held a six-day confirmation hearing at which it provided objectors (including *pro ses*) the opportunity to be heard.

Op. 22, 68-79.  The UST thus gets the public interest in this case exactly backwards—for the very reasons set forth in the Panel's decision.

The UST also complains (Mot. 19) that the Panel's reasoning threatens the public interest by failing to confine nonconsensual third-party releases to private citizens or civil claims.  But that is an especially odd distinction for the UST to press here because the Release does *not* extinguish the claims of the U.S. government or criminal claims.  *See* Mot. 1-2.  And with the additional settlement with the once-objecting states, all forty-eight states that did not settle in advance of the bankruptcy case and the District of Columbia, together with every participating Territory of the United States, now support the Plan. Op. 38-39.  That means "the main challenge to this appeal is not by creditors, but by the Trustee—a government entity without a financial stake in the litigation." Op. 74.  Accordingly, the UST's views are at odds with those of government entities, which have made the real-world decision on behalf of their constituencies to support the Plan.  The UST therefore is not the voice of the public's interest.

\* \* \*

23

At bottom, it is unclear why the UST has chosen this case (of all cases) to take a stand on nonconsensual third-party releases, notwithstanding the near-universal support for the Plan's many benefits and the manifest countervailing harms associated with a stay of the mandate pending further review. The UST's motion only confirms that its litigation position continues to be out of touch with reality. This Court should deny the motion to stay the mandate and permit the parties to take steps to effectuate the Plan.

## II. A TWENTY-ONE DAY ADMINISTRATIVE STAY IS NOT WARRANTED

As a backup, the UST requests (Mot. 5, 21) that, in the event a stay of the mandate is denied, this Court administratively stay the mandate for twenty-one days. But there is *no* possibility that the parties would consummate the Plan within twenty-one days of issuance of the mandate. *See* pp. 19-20, *supra*. Accordingly, an administrative stay of that duration would have no effect on the UST's ability to seek relief from the Supreme Court. *See* 28 U.S.C. § 2101(f).

At the same time, each day that the parties may take steps to effectuate the Plan will potentially save hundreds of lives by accelerating an exit from these chapter 11 cases that the Panel has already endorsed.

24

The implementation of the *creditors'* Plan has been held hostage to the appellate process for nearly two years. This Court should not risk any further (and needless) delay, even for twenty-one days.

## CONCLUSION

This Court should deny the UST's motion to stay issuance of the mandate, as well as the UST's contingent request for a twenty-one-day administrative stay, and issue the mandate.

Respectfully submitted,

/s/ Mitchell P. Hurley

Z.W. Julius Chen
AKIN GUMP STRAUSS HAUER
   & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000

Erik Y. Preis
Mitchell P. Hurley
Sara L. Brauner
AKIN GUMP STRAUSS HAUER
   & FELD LLP
One Bryant Park
44th Floor
New York, NY 10036
(212) 872-1000
apreis@akingump.com

*Counsel for The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*

Dated: July 17, 2023

25

# CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Century Schoolbook proportional font and contains 5,044 words, and thus complies with Federal Rule of Appellate Procedure 27(d).

Dated:     July 17, 2023

_/s/ Mitchell P. Hurley_
Mitchell P. Hurley

# CERTIFICATE OF SERVICE

I hereby certify that, on July 17, 2023, I electronically filed the foregoing with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system, except for the following, who will be served:

via email and Express Mail:

> Ellen Isaacs, on behalf of Patrick
>   Ryan Wroblewski
> P.O. Box 725
> Floyd, VA 24091
>
> *Pro Se*

via email and UPS overnight delivery:

Ronald Bass
450 Little Place, Apt. 53
N. Plainfield, NJ 07060

*Pro Se*

Maria Ecke
8 Glenbrook Dr.
West Simsbury, CT 06092

*Pro Se*

Andrew Ecke
18 Meadowlark Rd
West Simsbury, CT 06092

*Pro Se*

Richard Ecke
18 Meadowlark Rd
West Simsbury, CT 06092

*Pro Se*

*/s/ Mitchell P. Hurley*
Mitchell P. Hurley